# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| PLAINTIFF, | : | |
| v. | : | CASE NO. 2:09 cr 085 |
| | | JUDGE GRAHAM |
| RICHARD BISTLINE, | : | |
| DEFENDANT. | : | |

## UNITED STATES SUPPLEMENTAL SENTENCING MEMORANDUM

The United States files this supplemental sentencing memorandum to address the weight to be given U.S.S.G. § 2G2.2 in this child pornography possession case pursuant to its request to do so at the November 12, 2009, sentencing hearing.

### I. Background

Defendant Bistline's advisory guidelines for possession of child pornography were calculated at an offense level 26, criminal history category I resulting in a sentencing range of 63 to 78 months pursuant to U.S.S.G. § 2G2.2; however, the United States Probation Officer recommended a sentence of 24 months. The United States requested a guideline sentence and defendant asked for probation. The court pronounced a sentence of one day imprisonment, ten years of supervised release with one month of home confinement and various restrictions on defendant's access to a computer and to minor children. The Court made an exception, however, allowing defendant to have unsupervised access to his own grandchildren. The ages and genders of those grandchildren are unknown to the United States as the information is not in the record.

1

The United States raised several objections to the sentence announced including the Court's decision to give little weight to the guidelines without allowing the parties to brief the issue. The hearing was continued so that the issue could be briefed.

Defendant informed probation that he had begun downloading child pornography after typing in "Lolita" as a search term on his computer in 2005 or 2006. PSI at ¶ 18. He continued to download child pornography on various occasions until he was caught in October, 2009. *Id.* Defendant used Limewire to download child pornography and acknowledged that he eventually discovered that it was a file sharing program. *Id.* Defendant possessed "305 digital images and 56 digital movie files containing child pornography of prepubescent minor females." ¶ 14. Each movie counts as 75 images, thus defendant possessed a total of 4,505 images. ¶ 26; *See,* § 2G2.2, commentary at Application Note 4.(B)(ii). The guideline also suggests an upward departure if the length of the visual depiction is substantially more than 5 minutes. *Id.* As set forth in the United States letter to probation on July 9, 2009, attached hereto as Ex. 1, "several [movies] were 15 minutes to 20 minutes long." The images and movies are primarily of little girls between the ages of 8 and 9 and included hard core images involving adults engaged in sexually explicit contact with children. PSI at ¶ 14.

The United States informed probation that the images included rape of prepubescent girls and that one movie involved bestiality, the PSI mentions neither the content nor the length of the videos as a reason for a departure or variance. Ex. 1; PSI at ¶ 72. Instead the PSI states that a deviation may be considered because the defendant is a 66 year old college educated man with health problems who assists in providing care for his wife. PSI at ¶ 72. The images were delivered to the Court at its request for its review and accordingly, the United States will submit

them to the Court to include in the record under seal separate from this Memorandum. Defendant's collection of child pornography was discovered by undercover agents in Florida and Maryland when he shared images with them through Limewire. PSI at ¶ 11; Statement of Facts at arraignment.

When defendant had not filed a sentencing memorandum five days before the hearing, the United States filed its Sentencing Memorandum in which it discussed the 3553(a) factors and pre-emptively anticipated that the defendant might raise criticisms of the guidelines. Without defendant's disclosure of its legal or factual positions, the United States merely noted recent criticisms of the child pornography guideline and discussed the lack of similarity to the situation engendered by the crack/powder cocaine guideline resolved by *Kimbrough v. United States*, 128 S. Ct. 558, 574, (2007). The United States had recently had a child pornography possession case before this same judge in which defendant was sentenced to 36 months imprisonment, which was a downward departure. However, in that case, the Court did not mention any dissatisfaction with the guideline despite arguments addressing those criticisms in the parties' sentencing memoranda. *See, United States v. Hartley*, Case No. CR2-08-0187 (S.D. OH), sentenced on April 29, 2009.

Defendant Bistline eventually filed a sentencing memorandum the day before the Sentencing Hearing in which he referred to but did not discuss a memorandum written by Troy Stabenow, Assistant Federal Public Defender in the Western District of Missouri, Jefferson City Branch Office, dated January 1, 2009.[1]  Defendant also referenced a cite to the Stabenow article

---

[1] "Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines." It is noted that the revised version of the memorandum is on the www.fd.org website. It was amended after a United States Attorney's Office intern wrote a point

3

contained within an article published by the ABA Journal entitled "Reluctant Rebellion."

Defendant also cited three district court cases from outside this circuit and a Third Circuit and a

Seventh Circuit case in support of his request for a sentence of probation.

This Court relied on the Stabenow memorandum, mentioned Ohio State professor Doug

Berman, indicated that the guideline is the result of political influence, cited defendant's cases as

well as a Northern District of Ohio case, a very recent case from the Southern District of West

Virginia and a recent Sixth Circuit case affirming a one day sentence, *United States v. Stall,* 581

F.3d 276 (6th Cir. 2009). This Court then concluded that the applicable guideline would be given

little weight.

This Memorandum will address the role of Congress as being entitled to equal weight in

formulating the guidelines as the Sentencing Commission, the questionable foundation of some

of the materials relied on by defendant and the Court to discount the weight to be given to the

guideline, the rationale underlying the serious crime of possession of child pornography.

## II. The Congressional Role in the Development of the Guidelines Is Part of the Scheme

The government accepts the fact, as it must, that some courts have come to the conclusion

that the child pornography guidelines are of less value despite the findings of Congress and the

study by the Sentencing Commission discussed in the next section herein. Other courts faced

with the same arguments regarding the guidelines have acknowledged their power to discount the

guideline, but have not found good reason to do so. As one court explained:

> The court is aware it has the power to vary downward on purely policy grounds or
> for some alleged defect in the Guidelines. However, the court declines to follow

---

by point fact check of the original June, 2008, article.

4

Defendant's cited district court cases.... Unlike Defendant, the defendants in *Stern, Baird* and *Shipley* did not produce child pornography. ... Defendant is not similarly situated to such defendants.

*In any event, the court respectfully believes Defendant's cited district court cases were wrongly decided. In the undersigned's view, the sentences imposed in Stern, Baird and Shipley understate the seriousness of the offenses under consideration and fail to promote respect for the law and provide just punishment. See, e.g., Stern,* 590 F.Supp.2d at 959-61 (varying downward from 46 to 57 months of imprisonment to 12 months and 1 day...); *Baird,* 580 F.Supp.2d at 892-96 (varying downward from a Guidelines range of 46 to 57 months of imprisonment to a sentence of 24 months...); *Shipley,* 560 F.Supp.2d at 742-46 (varying downward from a range of 210 to 240 months of imprisonment to 90 months of imprisonment,...);... . Such sentences increase sentencing disparity...

*United States v. Fiorella,* 602 F. Supp. 2d 1057, 1074-76 (S.D. IA 2009).(emphasis added).

More importantly, the Sixth Circuit has already spoken on this issue and bound this Court not to dismiss the findings and directives of Congress. A child pornography defendant argued that the guidelines "no longer reflect the expertise of the Sentencing Commission" and that they have been distorted by congressional meddling. *United States v. Kirchhof*, 505 F. 3d 409, 414 (6th Cir. 2007). The Sixth Circuit found the argument unpersuasive:

However, Kirchhof fails to recognize that it is the prerogative of Congress to fix the sentence for a federal crime and the scope of judicial discretion with respect to a sentence. *Mistretta v. United States*, 488 U.S. 361, 364...(1989). As Kirchhof does not suggest that the modifications to the guidelines are unconstitutional, *it is not the court's role to second-guess the legislative determination of appropriate sentences made by Congress.* See, *United States v. Caver*, 470 F.3d 220, 249 (6th Cir. 2006). (emphasis added)

The Supreme Court has also weighed in on this issue, but not in the child pornography context, stating that "Congress has delegated to the Commission significant discretion in formulating guidelines.... Broad as that discretion may be, however, it must bow to the specific directives of Congress." *United States v. LaBonte*, 520 U.S. 751, 757 (1997).

5

Thus, the criticism by the sources cited by defendant (Stabenow and Reluctant Rebellion) that the guidelines for child exploitation offenses were not developed using an empirical approach by the Sentencing Commission, but rather were mainly promulgated in response to statutory directives is unsound.  The Sentencing Commission's characteristic institutional role is not limited to cataloguing past sentencing practice, but includes revising the Guidelines in response to directives from Congress.  See generally U.S.S.G. Ch. 1, part a.4.d; Ilene H. Nagel, Structuring Sentencing Discretion: The New Federal Sentencing Guidelines, 80 J. CRIM. L. & CRIMINOLOGY 883, 927-32 (1990).  The Sentencing Commission just published its "History of the Child Pornography Guidelines"[2] in which it began by reviewing the Sentencing Reform Act ("SRA") requirements and its procedural process in promulgating guidelines.  *History* at 2-6.  It described the Congressional role, belittled by Stabenow and by some court decisions, thus:

> Notwithstanding the delegation of authority provided to the Commission in the SRA, congress retained ultimate authority over the federal sentencing guidelines. The guideline amendment cycle described above by statute culminates with the submission of promulgated amendments to Congress for its review.... During the pendency of the amendments, Congress may modify or reject submitted amendments.
>
> * * *
>
> In addition to its power to disapprove guideline amendments, Congress retains the ability to influence federal sentencing policy by enacting directives to the Commission. These directives may be general or specific. When Congress enacts such a provision, the Commission is obliged to implement in a manner consistent with the legislation.

*Id.; see* 28 U.S.C. § 994(a).

Accordingly, as the Supreme Court has recognized, the Commission's "empirical approach" began with an examination of past sentencing practice and then proceeded to

---

[2]Available on the Commission's website at www.ussc.gov.

"modifying and adjusting past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional directives, and the like." *Rita*, 127 S. Ct. at 2464 (citing the United States Sentencing Guidelines Manual). It is thus simultaneously correct that the Guidelines for child-pornography-possession offenses account for congressional directives, and that they are the product of the Sentencing Commission's characteristic institutional role. *See United States v. Pugh*, 515 F.3d 1179, 1201 n. 15 (11th Cir. 2008) (explaining that applicable Guidelines "do not exhibit the deficiencies" of the crack cocaine ones, which were based on neither past practice nor congressional directive); *United States v. Goldberg*, 491 F.3d 668, 673 (7th Cir.), *cert. denied*, 128 S. Ct. 666 (2007).

Merely implicating Congress for actively taking a role in the state of the guideline today in order to give less weight to the guideline does not stand up as Congress and the Commission have each acted as the law anticipated they would and as the law directly allows and prescribes.

## III. The Societal Harm and Harm to the Victims in the Possession of Child Pornography

At sentencing, defense counsel remarked, and the Court's comments seemed to agree, that defendant was just viewing images in the privacy of his own home.[3] This statement reflects the views of Mark Hansen's article "A Reluctant Rebellion," (cited by defendant) which appeared in the June 2009 issue of the ABA Journal and the underlying viewpoint in FPD Stabenow's so-called deconstructing of the guideline.[4] The Reluctant Rebellion article and

---

[3]Of course, if that statement were true, Mr. Bistline's interest in images of young girls being sexually abused would not have come to the attention of a task force of investigators in Florida and the attention of the FBI. He kept his images in a "shared" folder and the only purpose of that "shared" folder is to share the images with other Limewire users.

[4]Hanson, Stabenow and the cases which rely on their flawed analysis are sometimes referred to herein as the 'deconstructionists.'

7

Stabenow raise questions about how seriously child pornography should be treated and in doing so they perpetuate fundamental misunderstandings about the nature of the crime, the offenders, and the law.  When properly understood, the criminal provisions and sentences for these "pernicious crimes show an appropriate response to an exploding crime problem."  (A Response to "A Reluctant Rebellion," by Alexandra Gelber, Assistant Deputy Chief, Child Exploitation and Obscenity Section, Criminal Division, United States Department of Justice, July 1, 2009 , hereinafter "Gelber Resp.").[5]

***The True Nature of These Images:***  The phrase "child porn," used repeatedly by Mr. Hansen throughout his article, masks the true nature of what the material portrays, which is permanent evidence of the sexual abuse of children.  In the 1970's and 80's, before possession of images was illegal, the typical interstate child pornography case involved photos of nude children in sexual poses.  See, e.g., *United States v. Petrov*, 747 F.2d 824, 829 (2d Cir. 1984); *United States v. Weigand*, 812 F.2d 1239, 1241 (9th Cir. 1987); *United States v. Dost*, 636 F. Supp. 828, 833 (S.D. Cal. 1986).  However, increasingly severe images have started to become the norm instead of the exception, depicting the violent sexual abuse of younger children, including infants and toddlers.[6] *See e.g.*, *United States v. Cole*, 2009 WL 1443937 *1 (6th Cir. May 22, 2009) (unpublished) (defendant admitted to possessing images of adult males engaged in sexual activity with infants); *United States v. Pugh*, 515 F.3d 1179, 1193 (11th Cir. 2008) (included a video of an adult male

---

[5]Much of the information in this section has been excerpted from the "Gelber Response" with her permission.

[6]The statistics surrounding child pornography are alarming.  An estimated 58% of children used in such images today are prepubescent and 6% are infants.  The National Center for Missing and Exploited Children, http://www.missingkids.com/missingkids/servlet/ NewsEventServlet?LanguageCountry=en_US&PageId=3142.

raping an infant girl and a picture of an adult male having sex with a toddler who wore a dog

collar around her neck). As Ms. Gelber notes:

> Thus, the collection, trade, and possession of such images are not illegal because
> of "polite society's disgust and revulsion" with pornography, or as one judge put
> it, "[o]ur 'social revulsion' against these 'misfits.'" *United States v. Paull*, 551
> F.3d 516, 533 (6th Cir. 2009) (Merritt, J., dissenting). The heart of a child
> pornography case is not Victorian-era discomfort with sex, but the sexual
> exploitation of children through the ongoing mass circulation of images of their
> abuse. As the Supreme Court noted in *New York v. Ferber*, 458 U.S. 747, 756-57,
> 58 (1982), "It is evident beyond the need for elaboration that a State's interest in
> safeguarding the physical and psychological well-being of a minor is compelling
> ... [and that] the use of children as subjects of pornographic materials is harmful to
> the physiological, emotional, and mental health of the child" (internal quotation
> and citation omitted).

***The True Nature of the Harm Caused to the Victims:*** The trade of these images of the sexual

abuse of children inflicts unique harms upon its victims. As expressed by one victim, who

survived a murder attempt by her mother, and five years of sexual abuse, when she was aged 5-

10, by her adopted father who shared images of that abuse (and also kept her chained in the

basement and intentionally malnourished), "Usually, when a kid is hurt and the abuser goes to

prison, the abuse is over. But because [the defendant] put my pictures on the Internet the abuse is

still going on. Anyone can see them. People are still downloading them ... I'm more upset about

the pictures on the Internet than I am about what [the defendant] did to me physically."

The Supreme Court's view on these images, as it explained more than two decades ago,

reflects that victim's sentiment:

> The distribution of photographs and films depicting sexual activity by juveniles is
> intrinsically related to the sexual abuse of children ... [T]he materials produced are
> a permanent record of the children's participation and *the harm to the child is
> exacerbated by their circulation* ... [P]ornography poses an even greater threat to
> the child victim than does sexual abuse or prostitution. Because the child's
> actions are reduced to a recording, the pornography may haunt him in future years,

9

> long after the original misdeed took place.   A child who has posed for a camera
> must go through life knowing that the recording is circulating within the mass
> distribution system for child pornography.

*Ferber*, 458 U.S. at 759-60 and n.10 (internal citations omitted) (emphasis added).

**The True Dynamic of the Crime:**  In addition to severely downplaying the content and trafficking of these illegal images,  Mr. Hansen's article also misrepresents the true dynamics of this crime, which he describes as the "swapping" of images in the "presumed privacy" of a defendant's own home.  In a similar vein, FPD Stabenow wrongly characterizes these defendants as the passive viewers of the crimes of others.  This Court has also seems to have adopted this position at sentencing.

The possession of child pornography is properly prohibited by law, even when it is in "private."  *Osborne v. Ohio*, 495 U.S. 103, 110-11 (1990) (affirming the constitutionality of laws prohibiting possession of child pornography).  It is simply not possible to disconnect the collection, trade, viewing, and possession of these images from their production.  Every defendant who receives sexually abusive images of children is not acting within the four corners of his own home, but rather is a participant in what Mr. Hansen and this Court acknowledge is a global market with millions of members–a market which constantly demands that more children be abused in order to create new images.  The term "market" is not limited to the payment for such images.  Child pornography images themselves are their own currency.  Having images allows one to trade to get more images.   Limewire works on the principle that the search engine works harder if the user shares more material.  Possessors are the engine of demand that fuels the molestation of children to create more supply.

10

The Supreme Court recognized this dynamic over 25 years ago when it wrote, "the distribution network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled." *Ferber*, 458 U.S. at 759. The Supreme Court repeated this sentiment several years later when it commented that "It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand." *Osborne*, 495 U.S. at 109-110.

There are other insidious dynamics of this crime, apparently discounted or ignored by this Court: the impact of the content on the viewer, and the impact the collectors have on each other. Mr. Hansen quotes FPD Stabenow who essentially suggests that the laws are wrongly concerned that the images goad the viewers to commit future crimes: "People who watch movies like Saw and Friday *the 13th* are being titillated by the act of torture and murder ... That doesn't mean that they're going to go out and commit torture and murder." The analogy does not hold water, principally because no one who watches *Saw* believes that the images of violence are actually happening. Whereas, in child pornography images, real children are actually being abused. Furthermore, what is the point of any pornography if not to stoke the fires of sexual desire?

Through the internet, child pornography collectors can operate in a world populated exclusively by "like-minded individuals" who tell them that their interest in it is normal, and that it is acceptable to act on that attraction. This message, conveyed through the images themselves, erodes the societal mores which would otherwise inhibit them from satisfying that impulse. These images diminish the shame that someone might have felt about having an attraction to children, which lowers the barriers to indulging that attraction. Every defendant who provides a

11

sexually abusive image to someone else is saying that it is OK to be exploiting children this way, which is one more reason why this activity is properly criminalized and punished.

It becomes clear that, contrary to the Court's suggestion, individuals who have collected child pornography have exploited children. Nonetheless, woven throughout this Court's reasoning and the Hansen article is the theme that individuals who collect child pornography are not really a threat to children or society.

> [I]t is difficult to understand how Mr. Hansen can conclude that a child pornography collector does not, and will not, pose a physical threat to a child, especially when he himself writes that "there is no published research on the odds that viewers of child porn will actually assault a child," and quotes a psychiatrist who says, "There's nothing very definitive when it comes to sexual disorders, especially sexual disorders involving children." This lack of definitive information does not stop Mr. Hansen and countless defendants from repeatedly making the self-serving argument that they are not a threat to children.

(Gelber Resp.)

Contrary to the statements in the article, "a study has been published indicating that among individuals who were convicted federally of trafficking or possessing child pornography, there was a high incidence of previously undisclosed contact offenses against children. Bourke, M.L, Hernandez, A.E. (2009). *The 'Butner Study' Redux: A Report of the Incidence of Hands-on Child Victimization by Child Pornography Offenders*. Journal of Family Violence, 24(3), 183-191. Setting aside whether there is a causal connection or even a correlation between pornography and molestation, those who collect child pornography exploit and victimize the children in those images, and create a demand for the production of more child pornography, regardless of whether they have ever personally molested a child.

12

***Lack of prior criminal history:*** To further bolster their claim that they are not dangerous, and therefore should not be punished harshly, defendants often cite to their purported lack of criminal history. (Of course, a defendant's lack of criminal history is already accounted for in the sentencing guidelines, and thus is not a proper basis for reducing the recommended sentencing level. *United States v. McCart*, 377 F.3d 874, 877 (8th Cir. 2004)). The silent and secret nature of sex crimes in general (particularly with a vulnerable population such as children) protect defendants from detection by law enforcement if they have been molesting children. The very case highlighted in the Hanson article proves this point: Jon Hanson had been violating the law by collecting sexually abusive images of children for "*several years.*" He may have been "an otherwise law abiding father of three," but when it came to the child pornography laws that he was willing to break, he did so persistently, consistently, and with unwavering dedication. Unlike Jon Hanson who at least made a show of rehabilitating himself after he was caught, defendant Bistline made no attempt at rehabilitation and made no statement expressing any understanding of his victimization of the abused children in the images and videos.

The victim quoted earlier was rescued only when law enforcement conducted a search of her abuser's home looking for evidence of the collection and trade of child pornography; no one had any idea that she was being molested as well. The "otherwise law abiding" citizens prosecuted by the Southern District of Ohio include parents, grandparents, professors, teachers, coaches, doctors, military officers, ministers, YMCA counselors, and more. Unlike gang members, drug runners, alien smugglers, and illegal gun dealers, these defendants typically do not make their living through the violation of the law. It can be difficult to understand how someone who has so much to lose would be involved in something so debased and illegal as the

trade of child pornography.  This is all the more reason to have a consistent system of sentencing so that defendants looking and outwardly seeming like our friends and neighbors do not get more lenient treatment for the wrong reasons.

> Comparing child pornography defendants to white collar defendants highlights this point.  The Bernie Madoffs of the world are married, have children, have no criminal history, and outwardly appear to be pillars of their community, yet the devastating nature and scope of their criminal conduct remains in sharp focus.  In child pornography cases, however, there is a distressing tendency to place greater emphasis on a defendant's outer appearance of normalcy than on his criminal conduct, which can lead to an under-estimation of their danger and an over-estimation of their capacity for rehabilitation.  (Gelber Resp.)

### *The True Conduct Punished by the Child Pornography Laws and Sentencing Guidelines:*

The Hansen article and cases which rely on it,  also argue that the trafficking and possession laws are mere proxies used to punish child molestation.  For example, Hansen writes, "The guidelines are predicated on the untested assumption that anyone who would access and view child porn is a potential child molester."  He also includes a comment by Mr. Stabenow that "the child porn guidelines, in effect, punish for presumed future behavior."  This argument is factually and legally baseless.

The arguments set up a false syllogism: "the child pornography guidelines really punish the molestation of children; there is no evidence that this defendant has molested children; there is no evidence that his collection of child pornography will cause him to molest children in the future; therefore, he should not be punished."  (Gelber Resp.)  This argument fails for no other reason than the fact that the child pornography laws are not premised on the assumption that all collectors are or will be abusers.  The laws target the viewing of child sexual abuse crimes.

14

Thus, it is a distinct and deplorable form of child abuse that inflicts specific harms upon its

victims.

> Further, as is discussed in more detail below, there is only one sentencing
> enhancement in the child pornography trafficking guideline which increases a
> defendant's sentence based on his molestation of a child, and it applies, not in
> cases where there is a prediction of future dangerousness, but in cases where there
> is a demonstrated pattern of child exploitation.

(Gelber Resp.)

The legislative history of the original child pornography trafficking laws in the late 1970s

indicates that the:

> [L]egislation [is] designed to eliminate the exploitation of children in
> pornographic materials ... [and to] increase the deterrent effect of current federal
> statutes dealing with the sale and distribution of such materials through interstate
> or foreign commerce.

S. Rep. No. 95-438 (1977), *reprinted in* 1978 U.S.C.C.A.N. 40, 41, 55.  The Supreme Court

later noted the most efficient method of combating the production of child pornography was to

penalize its distribution and possession.  *Ferber*, 458 U.S. at 760; *Osborne*, 495 U.S. at 109-110.

Thus, the child pornography trafficking laws were conceived, not as punishment, but as a way to

stop the abuse of children by others by eliminating the demand for and trade in such images.

***Child Pornography Sentences Are Appropriate Compared to Other Crimes:***  The cases

ignoring the guidelines and one of Stabenow and Hansen's primary arguments against the

severity of federal child pornography laws is premised on parity.  The Hansen article claims the

guidelines:.."treat first-time offenders with no history of abusing or exploiting children as

seriously as murders, rapists, or child molesters ... You can get a lower score for killing

somebody than for downloading child porn ..."  Nowhere in the article does it give actual federal

15

sentences for murder, rape, and child molestation. When a true comparison is made, the deconstructionist claims fall apart. With few exceptions, the statutory penalties and minimum recommended sentences for murder, rape, child molestation, and child enticement are higher than those for child pornography trafficking and possession for first time offenders. The chart attached as Exhibit 2 is illustrative. Looking at that chart, there is no question that the most serious murderer, rapist, or molester is generally treated more seriously under federal law than the most serious child pornography collector. For example, someone who actually has sex with a child under 12 faces a sentence of thirty years to life, while someone who views or possesses a sexually explicit image of a child under 12 would have a recommended sentence of 41-51 months and could not receive a sentence in excess of 10 years. Thus, FPD Stabenow is plainly wrong when he complains that the child pornography guidelines "equate the titillation of witnessing an illegal act with its actual commission."[7]

***The Child Pornography Guidelines Make Sense:***   As Ms. Gelber explains, the enhancements echo the scheme in other offenses:

> When considering the actual provisions of the guideline, it becomes apparent that they are, in fact, premised on a great deal more than 'the general revulsion that is associated with child exploitation-related offenses.' *United States v. Shipley*, 560 F. Supp. 2d 739, 744 (S.D. Iowa 2008). This is especially so because the concepts that underpin this guideline are not novel. For example, imposing a higher sentence on defendants with larger collections of contraband is hardly arbitrary and irrational. The drug, explosives, and gun guidelines also provide for higher sentences based on the volume of contraband involved, and the fraud and theft

---

[7]It is true that a defendant could theoretically receive a lower sentence for killing someone than for collecting child pornography, but to achieve that result, you would have to compare the least serious offender of one crime (involuntary manslaughter caused by negligence) with the most serious offender of the other (a child pornography distributor with a large collection of extremely young children being sadistically abused and with a history of abusing children), at which point any attempt to draw comparisons across these crimes has little meaning.

guidelines recommend higher sentences in cases with larger losses. *See*, U.S.S.G. §§ 2D1.1 (drugs), 2D1.11 (chemicals), 2K1.3 (explosive material), 2K2.1 (guns and ammunition) 2B1.1 (fraud), 2B2.1 (burglary).

As another example, consider the enhancement for sadistic and violent images. This echoes enhancements found throughout the guidelines which apply depending upon the severity of the physical injury to the victim. *See*, U.S.S.G. §§ 2A2.1 (assault), 2A2.2 (assault), 2A3.1 (sexual abuse), 2A4.1 (kidnapping), 2B3.1 (robbery), 2B3.2 (extortion). As 2G2.2 does, other guidelines provide for enhancements when pecuniary gain is involved, such as in the assault guidelines found at U.S.S.G. §§ 2A2.1 and 2A2.2. Other guidelines also call for higher penalties when younger victims are involved. *See*, U.S.S.G. §§ 2A2.3 (minor assault), 2A3.1 2A3.4 (sexual abuse).

As it is for those crimes, it is completely logical in child exploitation cases that a defendant who had a larger collection, who had pictures of younger children, or who had violent pictures has committed a more serious crime than someone who does not. It turns the disparate sentencing considerations on their head when a defendant who has some or all of these characteristics gets the lowest possible prison sentence of one day. There is simply nowhere to go when the less serious offender is before this Court for sentencing.

The pool of offenders represented in the Sentencing Commission data are not the universe of people involved in child pornography, but only those the federal government selects for prosecution.[8] Therefore, if Bistline is the mine run defendant charged with possession of child pornography, this would have no bearing on the reasonableness of his Guideline range. If every federal defendant received the bulk of the Guidelines adjustments, and was eligible for a Guideline sentence encompassing the statutory maximum, this would demonstrate only that the

---

[8]The data does not account for cases prosecuted in state courts for child pornography offenses, cases otherwise declined for federal prosecution and cases never referred for federal prosecution. Indeed, data about how individuals selected for prosecution are sentenced was never intended to create a definitive profile of who is committing this crime.

17

government had selected for federal prosecution those defendants that have committed conduct identified by Congress and the Commission as the most serious. The Guidelines, like the statutes, are drawn to cover all potential defendants. If the federal government chooses to prosecute largely the worst defendants, who are eligible for the higher Guideline ranges, that does not impugn the integrity of the Guidelines. FPD Stabenow simply assumes away the far larger pool of offenders not prosecuted in federal courts for child pornography offenses.

Contrary to the criticisms that the "guidelines make no clear distinction between the offender who swaps a few images online... and the mass producers and distributors who make and market such material to millions..." (Reluctant Rebellion at 57; see, Stabenow at 38), sentences for those behaviors are vastly different. If sentenced under 2G2.2, a mass producer and distributor would receive *at least* a 5 level enhancement, which could go higher depending on sales, while someone only "swapping" images could receive only a 2 level enhancement. Further, a mass producer, advertiser, and distributor would probably be charged under 18 U.S.C. § 2251 and sentenced per U.S.S.G. § 2G2.1 for producing and marketing the images in the first instance, which carry a much higher sentencing range and guideline scheme.

***The Guideline Range for the "Typical" Offender:*** The Reluctant Rebellion article notes (and this seems to be a basic criticism of those who ignore the guideline) that "the typical offender charts at a guideline range that automatically exceeds the statutory maximum, even when there is full acceptance of responsibility, complete cooperation with law enforcement officials, little or no threat of physical harm to any children, and no criminal history." The article fails to describe who the "typical offender" is. There are two common sense ways to look at the allegation and both show the charge is wrong. First, as acknowledged by Mr. Hanson, the

18

average child pornography sentence for all types of such offenses in 2007 was 97 months, well

below either the 10 or 20 year statutory maximum.  Second, a defendant who receives all of the

most commonly applied enhancements and gets acceptance of responsibility will not be in a

guideline anywhere near the statutory maximum.[9]  Therefore, Mr. Hanson's arguments

concerning the guidelines are not anchored in fact.

> If anything, the fact that many of the enhancements tend to apply in most
> cases–meaning that most offenders amass collections in excess of 600 images
> which depict the sexual abuse of children under the age of 12 and the sadistic or
> masochistic abuse of children–simply underscores the fact that this crime problem
> has steadily increased in severity, which necessitates meaningful sentences that
> have the deterrent value to shut down the market for this abuse.  (Gelber Resp.)

*A Growing, and Misunderstood, Crime Problem:*  The deconstructionists note that the

sentence for child pornography defendants increased by 350% over the 10 years from 1997-2007,

from less than 21 months to more than 91 months.  Just because the average sentence has risen, it

does not indicate that the average sentence is now too high.  The context is critical.  At the same

time that the average child pornography sentence was rising, so was the extent of the crime, both

in terms of frequency and severity.  As Mr. Hansen notes, as the average child pornography

sentence has risen, so too has the rate of child pornography prosecutions, from a few dozen a year

in the late 90's to well over 2000 per year in the last few years.  The critics of the guideline fail to

draw a meaningful conclusion from those facts.  It is astonishing that as the crime problem is

actually worsening there can be talk that it should be treated *less* seriously under criminal law, or

---

[9] As of FY 2008, the most commonly applied enhancements are +2 for images of
prepubescent children, +4  for sadistic or masochistic content, +2 for use of a computer, and +5
for more than 600 images.  *See*, http://www.ussc.gov/gl_freq/08_glinexgline.pdf, pp. 36-37.  A
viewing or possession case with those enhancements will result in an offense level or 31, or 28
after a plea (78-97 months).

that this Court could suggest that the Congressional effort to address this problem is "political." (Sent. Tr. at 22).

> At its heart, the current criticism of child pornography sentences is not really about the degree of the sentence imposed on these defendants, but rather whether the distribution, receipt, viewing, and possession of child pornography--activity which the Supreme Court recognized in *Ferber* as being "intrinsically related to the sexual abuse of children"-- should be viewed as a crime at all. 458 U.S. at 759. (Gelber Resp.)

It appears that on the whole, courts have imposed below guideline sentences in distribution, receipt, or possession cases where there is no evidence that defendants had enticed or molested a child. Salvatore Graci, a former elementary school teacher who subscribed to child pornography websites, was sentenced to one day in prison because, according to the court, there was no evidence presented that the defendant ever acted in a predatory way towards minors. *United States v. Graci*, Case # 2:09-CR-0131 (6/30/09, E.D. Pa.). *See also, Shipley*, 560 F.Supp.2d at 741, 44-45, *Grober*, 595 F.Supp.2d at 384-86, *United States v. Szymanski*, 2009 WL 1212252 *3 (N.D.OH 2009), *United States v. Beiermann*, 599 F.Supp.2d 1087, 1091-93 (N.D.IA 2009), *United States v. Smith*, 275 Fed.Appx. 184, 184-86 (4th Cir. 2008) (unpublished), *United States v. Rowan*, 530 F.3d 379, 380 (5th Cir. 2008), *United States v. Duhon*, 541 F.3d 391, 394-95 (5th Cir. 2008), *United States v. Weller*, 2009 WL 1349779 *1-2 (6th Cir. 2009), *United States v. Prisel*, 316 Fed.Appx. 377, 378-79 (6th Cir. 2008) (unpublished), *United States v. Autery*, 555 F.3d 864, 867-68 (9th Cir. 2009), *United States v. Huckins*, 529 F.3d 1312, 1314-15 (10th Cir. 2008).

In contrast, in cases where the defendants both collected child pornography images and molested children, little to no criticism is heard that the child pornography guidelines are an excessive reaction caused by simple revulsion. *See, e.g., United States v. Fink*, 502 F. 3d 585 (6th

Cir. 2007); *United States v. Fiorella, 602 F. Supp. 2d 1057 (N.D. IA 2009); United States v.*

*Paull*, 551 F.3d 516 (6th Cir. 2009); *United State v. Beenen*, 305 Fed. Appx. 307 (8th Cir. 2008).

   The conclusion to be drawn from these cases is clear: when a court expresses concern

about the purported empirical basis of the child pornography guideline, the question actually

being asked centers on the legitimacy of the crime in the first instance.  This becomes most

obvious in cases where the courts impose the lowest possible sentence.  "A disagreement with

the guidelines at the margins is one thing, but a wholesale disregard for every and all

recommended aggravating factors is quite another" (Gelber Resp.).  Courts that ignore the entire

content of the guideline are revealing a fundamental disagreement with the crime.  While this

Court claims not to be rejecting the guideline entirely, its sentence of one day in the face of a 63-

78 month guideline says otherwise.

> The problem, then, is not really with the guidelines, but with our understanding
> and appreciation of the true nature of the crime and the harm caused by these
> defendants.  It appears that it is easy to understand traditional child exploitation
> where the defendant and the victim are face to face, but harder to understand the
> severity of the crime when a computer stands between the defendant and victim."
> (Gelber Resp.).

There is no other way to explain results such as the one day sentence in the Graci case, where a

teacher who held a position of trust over young children is furthering the trade in images of their

rape and abuse.  This has no deterrent value on others.  The implication ultimately made by such

cases, as well as Mr. Hansen's and FPD Stabenow's arguments, is that the federal government

should use the child pornography laws only against known child sex offenders.  If nothing else,

that approach would effectively legalize the collection, receipt, and trade of child pornography

except in the most egregious circumstances.  Imagine a scenario where the production of cocaine was illegal, but its transportation, receipt, and possession were legal.

The only viable approach is the one recognized by the Supreme Court that "the most expeditious if not the only practical method of law enforcement may be to dry up the market for this material by imposing severe criminal penalties" on all activity along the entire distribution chain, from producer to possessor, whether or not those possessors are contact offenders as well. *Ferber*, 458 U.S. at 760; *Osborne*, 495 U.S. at 109-110.  The Supreme Court has also noted that "child pornography harms and debases the most defenseless of our citizens.  Both the State and Federal Governments have sought to suppress it for many years, only to find it proliferating through the new medium of the Internet." *United States v. Williams*, 128 S.Ct. 1830, 1846 (2008).  Mr. Hansen's article essentially asks whether those laws meant to suppress this crime are truly legitimate.  The mother of a child pornography victim, whose images are now circulating the world on the Internet, has an answer:

> All those who trade these images and thereby create the demand for lurid and violent depictions of children are participants in the exploitation of my daughter. Each traded picture that placed a value on inventiveness, novelty, or cruelty played a role in egging on the abuser to even more vile acts.
>
> * * *
>
> [As for my daughter,] a shadow ... comes over her face if a stranger gives her an unexpected compliment.  The pictures are still out there ...
>
> * * *
>
> If I had my way, each and every image of my daughter's sufferings would be burned.  Then she would no longer have to worry about those images being used to further hurt or humiliate her.  But as it is, there are those who have no shred of decency, and continue to copy and pass on these pictures ...
>
> * * *
>
> I can find no words to express the fury I feel at those who participate in this evil, or my scorn for any attempt to minimize responsibility by feeble claims that the crime was 'victimless.'  My daughter is a real person.  She was horribly victimized to provide this source of 'entertainment." She is exploited anew each

and every time an image of her suffering is copied, trade, or sold.  While the crime is clearly conscienceless, it is hardly 'victimless.'

I asked my daughter what she most wanted to ask of the judge.  Her request: 'Please, don't let them pretend no-one's getting hurt.'

## IV. The PROTECT Act's Passage Was Debated, Bi-Partisan Legislation

The Court mentioned with concern the "most recent changes[10] to the guidelines [that] apparently came from two lawyers in the Justice Department who persuaded a novice congressman to add them to the popular Amber Alert bill,"[11] citing *United States v. Stern*, 590 F. Supp. 2d 945 (N.D. OH 2008).  A quick review of the source of this 'fact' shows the pitfalls of looking behind this or any other guideline.  *Stern* relied on *United States v. Hanson*, 561 F.Supp.2d 1004, 1009 (E.D.Wis., 2008), which in turn relied on the original June, 2008 Stabenow article, which got the information from a law review article written by a student, Skye Phillips, at Brooklyn Law School.  Stabenow at 18; Stabenow Rev. at 19.  The student law review article in turn relies on a newspaper article in the Wall Street Journal entitled "Ashcroft Intensifies Campaign Against Soft Sentences by Judges."  Student law review articles and newspapers are not normally cited for important issues in federal criminal cases.

The PROTECT Act's passage as described by FPD Stabenow is inaccurate and the review of his claims versus reality (set forth in this section) is instructive, but in fact, the only provision in the PROTECT Act which affects this case is the addition of the enhancement for the number of images.  Stabenow's claim regarding the Feeney Amendment is a mischaracterization

---

[10]In fact *Stern* was not referring to the most recent changes but to the PROTECT Act, passed in 2003, Publ L. No. 108-21, 117 Stat. 650 (2003).

[11]The reference is to a part of the PROTECT Act known as the Feeney amendment.

or at best a half-truth based on several layers of 'hearsay.' Going back to the Wall Street Journal article itself, the article also provided the Department of Justice and Congress's rationale for passing the amendment, which information was never mentioned by Stabenow. Regardless of who drafted the original Feeney amendment, both the House and the Senate reviewed it, changed it, held debates and passed an altered version of the amendment. According to the Sentencing Commission's *History* at footnote 181, the PROTECT Act passed the Senate by a vote of 98-0, 149 Cong. Rec. S5156, S5157 (Apr. 10, 2003), and passed the House by a vote of 400-25. 149 Cong. Rec. H3075, H3076 (Apr. 10, 2003).

Stabenow failed to convey the full history of the Feeney Amendment. The first version of the Feeney Amendment was to never allow any downward departure in any case. The Feeney Amendment in the House limited this abolition of departures on all cases and the Graham version of the Amendment, which the Senate held a debate on, limited departures relating to crimes victimizing children. 149 Cong. Rec. S5113-01, S5123.

> It is important to note that the compromise restricts downward departures in serious crimes against children and sex crimes and does not broadly apply to other crimes, but because the problem of downward departures is acute across the board, the compromise proposal would direct the Sentencing Commission to conduct a thorough study of these issues, develop concrete measures to prevent this abuse, and report these matters back to Congress.

*Id.* The bipartisan conference which led to the compromise agreed that the downward departure limitation "will affect only crimes against children and sex crimes; that is, sexual abuse, pornography, prostitution, and kidnapping/hostage taking. These types of cases represent only 2 percent of the Federal criminal case load." *Id.* It is important to note that this restriction on downward departures is no longer followed post-Booker by any circuit to address the issue,

including the Sixth Circuit, and has no affect on the guideline debate in Bistline.  See, *History* at

footnote 29.  Yet Stabenow uses the Feeney amendment to cast doubt on the entire guideline

structure and the Court apparently found Stabenow's perspective as echoed by *Stern* persuasive

enough to mention.

Stabenow *only* cites to inflammatory negative remarks in his legislative history.  The

Senate's debate actually started with Senator Hatch acknowledging the three main harms which

child pornography produces including that it creates an "immeasurable and indelible harm on the

children who are abused to manufacture it."  *Id.*  Senator Hatch continued that he "worked with

Chairman Sensenbrenner, Senator Graham and my colleagues to develop a bipartisan

compromise which was ultimately supported by not only all of the Republican conferees, but the

Democratic conferees as well-Senator Biden, as well as congressmen Frost, Matheson and

Hinojosa."  *Id.*

Similarly, Stabenow only cites to letters to portray a one-sided view of the Senate's

debate.  He did not recognize that Congress also received letters supporting the bill.[12]  In short,

both sides offered letters from various political and legal entities that supported their positions,

allowing for the exchange of ideas that is typical in a Congressional debate on any legislative

matter.

The PROTECT Act also directly amended § 2G2.2 by adding varying levels of increases

for the number of images possessed and an adjustment to the mandatory minimum sentences and

---

[12]These omitted sources included the National Center for Missing and Exploited
Children, the Smart family, the Boys and Girls Clubs of America, National Sheriffs' Association,
Law Enforcement Alliance, Major County Sheriffs' Association, Federal Law Enforcement
Officers Association, and the U.S. Department of Justice.

statutory sentencing maximum for child pornography offenses, all of which was supported by

rationale and research. *See*, PROTECT Act § 401(i)(1)(B)(C). Since Bistline is not subject to a

mandatory minimum and is not even close to the statutory maximum, the only remaining part of

the PROTECT Act which affects this case is the enhancement for the number of images.

In passing the PROTECT Act, however, Congress made it clear that the act, as a whole,

was passed to further the fight against child pornography, including possession. According to

Senate Report 108-002: "The purpose of S. 151, the Prosecutorial Remedies and Tools against

the Exploitation of Children Today Act or 'PROTECT Act of 2003,' is to restore the

government's ability to prosecute child pornography offenses successfully." *Id.* Further, in

formulating the bill:

> The Judiciary Committee held a hearing on S. 2520 on October 2, 2002, and heard
> testimony from Daniel P. Collins, Associate Deputy Attorney General and Chief Privacy
> Officer, United States Department of Justice; Frederick Schauer, Professor of Law, John
> F. Kennedy School of Government, Harvard University; Anne M. Coughlin, Professor of
> Law, University of Virginia School of Law; and Daniel S. Armagh, Director, Legal
> Resources Division, National Center for Missing and Exploited Children. At that time,
> the Committee also considered the evidence and testimony presented on June 4, 1996,
> during the hearing on the Child Pornography Prevention Act of 1996, detailing the
> problems of child pornography and the technological changes in the production and
> dissemination of these materials. *Id.*

In sum, Stabenow inaccurately portrayed the passage of the Feeney Amendment and its

purpose. The Senate held a debate about the importance of preventing downward departures,

especially in the areas of sexual exploitation of children, but as noted that is now a moot point

and has no effect on the present case. In its hearings, Congress specifically found that the

provisions Stabenow contends were passed without rationale, were passed after comment and

consideration of various viewpoints and in order to protect children and make it easier for the federal government to prosecute child pornography offenders.

If this Court desires to discount the 2003 amendment of the guideline which added the 5 point enhancement for more than 600 images because it was directed by Congress (albeit after study and debate) instead of by the Commission, the advisory guideline would be 27-33 months pursuant to § 2G2.4 as it existed in 2003 without the amendment.[13]  Just as an example of one way to address the issue, this reasoned substitution of a guideline that the Court can endorse is far better than no guideline at all.[14]

As the Commission's *History* demonstrates, the child pornography guidelines to this point were promulgated in accordance with the SRA involving the Commission's traditional study, its required procedures (including public comment), Congressional concurrence and changes in the underlying laws.  The original guideline for possession came into being when that became a crime in late 1990 in the Crime Control Act of 1990.  *History* at 17.  The guideline for receipt and distribution already provided for an offense level of 13 and enhancements for prepubescent minors (+2), distribution increased by retail value (at minimum +5) and for sadistic or masochistic depictions (+4) and had been originally promulgated by reviewing sentencing practice and the other considerations of the original guidelines.

The Commission had its staff prepare "another child sex offense report in early 1991."

---

[13]  Base level of 15, +2 for prepubescent minors, + 2 for more than 10 images, +2 for use of a computer = 21 minus 3 points for acceptance = 18.

[14]This proposal is not meant to ignore the 2003 and later amendments but merely to seek some standards in sentencing these cases.  A discussion of the later amendments is at the end of this section.

*Id.* at 18-19.  It considered quantitative data and case analysis including departures and qualitative data at 12 district court sites "where it conducted interviews with judges, assistant U.S. Attorneys, and probation officers..."  It also reviewed calls for technical support and case law.  *Id.*  The proposed guideline, § 2G2.4,  included 'receipt[15] or possession' with a base offense level of 10 and an enhancement if the material involved a prepubescent minor.  Both the Senate and the House voted overwhelmingly for the Commission to raise the guidelines and to return the offense of receipt to § 2G2.2.  *Id.* at 20-22.  The legislation did not refuse to accept the guideline but set forth directives for the Commission to raise the base offense level to 13 for possession and add an enhancement of 2 points for possession of more than 10 items.[16]  The amended 1991 guidelines existed unchanged until 1996.

In 1995, Congress, as it is empowered to do, issued directives to the Commission in the Sex Crimes Against Children Prevention Act of 1995 ("SCACPA"), Pub. L. 104-71, to increase the base offense levels and add an enhancement for use of a computer.  *Id.* at 26-28.  At that time it also asked the Commission to prepare a report regarding analysis of the sentences, 5k motions for downward departures, the recidivism rate and other recommendations.  *Id.*  Amendments were issued for public comment.  The ABA stated it could not take a position about any specific numerical offense, DOJ agreed that the amendments responded to the directive and the Federal defender bar proposed that the Commission wait until the report to Congress was complete.  *Id.*

_____

[15]The guideline inexplicably treated 'receipt with intent to traffic' in a separate guideline even though the statutes made no such distinction.  *History,* at 19, fn. 90.

[16]It should be noted that at that time it was common for sentencing hearings to concern what should be counted for the 10 or more enhancement as the transfer and availability of child pornography on the Internet was not yet occurring.  Some courts counted a single floppy disk of numerous child pornography images as a single item.

at 27.   In June, 1996, the Commission's report analyzed sentences of all 423 convictions for

child sex offenses in fiscal 1994 and 1995 and reviewed scientific literature[17] regarding studies of

sexual offenders *Id* at 28.  The report provided information on several topics.  It reviewed the

statutes and application of the guidelines, it examined the burgeoning use of computers and it

discussed methods of identifying the most dangerous offenders and those most likely to

recidivate.  *Id.*

Most importantly, the report made recommendations to Congress based on data, literature

and mandates, noting that "[t]he amount of prison time that is appropriate for these offenses is a

policy judgment to be made by Congress and the Sentencing Commission. This judgment can be

informed, however, by data on how the range of punishments available under the present

guidelines are being used." *Id* at 29.   For possession cases, the data included only 24 cases

which had an average sentence of 15.4 months with 75% sentenced with the range, no upward

departures and 13% receiving a downward departure based on substantial assistance.  *Id.*  The

report supported the use of a computer enhancement to solicit participation and recommended

only the two level base offense level increase in 2G2.2 and 2G2.4.  *Id*. at 30.  It also found that

some defendants sentenced under each of the guidelines exhibit a pattern of recidivism.  *Id*. at 31.

The Commission also noted that it was considering an expansion of the pattern of activity

enhancement to production and to possession cases because it is prevalent in those cases as well

as in receipt and distribution cases.  *Id.*   The Commission also was continuing to consider a non-

pecuniary distribution enhancement, a consolidation of 2G2.2 and 2G2.4 to avoid confusion as

well as a 2 point reduction for simple receipt cases.  *Id.*

---

[17]The extensive literature reviewed is itemized at footnote 133 in the *History* at 28.

These reports, comments and history undermine Stabenow's argument that Congressional directives underlying ' 2G2.2 were targeted at "mass producers, repeat abusers, and mass distributors" rather than mere possessors of child pornography such as Bistline. Stabenow Rev. at 35. Further, Congress could scarcely have been more clear in specifying that the possession of child pornography was a priority when it adopted the Protection of Children from Sexual Predators Act of 1998 ("Sexual Predators Act"). It entitled Sec. 203 of the law "Zero Tolerance For Possession of Child Pornography" and amended 18 U.S.C. § 2252(a)(4) to prohibit even the possession of a single image of child pornography. In response to the legislation, the Commission amended § 2G2.2 in late 2000, and explained that changes to the guidelines were made in order to:

> [R]espond to increased congressional concerns as indicated in the legislative history of the [PSCPA], that pedophiles, including those who use the internet, are using child pornographic and obscene material to desensitize children to sexual activity, to convince children that sexual activity involving children is normal, and to entice children to engage in sexual activity.

Sentencing Commission Amendment 592, November1, 2000.

Congress expressed a specific concern about possession of child pornography "independent of its concerns about trafficking and production." See, Whitfield v. United States, 543 U.S. 209, 215 (2005) ("Because the meaning of § 1956(h)'s text is plain and unambiguous, we need not accept petitioners' invitation to consider the legislative history."). Moreover, if the text of the legislation wasn't sufficiently clear to express the evil that Congress was seeking to prevent with Sec. 203, the Commission surmised it succinctly: Congress feared that pedophiles were possessing and using child pornography to initiate and lure children into sexual activity.

That Stabenow chose to avoid the import of the Sexual Predators Act legislation and an

opportunity to argue that "Zero Tolerance for Possession" is an ambiguous choice of words in favor of a handful of comments by individual legislators in 1995 (Stabenow Rev. at 11) is telling, because to take on the 1998 action by Congress is to run headlong into the clearly expressed language of Congress and the Commission's interpretation of Congress's intent. Stabenow's selective reading of the legislative history of a 1995 bill cannot and does not trump the clearly expressed view of Congress in the 1998 Sexual Predators Act. The U.S. Code was amended to reflect a zero tolerance policy against the possession of even a single image of child pornography. In sum, there is nothing extraordinary about the application of 18 U.S.C. § 2252(a)(4) and (b)(2) or § 2G2.2 to Bistline's conduct. Congress envisioned such prosecutions when it amended the statute in 1998 and when the Commission amended the guidelines in response in 2000.

According to the *History*, the Commission proposed amendments in 2000 that, among other things implemented the directive, first raised in its earlier report, to add an enhancement for non-pecuniary distribution. *Id.* at 34. Substantive public comment was received <u>only from the Federal Defenders who "did not oppose the addition of an enhancement for the distribution of child pornography for ... the receipt of a thing of value,"</u> recognizing that "child pornographic material is a 'thing of value' and if received in a bartered exchange for other child pornographic material, an enhancement should apply, " but suggesting a lower enhancement than proposed. *Id.* at 34. At a public hearing, some other positive comments were received. The ensuing amendment changed 2G2.2, but made no changes to 2G2.4. Thus, Bistline's guideline for possession was not changed.

The Commission continued its traditional work as outlined in the *History* in the next amendment cycle looking at consistency with other guidelines and related proportionality

31

concerns as well as the pattern of abuse enhancement.  *Id.* at 37.  There were significant changes
to the commentary and application notes of each section, but there were no further amendments
pursuant to the directives of the Sexual Predators Act.  This review thus brings us to the
PROTECT Act already discussed above.

Beyond the PROTECT Act, in 2004, the Commission substantially amended § 2G2.4 and
§ 2G2.2 to ensure that, in light of the PROTECT ACT, these sections continued to assign
proportional punishment to possession, receipt, transportation and distribution of child
pornography.  The Commission consolidated these sections, explaining that "consolidation
addresses concerns raised by judges, probation officers, prosecutors, and defense attorneys
regarding difficulties in determining the appropriate guideline (§2G2.2 or §2G2.4) for cases
involving convictions of 18 U.S.C. § 2252 or §2252A.  Furthermore, as a result of amendments
directed by the PROTECT Act, these guidelines have a number of similar specific offense
characteristics."  U.S. Sentencing Guidelines Manual, App. C, Amendment 664 (2004).  Thus,
not only did the 2004 revisions to § 2G2.2 result from thorough congressional study, but the
revisions once more underscored that the Guidelines concerning these offenses were shaped by
more than unfettered political force.

In sum, the United States submits that with this *History*, the Commission has shed an
unbiased light on the possession guideline.  The Stabenow analysis is flawed in many ways and is
a biased, factually deficient thesis from an advocate with a clear agenda.  Legislative history is
only enlightening when Congress's subsequent enactment is in some way ambiguous which they
have not been.  Congress and the Commission exercised of their proper institutional roles.  In
particular, the *History* reflects Congress's study of the sources and harms of child pornography,

32

and the Commission's involvement with Congress in the development of the Guidelines. [18]

## V.  In Keeping with the Deconstructionists, the Court Has Been Able to Give Little Weight to the Guideline by Minimizing Bistline's Conduct.

Defendant Bistline's conduct is minimized by the Court in line with the sentiments and minimization in Stabenow, in Reluctant Rebellion and in some of the district court cases which have adopted their reasoning.  This Court discussed viruses and spam, indicated that child pornography was available "at the mere click of a mouse and is often associated with compulsive activity" even though there was nothing at all in the record of this case regarding any of those issues.  Sent. Tr. at 26.  Most distressing, is the statement that defendant "permitted [child pornography] to be downloaded into his computer" and that the program itself resulted in the sharing of files.  *Id.* (emphasis added).  These statements take away any action by defendant at all!

The Statement of Facts in this case sets forth that Limewire is a 'program.'  Thus, it is not an Internet site that one gets to by browsing but must be actively obtained and installed like other programs on one's computer.  The Statement of Facts also indicate that in order to find child pornography files on Limewire, the agents conducted a search *using terms in the names of known child pornography images.*  Thus, a search on Limewire is also different than a simple Internet search where a string of subject matter terms can be entered to find what one seeks.  Defendant admits looking for and obtaining child pornography from 2005 or 2006. PSI at ¶ 18.  Defendant distributed child pornography to the agents in September, 2007, and the search occurred on

---

[18]This brief has omitted the original promulgation of 2G2.2 for non-possession offenses since Bistline's offense is a possession offense.  The *History* sets forth those details.  The original guideline was formulated in 1987 in the same manner as all of the guidelines by examining existing sentencing practices.  *History* at 10.

October 19, 2007. Statement of Facts. Thus, defendant's involvement with child pornography was of long-standing and involved collecting and keeping such images and movies as well as 'sharing' them with others anywhere in the world. Perhaps the real problem with Stabenow's and Hanson's articles is that despite the facts of each case, the crime itself is turned into nothing more than an afternoon of web browsing despite defendant's connection to and agreement with the actions of a worldwide community of criminals.

A global symposium organized through G8 brought together approximately 45 psychologists, medical doctors, criminologists, professors, sociologists and computer scientists, among others, from G8 and non-G8 countries who have examined child pornography offenses and offenders through psychology, social science and analytical research. As a direct result of the symposium, the G8 Ministers of Justice and Home Affairs issued a declaration entitled "The Risk to Children Posed by Child Pornography Offenders" on May 30, 2009.[19] There was firm agreement that child pornography trafficking must be viewed as an online marketplace reacting to the forces of supply and demand. The great demand for new images by those who seek out and download child pornography in the multitude of forums dedicated to child pornography fuels the market and drives the production of new and more extreme images. Report at 7.

Congress also found that child pornography's impact <u>on the adults who want to view it</u>, make it a clear and present danger to public safety. Congress has found that:

> (4) child pornography is often used by pedophiles and child sexual abusers to stimulate and whet their own sexual appetites, and as a model for sexual acting out with children; such use of child pornography can desensitize the viewer to the pathology of sexual abuse or exploitation of children, so that it can become

---

[19]The report can be accessed at: http://www.iprc.unc.edu/report.shtml The symposium papers can be accessed under the "Meeting Materials" link at: http://www.iprc.unc.edu/meetings.shtml.

acceptable to and even preferred by the viewer;[20]

P.L. 104-208, Section 121.

The Senate Report on P.L. 104-208 also quoted the testimony of Dr. Victor Cline[21] at the

June 4, 1996, hearing before the Senate Committee on the Judiciary, that:

> The best evidence to date suggests that most or all sexual deviations are learned
> behavior. . . . In the case of pedophiles, the overwhelming majority . . . . use the
> child pornography and/or create it to stimulate and whet their sexual appetites
> which they masturbate to then use later as a model for their own acting out with
> children. . . . [T]he use of child pornography in time desensitizes the viewer to its
> pathology no matter how aberrant or disturbing.  It becomes acceptable and
> preferred. (emphasis added).

S.Rep. 104-358 at 13.  *See also United States v. Byrd*, 31 F.3d 1329, 1339 (5th Cir. 1994)

("[C]ommon sense would indicate that a person who is sexually interested in children is likely to

also be inclined, i.e., predisposed, to order and receive child pornography.").

The testimony of witnesses before Congress has strong sociological support.  For

example, a 2005 joint-study funded by National Center for Missing & Exploited Children and the

Department of Justice, Office of Juvenile Justice and Delinquency Prevention, surveyed 2,574

state, county, and local law-enforcement agencies concerning arrests made for the sexual

victimization of a child between July 1, 2000, and June 30, 2001.  The study found that in 55%

of the arrests, the defendant was a "dual offender" meaning that the defendant both possessed

child pornography and had sexually victimized or attempted to sexually victimize a child.  *See*

---

[20] As noted in *United States v. Falso*, 544 F.3d 110 (2nd Cir. 2008).

[21] Dr. Kline is an Emeritus Professor in Psychology at the University of Utah,  a research
scientist with George Washington University Office, and operates a private clinical practice is in
Salt Lake City, Utah. http://en.wikipedia.org/wiki/Victor_Cline, website last visited on
November 27, 2009.

Wolak, J., Finkelhor, D., & Mitchell, K.J., *Child-Pornography Possessors Arrested in Internet Related Crimes: Findings From the National Juvenile Online Victimization Study* (2005).[22]

The Court takes none of the findings or studies into account, yet minimizes defendant's behavior and finds that since there is no evidence that defendant has touched a child inappropriately that he is not a pedophile.[23]  Sent. Tr. at 27.  This is particularly troubling since Defendant has not been forthcoming about how or why he sought child pornography, has not claimed any mental health issues,  has never recognized the harm to the children in the images and has not sought any treatment.  The Court has now ordered defendant to be evaluated. Defendant has essentially been given a road map at the sentencing hearing of what to disclose to an evaluating professional to 'fit' the profile this Court has already found to be true.

## VI. *Cruikshank* and *Stall*, Relied on by the Court, Are Distinguishable From Bistline

This Court recognized at the hearing that sentencing disparity was a very real problem in the area of child pornography sentences at this time.  Sent. Tr. at 30.  The disparity issue is never resolved by the Court except to say that a "recent decision by a district judge is instructive in that regard" citing *United States v. Cruikshank,* 2009 WL 3673096 and *United States v. Stall*, 581 F. 3d 276 (6th Cir. 2009).  The sentencing disparity issue is a very real consideration when 65% of the cases in 2008 were either within this particular guideline**,** an upward departure, or a government sponsored departure (8.5%).  Yet as defendant and the court have noted, some defendants got not just departures, but minimal sentences..  *History* at 8, fn. 33.  *Cruikshank* and

---

[22]Available at  www.unh.edu/ccrc/national_juvenile_online_victimization_publications.html .

[23]Since there is no psychological or other mental health information before the Court, it is unclear on what basis the court finds that Bistline is not a pedophile.  In any event, neither the offense conduct nor the guidelines turn on whether one is or is not diagnosed as a pedophile.

*Stall* do not resolve the disparity issue nor the 'general deterrence' factor.

Cruikshank was a middle-aged man with a family including two teenage daughters. He subscribed to web sites on two occasions for 30 day or similar periods to view child pornography spending less than $150 total. Unlike Bistline, he did not download the images to his computer and never distributed it. His viewing of it at work saved it to temporary files on his computer. While the facts show that he had over 900 suspected child pornography images, he was only given enhancements for between 300 and 600. There was no child pornography on his home computer. Children under 10 were involved in some of the images, but there is no further description of the type of material he viewed. His guideline range was almost 30% lower than Bistline's, yet Cruikshank received a sentence of 24 months imprisonment (not quite a 50% departure from his guideline) and 15 years supervised release.

Further, unlike Bistline, Mr. Cruikshank received four separate risk assessments from mental-health professionals used by the court to find that he was "not likely to re-offend, is not a sexual predator, and is a low risk to the community." *Id.* at *3. Most important, he had "consistently sought and taken advantage of all opportunities for rehabilitation.." *Id.* In arriving at the sentence it did, the *Cruikshank* court made passing reference to two points from the Stabenow article[24] and examined cases which have rejected the guideline altogether or have determined to give it less weight. *Cruikshank* leaned toward rejection of the guideline but, in the end, declined to do so. The Court relied on the 3553(a) factors stating simply that it had taken

---

[24]The first point is that severe punishment is not needed because no link has been established that a "viewer of child pornography is more likely to physically abuse a child."; and second, the premise that a possessor of child pornography "sitting alone" could receive a higher sentence than one convicted of rape. *Cruikshank* at *2 and at *5.

the guideline into account "mindful that the Guidelines are not to be presumed reasonable." This is a restatement of the law in every post-Booker sentencing and did not commit the Court to a wholesale embrace of public defender Stabenow's biased assault on a single guideline.

Like Mr. Bistline, defendant Stall received a one day sentence of imprisonment and ten years of supervised release.[25] The sentence was affirmed by the Sixth Circuit but only under plain error review for almost every issue.[26] There are several salient distinguishing facts in *Stall*, but the most important point to this current brief regarding the weight this Court has given the guideline is that there was apparently no discussion at sentencing or on appeal regarding any policy disagreement on any ground regarding the guideline or the weight it should be given.

As for the facts of Stall's offense, he had only 18 images versus over 4,000 for Bistline, Although Stall, like Bistline, admitted downloading child pornography for several years, Stall did not keep it. Stall also never distributed it.[27] Although the content of the images involved rape of girls under 12, Stall had no movies and thus no movies of those acts. Entirely unlike Bistline, Stall became "remorseful and distraught" upon arrival of the FBI, immediately fully confessed and expressed a desire for mental health treatment. Further, unlike Bistline, Stall said he "would never physically do anything to a child" thus demonstrating at least some empathy for the victims. *Id.* Stall's guideline level was slightly lower, at 57-71 months. At sentencing, Stall presented his psychologist's testimony showing that he demonstrated promise for rehabilitation.

---

[25]Mr. Stall was also assessed a $5,000 fine.

[26]The court held that the greater the variance, the more compelling the evidence must be, but on the government's challenge on this ground the court reviewed for abuse of discretion.

[27]Stall too used a peer-to-peer file sharing system but apparently would view and then delete the images thus not sharing the images with others. *Stall* at 278.

In reviewing the one-day sentence, the Sixth Circuit twice worried that the sentence could have been the result of judicial bias for a college educated more affluent defendant, but concluded that the downward variance "may have less to do with judicial bias and more to do with the failure of prosecutors to defend their sentencing recommendations vigorously." *Id.* at 282 and 286. *Stall* noted that in child pornography cases, the Sixth Circuit had once before upheld a one-day sentence and once before found a one-day sentence substantively unreasonable. *Id.* at 283-84[28].

Comparing Bistline to the defendants in *Stall* and *Cruikshank*, a one-day sentence compared with this Court's previous 2G2.2 sentences, as well as the fact that according to the Commission's 2007 and 2008 statistics most sentences are still within 2G2.2 , cannot avoid resulting in unwarranted sentencing disparities and failing to promote general deterrence. *See e.g.*, *United States v. Shrake*, 515 F.3d 743 (7th Cir. 2008) (upholding 330 month sentence for possession and distribution); *United States v. Harris*, 2009 WL 2222085 (6th Cir.)(reversing as unreasonable, a downward departure to 84 months from 210-262 month range).  The Court has an opportunity to correct that failing[29] of the one-day sentence herein.

## VII. Conclusion

Congress properly directed the applicable sentence for the possession of child pornography, and the Commission properly formulated Guidelines for such violations.  Those Guidelines should be given due consideration as directed in 18 U.S.C. § 3553(a).  The United

---

[28]*Stall* at 284 notes two cases from other circuits finding a one-day sentence unreasonable.

[29]The claim was addressed in *Stall* only under the plain error review standard and found lacking.

39

States acknowledges that it is within the discretion of this Court to consider the guidelines as written or to discount them in imposing a sentence based on the factors set forth in § 3553. But, as the Seventh Circuit has put it,

> "[W]e do not think a judge is <u>required</u> to consider ... an argument that a guideline is unworthy of application in <u>any</u> case because it was promulgated without adequate deliberation. He should not have to delve into the history of a guideline so that he can satisfy himself that the process that produced it was adequate to produce a good guideline." <u>United States v. Aguilar-Huerta</u>, 576 F.3d 365, at *2 (7th Cir. Aug. 3, 2009) (emphasis in original).

This Court should not give the guideline little weight based on all of the arguments made herein. Without a workable system to replace the guideline, defendant has been given almost the lowest possible sentence without sufficient support under the § 3553(a) factors. One suggestion made herein is that a pre-PROTECT Act guideline or other re-drawing of the line would be more appropriate than losing the deterrent value of the sentence altogether and increasing the disparity by giving the sentence announced. Inevitably defendants will appear before the court with less egregious facts and much more in the way of remorse, forthrightness and rehabilitation. Except for medical considerations, Bistline is the typical child pornography defendant contemplated by Congress and the Commission when they arrived at these guidelines after study and debate.

Respectfully submitted,

CARTER M. STEWART
United States Attorney

s/Deborah A. Solove
DEBORAH A. SOLOVE (0024552)
Assistant United States Attorney
303 Marconi Boulevard, Ste. 200
Columbus, Ohio 43215
(614) 469-5715
Deborah.Solove @usdoj.gov

40

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing United States Supplemental

Sentencing Memorandum has been served on Jonathon Tyack, attorney for defendant, Richard

Bistline on this 4th day of December, 2009, by virtue of its electronic filing this date.


<u>s/Deborah A. Solove</u>
Deborah A. Solove,
Assistant United States Attorney

41