**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO**

UNITED STATES OF AMERICA,      :

       *Plaintiff*,      :

vs.      :     Case No. 2:09-cr-00085

RICHARD BISTLINE,      :     JUDGE SMITH

       *Defendant*.      :

## DEFENDANT'S SENTENCING MEMORANDUM

Mr. Bistline submits this memorandum to assist the Court in imposing a sentence that complies with the Supreme Court law, and 18 U.S.C. § 3553. Furthermore, this Sentencing Memorandum is offered to the Court in order to assist the Court to comply with the requirements imposed upon it by the Court of Appeals in this case.  This Court must now exercise its sound discretion by weighing the factors set forth in 18 U.S.C. § 3553(a).  Defendant maintains, for the reasons set forth below, that a sentence of one day incarceration, followed by ten years of supervised release, with various conditions imposed by the Court, is more than sufficient to comply with 18 U.S.C. § 3553(a).  If this Court reads the decisions by the Court of Appeals as requiring the imposition of any particular sentence, Mr. Bistline urges the Court to make that conclusion clear on the record, along with any other basis by which this Court believes its discretion has been limited by the Court of Appeals decisions. Furthermore, Defendant respectfully requests the Court to issue a written opinion setting forth the legal and factual basis for any particular sentence imposed.

## I.    INTRODUCTION

### A. The Original Sentencing

On January 7, 2010, after two sentencing hearings, testimony from an FBI agent explaining the technology involved in the offense, a psychological evaluation by Dr. Tennenbaum, two sentencing memoranda from each of the parties, and the parties' oral arguments, Judge Graham imposed a sentence of one day in custody, thirty days of home detention, and ten years of supervised release with special conditions including limitations on and monitoring of computer use, and psychological treatment as directed by the Probation Officer.

In evaluating the seriousness of the offense, the Court considered how the technology operated, the fact that Mr. Bistline did not pay for, trade or affirmatively share images of child pornography, and the circumstances that led to the offense, as well as the horrendous nature of the images and the impact on the victims.  In evaluating the need for the sentence imposed to accomplish general deterrence, the Court noted the unlikelihood that a greater sentence could prevent dissemination of child pornography given the worldwide market, and determined that a greater sentence was not necessary to deter viewers of child pornography given their characteristics.  In evaluating the need for just punishment, specific deterrence, incapacitation, and treatment in the most effective manner, the Court took into account Mr. Bistline's lack of any criminal history, advanced age, serious medical problems, his wife's serious health problems and need for his care, and Dr. Tennenbaum's conclusion that Mr. Bistline poses a very low risk of re-offending and no risk of ever harming a child.  Tr. at 45-51 (1/7/2010); Tr. at 24-32 (11/12/09).

The Court also determined that it would give the child pornography guideline little weight pursuant to the Supreme Court's decision in *Kimbrough v. United States*, 552 U.S. 85 (2007).  *See* Tr. at 24 (11/12/09); Tr. at 45 (1/7/2010).  The Court determined that the guideline was not arrived

at by the Commission through the empirical process with which it was charged to achieve the sentencing goals set forth in § 3553(a), and thus provided less guidance in arriving at a sentence that complied with the statute.  *Id*.  In addition, after considering the discussion in six district court opinions, two articles,[1] the cases the Court itself had encountered, and the parties' arguments, the Court concluded that the guideline was "repeatedly raised, despite evidence and recommendations by the Commission to the contrary," and was "seriously flawed," leaving the courts "without a meaningful baseline for which they can apply sentencing principles."  Tr. at 22-27 (11/12/09). Judge Graham also discussed some of the aspects of this case that distinguish it from the assumptions underlying the guideline, including that Mr. Bistline is not at risk for ever harming a child, did not contribute to the market for child pornography, and any distribution that occurred was the automatic result of the Lime Wire program.  *Id*. at 25-28; Tr. at 46-50 (1/7/2010).  The Court concluded that, "regardless of the soundness of the guidelines, regardless of the authority with which they were arrived at," they are "simply one factor that the Court is called upon to consider" to achieve a sentence that is sufficient, but not greater than necessary, to satisfy the purposes of sentencing.  *Id*. at 45-46; Tr. at 22 (11/12/09).

Finally, the Court determined that the sentence imposed would not create unwarranted disparities in light of sentences imposed in other cases, including the sentence upheld in *United States v. Stall*, 581 F.3d 276 (6th Cir.2009).  Tr. at 30 (11/12/09).

---

[1] *See United States v. Cruikshank*, 667 F. Supp. 2d 697, 701-03 (S.D. W.Va. 2009); *United States v. Beiermann*, 599 F. Supp.2d 1087, 1090-91, 1100-01, 1103-06 (N.D. Iowa 2009); *United States v. Phinney*, 599 F. Supp. 2d  1037, 1041-43 (E.D. Wis. 2009); *United States v. Stern*, 590 F. Supp. 2d 945, 952-, 958, 960-61 (N.D. Ohio 2008); *United States v. Ontiveros*, slip op., 2008 WL 2937539, at **7-8 (E.D. Wis. July 24, 2008); Troy Stabenow, *The Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* (Jan. 2009), http://www.fd.org/docs/Select-Topics---sentencing/child-porn-july-revision.pdf, (App. 1); Professor Douglas A. Berman, *Is There an Ivy–Leaguer Exception to Federal Child Porn Charges?* (Oct. 22, 2008), http://sentencing.typepad.com/sentencing_law_and_policy/2008/10/is-there-an-ivy.html, (App. 2).

The sentence complied with Supreme Court law.  This Court correctly calculated the guideline range, *Gall v. United States*, 552 U.S. 38, 49 (2007), and did not treat that range as mandatory or presumptive, *id.* at 51; *Nelson v. United States*, 555 U.S. 350, 352 (2009), but as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a). *Kimbrough*, 552 U.S. at 90.  The Court "consider[ed] all of the § 3553(a) factors," "ma[de] an individualized assessment based on the facts presented," *id.* at 49-50, and explained how the facts relate to the purposes of sentencing.  *Id.* at 53-60; *Pepper v. United States*, 131 S. Ct. 1229, 1242-43 (2011).  The Court complied with its "overarching" duty to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing."  *Id.* at 101; *Pepper*, 131 S. Ct. at 1242-43.

The Court heard the prosecutor's arguments that the Commission's policy statements regarding departures variously did, or did not, prohibit the variance requested in this case, *see* Gov't Sent'g Mem. at 6 (11/4/09); Gov't Supp. Sent'g Mem. at 24-25 (12/4/09); Tr. at 9, 55 (1/7/2010), and correctly declined to follow them.  *See Gall*, 552 U.S. at 53-60 (upholding variance to probation based on factors prohibited or discouraged by policy statements); *id.* at 47 (rejecting "extraordinary circumstances" test); *Pepper*, 131 S. Ct. at 1249-50 (rejecting invitation to "elevate" policy statements above factors that are relevant to the purposes of sentencing, and requiring district court to "give appropriate weight" to such factors).

In deciding to give the guideline's advice little weight, even apart from the substantial mitigating facts in this case, the Court properly implemented a key component of Supreme Court law designed to ensure that the guidelines are truly advisory and constitutional.  Because "the Guidelines are now advisory . . . , as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*,

4

552 U.S. at 101-02 (internal punctuation omitted) (citing *Rita v. United States*, 551 U.S. 338, 351 (2007) (district courts may find that the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations").  As the Supreme Court held in *Kimbrough*, because "the cocaine Guidelines, like all other Guidelines, are advisory only," it "would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough*, 552 U.S. at 91, 109-10; *see also Spears v. United States*, 555 U.S. 261, 267 (2009) ("[D]istrict courts are entitled to vary from the crack cocaine Guidelines in a mine-run case where there are no 'particular circumstances' that would otherwise justify a variance from the Guidelines' sentencing range.").

Congressionally directed guidelines are just as advisory as any other guideline and therefore equally subject to policy-based variances.  In *Vazquez v. United States*, 130 S. Ct. 1135 (2010), the Supreme Court remanded for reconsideration in light of then-Solicitor General Kagan's position that "all guidelines," including congressionally-directed guidelines, "are advisory, and the very essence of an advisory guideline is that a sentencing court may, subject to appellate review for reasonableness, disagree with the guideline in imposing sentencing under Section 3553(a)." U.S. Br. at 11, *Vazquez v. United States*, No. 09-5370 (Nov. 2009).  As the Sixth Circuit has previously recognized, "*all* of the sentencing guidelines are advisory," including those directed by Congress.  *United States v. Michael*, 576 F.3d 323, 327 (6th Cir. 2009) (emphasis in original). Congressional directives "tell[] the Sentencing Commission, not the courts, what to do," and "a directive that the Commission specify a particular Guidelines range is not a mandate that sentencing courts stay within it." *Id*. at 328.

Judge Graham correctly began by finding that the child pornography guideline was not developed by the Commission in its characteristic institutional role of basing its determinations on empirical data and national experience, *see Kimbrough*, 552 U.S. at 109-10, consistent with the Supreme Court's repeated recognition that when a guideline was not developed by the Commission based on empirical data of past sentencing practices and national sentencing experience, it is not likely that the guideline "reflect[s] a rough approximation of sentences that might achieve § 3553(a)'s objectives," and that a policy-based variance from such a guideline is not subject to "closer review" and is "not suspect." *See Kimbrough*, 552 U.S. at 109-10; *Spears*, 555 U.S. at 264; *Rita*, 551 U.S. at 348, 349-50. For its conclusion that the child pornography guideline is flawed for policy reasons, the Court relied on and quoted from several district court decisions and two articles. This was more than sufficient under Supreme Court law. *See Spears*, 555 U.S. at 262 (noting with approval that district court relied in part on two district court decisions which in turn relied on a Commission report); *Kimbrough*, 552 U.S. at 93 (noting with approval that court "commented that the case exemplified the 'disproportionate and unjust effect that crack cocaine guidelines have in sentencing'").

The Court noted that the fact that Congress largely legislated the child pornography guideline explains *why* the Commission did not develop that guideline based on empirical data and study. *See* Tr. at 45 (1/7/10); Tr. at 22 (11/12/09). The Court of Appeals appears to have misunderstood the Court to have meant "that Congress should have delegated still more . . . power to set sentencing policy" to the Commission, and to have disagreed with the guideline "merely" on the ground that Congress legislated it. 665 F.3d at 762. In fact, Judge Graham stated that it was "not going to make a ruling as to whether" it was "proper or not" for Congress to legislate the content of the guideline, discussed the guideline's flaws, and concluded that "regardless of the

authority with which they were arrived at," the guidelines are "simply one factor that the Court is called upon to consider" to achieve an appropriate sentence. Tr. at 45-46 (1/7/10); Tr. at 22-28 (11/12/09).

### B. The Court of Appeals' Decision – *Bistline I*

On January 9, 2012, the Court of Appeals reversed the sentence as substantively unreasonable. First, it rejected the abuse-of-discretion standard adopted by the Supreme Court in *Kimbrough* for policy disagreements, instead applying "close scrutiny." *United States v. Bistline*, 665 F.3d 758, 761, 763 (6th Cir. 2012). The Court of Appeals made a distinction between guidelines that are directed by Congress (like much of the child pornography guideline), and guidelines that are chosen by the Commission (like the drug guidelines at issue in *Kimbrough*). *Id*. at 763-64. With respect to the latter, if the Commission "makes a policy decision for reasons that lie outside its [empirical] expertise," the resulting guideline is "vulnerable on precisely that ground." *Id*. With respect to the former, "the district court that seeks to disagree with the guideline on policy grounds faces a considerably more formidable task than the district court did in *Kimbrough*." *Id*. at 764. "[W]ith respect to those enhancements" that were directed by Congress, the district court "must refute . . . Congress's reasons." *Id*. The District Court "may still disagree with the policies embodied in [congressional] directives," but "to survive the close scrutiny that follows, the court must explain its disagreement in terms that are persuasive on policy grounds." *Id*. at 763.

Second, the Court of Appeals found the Court's application of 18 U.S.C. § 3553(a) to the facts of this case to be insufficient to support the extent of the variance. *Id*. at 764-68. The Court of Appeals concluded that Judge Graham undervalued the seriousness of the offense, and that one day in the lock-up, registration as a sex offender, and a ten-year term of supervised release were

7

"not enough" to reflect its seriousness.  *Id*. at 764-66.  The Court of Appeals found the Court's conclusion that general deterrence would not be advanced by a harsher sentence to be "inexplicable." *Id*. at 767.

Third, the Court of Appeals noted that it did "not mean to imply that only a sentence in or around [the guideline] range will avoid disparities," but "we do not see how the sentence imposed here avoids them."  *Id*. at 767.

Fourth, the Court of Appeals acknowledged that this Court "was entitled to consider" Mr. Bistline's age, unblemished record, health, and family circumstances, but held that those circumstances did not justify the sentence imposed because (1) this Court "did not consider" the Commission's policy statements discouraging departures on these grounds, (2) this Court "did not address" the government's "challenges to Bistline's assertions about his condition and that of his wife, instead accepting them at face value," and (3) Mr. Bistline's children live "not far from his home" and "presumably could help care for his wife."  *Id*. at 767.  In addition, the Court of Appeals found that Mr. Bistline was not remorseful, "on the record at least."  *Id*. at 767-68.

In assessing the seriousness of the offense, the Court of Appeals appears to have misunderstood the factual record, the District Court's fact findings, and the District Court's reasoning in several important respects.  In assessing just punishment, the Court of Appeals did not consider Mr. Bistline's age, serious health problems, or need to care for his wife.  The Court of Appeals did not consider the need for incapacitation or the need for medical care and correctional treatment in the most effective manner at all.  The Court of Appeals ignored Dr. Tennenbaum's report, and it ignored the condition of supervised release imposed by this Court that Mr. Bistline undergo treatment as directed by the Probation Officer.

### C.     Proceedings in the Supreme Court – *Bistline I*

In opposing certiorari, the Solicitor General argued that the Court of Appeals "did not require the district court to impose a particular sentence on remand," that its decision "may not affect the sentence . . . on remand to any significant degree," and that if it does, Mr. Bistline can "raise his current claims—together with any other claims that may arise with respect to his resentencing—in a single petition." Brief for the United States in Opposition, *Bistline v. United States*, No. 11-1431, 2012 WL 3756871, at *9-10 (Aug. 29, 2012). The Solicitor General also characterized Judge Graham's policy disagreement with the child pornography guideline as resting solely on Congress's involvement, *id.* at *12-13, denied that the Court of Appeals applied a heightened standard of review to the policy disagreement, *id.* at *10-12, and conceded that the Court of Appeals applied a heightened standard of review to the District Court's application of § 3553(a) to the facts of the case but contended that that fact-bound determination did not warrant further review, *id.* at *10, 13. *See also* Petitioner's Reply Brief, *Bistline v. United States*, No. 11-1431, 2012 WL 4042964 (Sept 11, 2012). Certiorari was denied on October 9, 2012.

### D.     Resentencing

On November 6, 2012, Bistline submitted a sentencing memorandum, with supporting documents and empirical evidence, in which he systematically addressed each of the concerns and objections identified the Court of Appeals. The District Court granted the government's request for a continuance (R.44, Order); on November 29, 2012, it submitted its response. (R.46, Gov't Re-Sent. Mem., #472-505.) Though it acknowledged several reasons supporting a below-guideline sentence, it reiterated that the advisory guideline range is 63-78 months (*id.* at #472), and asked the court to impose a sentence of 60 months imprisonment followed by five years supervised release (*id.* at #473). It based this request on its assertion that some of the images depicted rape of

children, and because the guideline range did not account for "the type of material possessed (hard core) and the length of the movies" (*id.*), pointing to an upward departure provision to account for longer videos, although it had agreed that the enhancement for sadistic and masochistic images did not apply and had never before suggested an upward departure.

On December 5, 2012, Bistline filed a written response to the government's memorandum. (R.47, Reply, #506-42.)  With it, he provided a declaration by Phillip S. Wise, retired Assistant Director of United States Department of Justice, Federal Bureau of Prisons ["BOP"], who gave his expert view regarding the type of facility to which Bistline would be designated, the level and quality of medical treatment he would receive, and the potential challenges he would face, including abuse at the hands of other inmates. (R.47-1.)

The first resentencing hearing was held on December 6, 2012, one week after the government filed its memorandum. The government objected to Mr. Wise's declaration on the ground that it had not had a chance to read it and would like to respond to it.  (R.56, Tr. at #607.) The court indicated that the information provided by Mr. Wise "would be helpful" as it "has a direct relationship to the sentences in these kinds of cases."  The government also objected to the court's consideration of statistical evidence Bistline provided in Appendix 1 to his Sentencing Memorandum (*see* R.43, Appendix 1 at #411-15), consisting of four tables extracted from the Sentencing Commission's publicly available database by Paul J. Hofer, Policy Analyst for the Sentencing Resource Counsel of the Federal Public and Community Defenders (and former Special Projects Director for the U.S. Sentencing Commission). (*Id.* at #621.)  The court indicated that it would like "to give defense counsel the opportunity to get a witness here who can vouch for the statistical analysis . . . or to provide the government with statistics from a source that it would consider reliable."  (*Id.* at #622.)

After taking more evidence and noting that "we have more to do, which will require arranging for some additional witnesses to be here to testify," the court called a recess so it could attend to another previously scheduled case, and asked counsel "to remain available" for the afternoon.  (*Id.* at #654.)  By the time the court finished with the other case, it was 4:30 P.M.  (*Id.* at #655.)  Given the hour, the court offered to reconvene the next day (a Friday), but Bistline's counsel requested until Monday to communicate with potential witnesses and find out if there was another source for the challenged statistics. (*Id.* at #657-59.)  The government agreed.  (*Id.* at #659.)  The district court otherwise indicated that it was "the Court's intention to get this sentencing completed as soon as possible and no later than the end of this year, even if it requires another witness." (*Id.*)

On Monday, December 10, 2012, Bistline informed the district court of the availability of Philip Wise to testify, and requested that the court appoint him as an expert, due to significant costs.  (R.50, Supp. Mem., at #557-58.)  He also informed the court, based on information he had obtained from the Commission, that if the court made a specific request to the Commission for data not publicly available, "it can provide that data to the court." (*Id.* at #558.)

On December 12, 2012, the government withdrew its objection to Mr. Wise's declaration and requested "a few days to consult with the medical experts at the Bureau of Prisons to see if it will file a letter or affidavit in response." (R.51, Notice, at #567.)  It reiterated its objection to the data in Appendix 1. (*Id.* at #567-68.).  Resentencing was completed on January 4, 2012, at which time the District Court imposed a tougher sentence that required three years of home detention.

**E.      Sentencing Commission's Report on Child Pornography Offenses**

In December 2012, the Commission released a report to Congress on the child pornography guidelines for non-production offenders. *See* U.S. Sent'g Comm'n, *Report to the Congress: Federal Child Pornography Offenses* (2012) ["*Child Porn Report*"] (App. 3). The Commission explained that it compiled the report in large part due to the increasing rate of below-guideline sentences, pursuant to its statutory duty to "consider whether the guidelines are in need of revision in light of feedback from judges as reflected in their sentencing decisions," *id.* at ii, and because "as a result of recent changes in the computer and Internet technologies that typical non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degrees of culpability." *Id.* at ii; *id.* at 323.

The Commission explained that because the enhancements for computer use and type and volume of images "now apply to most offenders," the guideline "fail[s] to differentiate among offenders in terms of their culpability." *Id.* at iii, xi; *id.* at 209, 323. It explained that "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre of child pornography that previously was not widely circulated." *Id.* at 6. Because "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders," *id.* at xi, the "current guideline does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," *id.* at 323. The cumulative enhancements addressing the content and volume of images possessed, "in addition to base offense levels of 18 or 22, results in guideline ranges that are overly severe for some offenders in view of the nature of their collecting behavior." *Id.*

In describing the varying degrees of culpability, the Commission reported that the "typical" child pornography case now involves images depicting "prepubescent children engaging in sexually explicit conduct." *Id.* at 84. Some offenders "acquire enormous and often well-organized collections," sometimes up to hundreds of thousands of images; some "intentionally collect child pornography depicting the sexual torture of children, including infants and toddlers," *id.* at viii, 84-92; and some have collected material over "a series of decades" beginning in the pre-Internet era, *id.* at 80. The variety of images readily available on the Internet and found in offenders' possession range from "legal but sexually suggestive poses" to extremely graphic images "depicting violence, humiliation, bondage, and bestiality." *Id.* at 80-81, 90-91. Some offenders "are very discriminating" and limit their collection by preference. *Id.* at 81. Offenders "vary widely in their technological sophistication," with some relatively unsophisticated offenders using widely available peer-to-peer networks, like LimeWire, to receive or distribute material "in an indiscriminate manner," while others "use their technological expertise to create private and secure trading 'communities' and to evade, and help others evade, detection by law enforcement." *Id.* at viii, 61-62.

The Commission reported that approximately one quarter of federal offenders "received child pornography from commercial websites, thereby fostering the commercial markets," and one quarter engaged in "personal distribution" to another individual through bartering or trading of images, also described as a "market." *Id.* at 98-99. There is, however, no social science research available to support the theory that criminal punishments "have affected commercial or non-commercial 'markets' in child pornography since the advent of the Internet and P2P file-sharing." *Id.* at 98.

The Commission reported that some offenders have "non-sexual motivations for viewing child pornography," including "avoidance of stress or dissatisfaction with life." *Id.* at 79.  It reported that recent studies show that "appropriate 'treatment interventions . . . are associated with lower rates of recidivism—some of them very significant,'" *id.* at 278 & n.31 (quoting Center of Sex Offender Management, *The Comprehensive Approach to Sex Offender Management* 5 (2008)), and that "[p]olygraph testing of sex offenders is widely accepted by experts as a critically important corollary of effective treatment." *Id.* at 282.

The Commission reported that "not all child pornography offenders are pedophiles or engage in other sex offending." *Id.* at 104.  Approximately one in three offenders sentenced under § 2G2.2 "have engaged in" what the Commission deems "sexually dangerous behavior," criminal or non-criminal, past or present, based on allegations in PSRs, arrests, and convictions. *Id.* at ix-x, 204-05.  However, "the current guideline measures for offender culpability (*e.g.*, for distribution of child pornography, number of images possessed, possession of sado-masochistic images) are generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." *Id.* at 204.

The Commission concluded that "[t]he current sentencing scheme in §2G2.2 places a disproportionate emphasis on outdated measures of culpability regarding offenders' collecting behavior and insufficient emphases on offenders' community involvement and sexual dangerousness." *Id.* at xx; *see also id.* at 321.  The Commission asked Congress to enact legislation to provide it authority to amend the guidelines that "were promulgated pursuant to specific congressional directives or legislation directly amending the guidelines." *Id.* at xviii, 322.

The Commission recommends that the specific offense characteristics related to the types and volume of images, distribution and use of a computer "be updated to account more

14

meaningfully for the current spectrum of offense behavior regarding the nature of images, the volume of images, and other aspects of an offender's collecting behavior reflecting his culpability (*e.g.*, the extent to which an offender catalogued his child pornography collection by topics such as age, gender, or type of sexual activity depicted; the duration of an offender's collecting behavior; the number of unique, as opposed to duplicate, images possessed by an offender)," and "to reflect offenders' use of modern computer and Internet technologies." *Id.* at xviii-xix, 322-33.

F.    **Second Court of Appeals Decision –** *Bistline II*

On the Government's appeal, the Sixth Circuit again reversed the sentence as substantially unreasonable. Without acknowledging the Commission's Report or most of the District Court's reasoning, the Court dismissed as "social science" the uncontested research and data retusing each of Congress' reasons for the increases in the guideline's base offense level and specific offense characteristics -- the very "policy grounds" required by *Bistline I* to survive "close scrutiny," – but insufficient by nature to "refute" Congress' "retributive judgment[s]" under *Bistline II*. It further held that Defendant's age and health must be "extraordinary" to support a variance, and otherwise rejected the District Court's § 3553(a) analysis. *Bistline II* now stands as the stark example of *de facto* mandatory minimum sentence for possession of child pornography in the Sixth Circuit, and what amounts to *de novo* review of a trial court's justifications in order to reverse a below-guidelines sentence as substantively unreasonable. The Court of Appeals in *Bistline II* independently reweighed the § 3553(a) factors and in reference to the very provisions that made the guidelines mandatory before *Booker*, found that the sentence was not severe enough. Such a determination conflicts with well settled Supreme Court case law. However, to the extent that this Court now concludes that it has some obligation to impose a particular sentence of incarceration,

Defendant respectfully requests this Court to set forth its conclusion on the record, through a written decision.

### G.        Proceedings in the Supreme Court - - *Bistline II*

In again opposing certiorari, the Solicitor General argued, "Although the Court of Appeals has made clear that a sentence that includes only a single day of imprisonment is substantively unreasonable, it has not directed the imposition of a particular sentence on remand." Brief for the United States in Opposition, *Bistline v. United States*, 13-557, pg 14. (January 31, 2014). Furthermore, in arguing against certiorari, the Government acknowledged that while, "[i]t is far from clear what term of imprisonment the new District Judge will impose, the District Judge's reasoning may not contain the deficiencies that the Court of Appeals identified with the District Court's reasoning here." *Id*. Put simply, the decisions by the Court of Appeals in this case do not, and cannot, require this Court to impose any particular sentence.  The Government acknowledges this truth in their Brief in Opposition to Certiorari.

Defendant maintains that throughout the two sentencing hearings in this case, Judge Graham adequately set forth sufficient justification for his policy disagreement with the guidelines, and further articulated his proper consideration of all of the § 3553(a) factors in determining a fair and just sentence.  Likewise, the Solicitor General has taken the position that Mr. Bistline's sentence is permissible under the law, so long as the trial court properly justifies its decision by virtue of clearly articulated reasoning. See I(C), <u>supra</u>.  Hence, this Court may impose a non-custodial sentence, as long as the Court takes the time to clearly articulate its reasoning in justification of the sentence imposed. Judge Graham took the time to more clearly set forth his reasoning in a recent article. Graham, Hon. James L., *The Sixth Circuit Broke New Ground in Post-*

16

*Booker Guidelines Sentencing with a Pair of Important Decisions*, Federal Sentencing Reporter, Vol. 26, No. 2, pp. 102-114 (2013), (App. 61).

The Sixth Circuit recently reaffirmed a District Court's obligation to exercise its discretion in the case of *United States v. Kamper*, _____ F. Supp. _____, 2014 U.S. App. LEXIS 6492 (6th Cir. April 9, 2014). Interpreting Supreme Court case law, the Sixth Circuit in *Kamper* reiterated the fact that trial courts "are in a superior position to apply the § 3553(a) objectives to the particular facts of an individual case." *Id*. at *26. "A sentencing Judge thus has the authority both to reject and to replace a Guidelines ratio purely based on his disagreement with the policy justifications underlying the ratio or his determination that the ratio regularly produces unwarranted sentencing disparities." *Id*. at *27. In fact, "[a] district court errs when it 'fails to appreciate the scope of its discretion' and 'indicates that policy disagreement are not a proper basis to vary.'" *Id*. at *29 (citing *United States v. Johnson*, 407 F. App'x 810 (6th Cir. 2010)). After all, District Courts "are not free to cede their discretion" "for reasons that *Kimbrough* rejected, such as institutional competence, deference to Congress, or the risk that other Judges will set different ratios." *Id*. at *30 (quoting *Johnson, supra*). The Court in *Kamper* further stated that this "directive is true even when Congress has expressed empirical or value judgments that underlie the selected Guidelines ratio." *Id*. at fn. 2 citing *Bistline I,* the Court of Appeals in *Kamper* found that the trial court erred when it failed to recognize its authority to reject congressionally mandated guidelines on policy grounds, even if such a rejection must be based on "particularly persuasive policy reasons." *Kamper, supra* at fn. 2 (interpreting *Bistline I*). Through his arguments, the evidence presented, and the empirical support provided to the courts, Bistline has presented particularly persuasive reasons to support his requested sentence.

## II.    <u>ARGUMENT – WEIGHING § 3553(A) FACTORS</u>

**Given the Nature and Circumstances of Mr. Bistline's Offense and His History and Characteristics, The Sentence Requested Is Sufficient, But Not Greater Than Necessary, to Satisfy the Purposes of Sentencing.**

### A.    The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

Mr. Bistline's son installed Lime Wire on his computer so that his father could listen to music.  *See* Sealed Exhibit at 11 (Letter of Jed Bistline).  Mr. Bistline had become severely depressed in reaction to his multiple debilitating medical problems and his wife's mental and physical deterioration.  *See* Sealed Exhibit at 5 (Psychological Consultation at 5 (12/9/2009)).  In 2005 or 2006, Mr. Bistline typed in "Lolita," then viewed child pornography from time to time until a search warrant was served in October 2007.  PSR ¶ 18.  As Mr. Bistline said, he felt that he "had lost everything," and it was "a pitiful way of reconstructing myself."  Sealed Exhibit at 4 (Psychological Consultation at 4 (12/9/2009)).  Dr. Tennenbaum concluded that Mr. Bistline "is a medically fragile, emotionally distraught, anxious and depressed adult whose incapacity and emotional deterioration led directly to committing the offense."  *Id.* at 5.

When agents arrived with a search warrant in October of 2007, Mr. Bistline immediately admitted to having child pornography on his computer, did not try to minimize his conduct, and asked only that he be allowed to break the news to his wife.  PSR ¶ 12.  He was not arrested or charged with any offense at that time.  A year and a half later, in the Spring of 2009, the prosecutor contacted undersigned counsel to propose that Mr. Bistline plead guilty to an information charging possession of child pornography.  Mr. Bistline has had nothing to do with child pornography since October 2007, and has complied with all terms of pre-trial and post-sentencing supervision since he was arraigned in April of 2009.

Mr. Bistline's computer contained 305 digital images and 56 digital movie files containing child pornography.  Mr. Bistline did not pay for the images or trade other images for them.  As the FBI agent testified, the Lime Wire program costs nothing to install.  It provides images in response to queries without any monetary payment or other quid pro quo.  *See* Tr. at 27, 30-31 (1/7/10); Sealed Exhibit at 11 (Letter of Jed Bistline).  When Lime Wire is installed, it automatically defaults to sharing status; specific action is required to eliminate file sharing.  Tr. at 32-33 (1/7/10); Sealed Exhibit at 11 (Letter of Jed Bistline).  Mr. Bistline's son installed the Lime Wire program in a folder named "Richard," the program itself created a folder named "documents and settings/Richard/shared," and the images were found in that folder.  *See id.*; PSR ¶ 14.

Like a Google search, Mr. Bistline typed in a search term and the Lime Wire program returned the images.  As the FBI agent testified, when a person types in a query, Lime Wire sends a list of files responsive to the query that it "automatically" collects from other computers that are connected to Lime Wire.  Tr. at 19-20, 22 (1/7/10).  When the recipient clicks on files in the list, they "automatically go to the share folder," and when someone else on Lime Wire makes a query, the program automatically accesses those files.  *Id.* at 24, 36.  Mr. Bistline did not affirmatively save or share the images.  Rather, the images were automatically saved in the "shared" folder, which had been "created by a default function of the software itself, and not by [Mr. Bistline or his son]," Sealed Exhibit at 11 (Letter of Jed Bistline), and the images were automatically shared by Lime Wire.  Tr. at 24, 36 (1/7/10).   As the FBI agent testified, child pornography offenders usually move files from the shared directory in order to "really organize their collections," *id.* at 25, but here, the files remained in the shared folder.  PSR ¶ 14.  Mr. Bistline did not "place[] [the images] in his 'shared' files on a 'peer to peer' internet program," as the Court of Appeals believed. *See* 665 F.3d at 760.

19

Mr. Bistline is 71 years old.  He has no criminal history, and has complied with all conditions of release over the past four and a half years.  PSR ¶¶ 35-36; Supplemental PSR ¶ 2. Mr. Bistline graduated from college in 1966 with a Bachelor of Science Degree in Education.  He was employed as a high school teacher for seven years,[2] held a variety of jobs including sales, tree service work, being a self-employed electrician for the next sixteen years, worked as a training officer for the Ohio Department of Transportation for the next ten years, and was Safety Director for United Pre Cast Inc. for the next four years.  He retired in 2004.  PSR ¶¶ 48, 51-53.

Mr. Bistline has been married for forty-eight years, and has three adult daughters, one adult son, and seven grandchildren.  PSR ¶¶ 39-40; Sealed Exhibit at 8-10 (Letter of Krista Bistline). Mr. Bistline's wife and daughters appeared in court to support him at the initial sentencing hearing. Tr. at 8 (11/12/09).  They believe that this behavior was out of character and that he will never become involved in possessing child pornography again.  PSR ¶¶ 42, 44.  Mr. Bistline tearfully reported to Dr. Tennenbaum that he "let them all down," that his son "is ashamed of me" and "doesn't want to talk to me now."  Sealed Exhibit at 2 (Psychological Consultation at 2 (12/9/2009)).  Mr. Bistline stated without prompting that he does not like to see children hurt.  *Id*. at 3.  He is deeply ashamed and remorseful for his actions.  *Id*. at 2-3.  The Court of Appeals was wrong in concluding that Mr. Bistline is not remorseful.  665 F.3d at 767-68.

The Court of Appeals stated that "the court here did not address the government's challenges to Bistline's assertions about his condition and that of his wife, instead accepting them at face value." 665 F.3d at 767.  The Court of Appeals did not see and speak to Mr. Bistline like Judge Graham did, or visit the Bistlines' home, or speak with Mr. and Mrs. Bistline and their

---

[2] The government previously speculated that Mr. Bistline might have had to leave teaching because of sexual behavior with minors.  The Probation Officer confirmed that Mr. Bistline left his two teaching jobs under entirely innocent circumstances.  PSR ¶ 53.

daughter as the Probation Officer did.  The prosecutor questioned the severity of Mr. Bistline's physical impairments because he was mowing the lawn when the search warrant was served in October 2007.  Mr. Bistline was using a riding lawn mower.  The government's challenge is specious.

Mr. Bistline's diagnoses include myocardial infarction (heart attack), stroke, coronary artery disease, atrial fibrillation, hypertension (high blood pressure), acoustic neuroma, deep venous thrombosis of his lower extremity, and depression.  After the resentencing hearing in this case, on January 21, 2012, Mr. Bistline had a heart attack, for which he underwent left heart catheterization, angioplasty, and placement of a stent.  Mr. Bistline has a pacemaker and a defibrillator to keep his heart beating.  He suffered two strokes, one in 1995 and one in 2005.  In 1996, he had a tumor removed from the auditory nerve on his right ear.  As a result, he is deaf in his right ear, has 30% hearing in his left ear, and has a visible droop on the right side of his face which interferes with his speech and ability to see out of his right eye.  He had surgery on his knee for arthritis which causes him to walk with a limp and lose his balance frequently.  He has been physically incapable of engaging in sexual activity since age 60.  He takes multiple medications per day, including Prozac, Clopidogrel Bisulfate, Terazosin, Simvastatin, Warfarin, and Amiodarone.  *See* Sealed Exhibit at 8-10 (Letter of Krista Bistline); *id*. at 7 (Letter of Dr. Carducci); *id*. at 12-27 (Richard Bistline Medical Records); *id*. at 3 (Psychological Consultation at 3 (12/9/2009)); PSR ¶ 45; Supplemental PSR ¶ 4.  Mr. Bistline's primary care doctor believes that "incarceration would be detrimental to Mr. Bistline's health."  *See* Sealed Exhibit at 7 (Letter of Dr. Carducci).

Mr. Bistline has recently been diagnosed with suffering severe depression and stress.  He is undergoing treatment at Behavioral Healthcare Partners of Central Ohio, Inc., in Mount Vernon, Ohio.  Supplemental PSR ¶ 8.  He has further exhibited suicidal ideation.  Id.

Mr. Bistline's wife, age 68, was diagnosed with non-Hodgkins lymphoma in 1995 and was given a 50% chance of survival.  She was treated with chemotherapy, radiation, and a peripheral stem cell transplant.   In 2010, Mrs. Bistline was diagnosed with an aggressive form of endometrial cancer apparently caused by the radiation treatment in 1995.  She had surgery to remove the cancer and was again treated with chemotherapy.  She also has cholecystitis and pancreatitis, and has had foot surgery and gallbladder surgery.  The residual effects of Mrs. Bistline's cancer and treatments include (1) permanent nerve damage and pain from the stem cell transplant; (2) lymphedema, *i.e.*, swelling due to the blockage of the lymph passages in her legs; (3) deep venous thrombosis (clots) in her legs, and a large blood clot in her right leg from her groin to her ankle; (4) cellulitis, a painful skin infection caused by bacteria; (5) a permanently compromised immune system; (6) weakness and numbness in her hands and feet; (7) confusion, fatigue, dizziness, insomnia, loss of balance and memory problems.  In addition, she has a severe thyroid condition which also causes confusion and dizziness.  *See* Sealed Exhibit at 8-10 (Letter of Krista Bistline); *id*. at 7 (Letter of Dr. Carducci); *id*. at 28-34 (Carol Bistline Medical Records).

Mrs. Bistline cannot live alone and cannot safely be alone for any period of time.  She has fallen multiple times in the bathroom, and fell down the basement stairs and suffered a concussion. She does not drive any significant distance.  Mr. Bistline has taken care of her throughout all of her illnesses, treatments, and procedures, and she could not function without his daily assistance. He makes sure she is taking the right medications in the right dosages, drives her to medical appointments, helps her get dressed every day, cooks their meals, and does most of the household

22

chores.  *See* Sealed Exhibit at 8-10 (Letter of Krista Bistline); *id*. at 7 (Letter of Dr. Carducci); *id*. at 28-34 (Carol Bistline Medical Records); *id*. at 5 (Psychological Consultation at 5 (12/9/2009)); Tr. at 10-11 (11/12/09); PSR ¶¶ 40, 44.  Mrs. Bistline's primary care doctor notes that Mr. Bistline "has been a primary caregiver for his wife Carol," and believes that if he were incarcerated, it "would affect her care both physically and emotionally."  *See* Sealed Exhibit at 7 (Letter of Dr. Carducci).

The Court of Appeals stated without factual basis that the Bistlines' "four adult children . . . live not far from his home and presumably could help care for his wife."  *Id*. at 767; *see also id*. at 760 (referring to the "putative need to care for his wife").  To be clear, Mrs. Bistline needs fairly constant care and supervision.  The adult children live 35 minutes, 50 minutes, and over two hours away.  They all work to support themselves and their families.  Two of the daughters work seven days a week.  One daughter is also the mother of five and another is the mother of two.  The son, as his sister puts it, "is of very limited use when it comes to helping with my parents."  Sealed Exhibit at 8-10 (Letter of Krista Bistline).  Mr. Bistline's social security payments and a small pension just cover their basic monthly expenses.  PSR ¶¶ 50, 54. They lack the means to pay for the daily care and supervision Mrs. Bistline needs.  Mrs. Bistline's condition has not improved since the Resentencing.  Supplemental PSR ¶ 6.

Dr. Tennenbaum was appointed by this Court to assess Mr. Bistline's mental condition, and specifically whether he poses any physical danger to children; whether he is likely to repeat the offense or engage in similar activities in the future; the existence of any underlying psychological factors which led him to commit the offense; recommendations for appropriate treatment; and recommendations for any appropriate limitations on his activities during supervised release.  Sealed Exhibit at 1 (Psychological Consultation at 1 (12/9/2009)).

Dr. Tennenbaum found Mr. Bistline to be a "kindly," "gentle and well-humored man" who is "clinically severely depressed." *Id.* at 4. Based on the MMPI-2 and his three-hour interview of Mr. Bistline, Dr. Tennenbaum concluded that he "is a medically fragile, emotionally distraught, anxious and depressed adult whose incapacity and emotional deterioration led directly to committing the offense." *Id.* at 5. Mr. Bistline had "no risk factors among the 20 factors" in the Sexual Violence Risk-20 test Dr. Tennenbaum administered. *Id.* at 5. Dr. Tennenbaum concluded that, though there is no such thing as "no" risk, "the likelihood of repeat offending is very low." *Id.* There was "no data" to "suggest that Mr. Bistline poses any physical danger to children," "to repeat the offense, or engage in similar activities." *Id.*

As the Probation Officer can confirm, Mr. Bistline successfully completed a sex offender treatment program at Southeast, Inc. He participated in weekly group therapy sessions, using cognitive behavioral therapy, from January 28, 2010 to January 11, 2011. He met all of the goals of the program: He acknowledged personal responsibility for his offending behavior, no longer engages in that behavior, improved his understanding of how sexual abuse and assault negatively impacts victims, and made progress towards achieving lifestyle stability, healthy social supports, and relapse prevention.

Mr. Bistline was diagnosed by Dr. Tennenbaum with severe clinical depression, and by Southeast, Inc. with Voyeurism and Sexual Disorder Not Otherwise Specified. He is not a pedophile. He continues treatment for his depression. Supplemental PSR ¶ 8.

As the Probation Officer can confirm, Mr. Bistline took a polygraph test in 2010, and was found to be non-deceptive. The questions and answers were as follows:

Is your sexual history disclosure questionnaire truthful and complete? Yes.

Between the ages of 21 and 67 have you had sexual contact with a minor? No.

24

Do you have a paraphilia that you have not disclosed to your treatment provider at Southeast? No.

## B.    Purposes of Sentencing

In enacting the Sentencing Reform Act, Congress did "not favor[] one purpose of sentencing over another," except that rehabilitation was not to be a reason to impose a sentence of incarceration. *See* S. Rep. No. 98-225, at 67 (1983). Rather, "each of the four stated purposes should be considered in imposing sentence in a particular case," and "one purpose of sentencing may have more bearing on the imposition of sentence in a particular case than another purpose has." *Id*. at 68. In choosing what kind of sentence to impose, the court "must consider" all of the purposes and factors set forth in § 3553(a). *Id*. at 119. "Whether [imprisonment] should be imposed when authorized is a question to be resolved after balancing all the relevant considerations." *Id*.; *see also United States v. Bridgewater*, 479 F.3d 439, 442 (6th Cir. 2007) ("often one or two [purposes] prevail, while others pale").

Here, all of the purposes of sentencing point in the same direction. Mr. Bistline's offense is less serious than the offenses Congress had in mind, and Mr. Bistline is not the dangerous offender Congress envisioned. Incarceration is not necessary to protect the public, and would be a particularly harsh punishment for Mr. Bistline, who is 71 years old and suffers from serious health problems that are unlikely to be even adequately treated in prison, and is unable to protect himself. Mr. Bistline's age, family circumstances, education and employment history point to a very low risk of further offending. As a sex offender who has successfully completed cognitive behavioral therapy, his already very low likelihood of reoffending has been even further reduced. Mr. Bistline is needed to care for his wife, who, because of her physical and mental impairments,

cannot live alone or safely be alone for any period of time. Any medical or mental health treatment Mr. Bistline will yet require is best received outside of prison.

### 1. Need for Just Punishment in Light of the Seriousness of the Offense, 18 U.S.C. § 3553(a).

#### a. Seriousness of the offense

Congress's actions with respect to the child pornography guideline have stemmed in large part from the belief that those who view child pornography are actually child molesters.[3] Under this view, punishing child pornography possessors serves as a proxy for punishing child sexual abusers. Aside from the lack of evidence to support this belief in general,[4] Mr. Bistline has not

---

[3] *See* 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) (in support of directing increase to base offense level from 10 to 13); *id*. at H6736, H6738 (Sept. 24, 1991) (Representative Wolf) (same)(App. 4); 141 Cong. Rec. S5509 (Apr. 6, 1995) (Senator Grassley) (in support of directing additional increase in base offense level from 13 to 15)(App. 5); 144 Cong. Rec. S12262 (Oct. 9, 1998) (Senator Hatch) (in support of directing expanded reach of "distribution" enhancement)(App. 6); 149 Cong. Rec. S5126 (Apr. 10, 2003) (Senator Hatch) (in support of Feeney Amendment, which included number-of-images enhancement)(App. 7); *see also generally* Child Pornography Prevention Act of 2006, Pub. L. No. 104-208, § 121, 110 Stat. 3009, 3009-26 (1996); S. Rep. No. 108-2, at 3 (2003), (App. 62) ; S. Rep. No. 104-358, at 12-14 (1996), (App. 63); USSG app. C, amend. 592 (Nov. 1, 2000).

[4] To support its contention that there is a "high incidence of previously undisclosed contact offenses against children," the government cited the "Butner study." Gov't Supp. Sent. Mem. at 12. However, one of the Butner study's authors has since recanted, stating that "the argument that the majority of [child pornography] offenders are indeed contact sexual offenders and, therefore, dangerous predators . . . simply is not supported by the scientific evidence." Andres E. Hernandez, *Psychological and Behavioral Characteristics of Child Pornography Offenders in Treatment,* at 4 (2009), http://www.iprc.unc.edu /G8/Hernandez_position_paper_Global_Symposium.pdf, (App. 8). And the study has been thoroughly discredited by others. *See* Melissa Hamilton, *The Child Pornography Crusade and its Net Widening Effect*, 33 Cardozo L. Rev. 1679, 1703-10 (2012)(App. 9); Written Statement of Richard Wollert, Ph.D. before the U.S. Sent'g. Comm'n, at 10-14, 18 (Feb. 15, 2012); Richard Wollert *et al.*, *Federal Internet Child Pornography Offenders – Limited Offense Histories and Low Recidivism Rates*, in The Sex Offender, Volume VII (Barbara K. Schwartz ed, forthcoming 2012)(App. 10); Statement of Heather E. Williams Before the U.S. Sent'g Comm'n, Phoenix, Ariz., at 49-51 (Jan. 21, 2010)(App. 11). A number of courts have rejected the Butner study as a basis for punishment, along with the notion that a defendant may be punished based on speculation that he might be a child molester. *See, e.g.*, *United States v. C.R.*, 792 F. Supp. 2d 343, 375-76 (E.D.N.Y. 2011); *United States v. Phinney*, 599 F. Supp. 2d 1037, 1045 n.10 (E.D. Wis. 2009); *United States v. Johnson*, 588 F. Supp. 2d 997, 1005 (S.D. Iowa 2008); *see also United States v. Apodaca*, 641 F.3d 1077, 1087 (9th Cir. 2011) (Fletcher, J., concurring).

been convicted of sexually abusing a child, has not in fact sexually abused a child, and is at no risk of harming a child. *See* Sealed Exhibit at 5 (Psychological Consultation at 5 (12/9/2009)). This distinguishes Mr. Bistline from the offenders Congress had in mind, and is therefore highly relevant. *See United States v. Marshall*, __ F. Supp. 2d __, 2012 WL 2510845, at *2 (N.D. Ohio June 29, 2012) (rejecting presumption that "those who view child pornography are indistinguishable from those who actually abuse children," finding instead that the "[e]mpirical data strongly suggests that viewing child pornography does not equate to child molestation"); *United States v. Kelly*, __ F. Supp.2d __, 2012 WL 2367084, at *5 (D.N.M. June 20, 2012) (rejecting government's argument that guideline range is appropriate because of the "chance that [defendant] will molest children in the future, or that he has in the past," as this "speculation is directly contrary to submissions by Kelly's therapist and Kelly's psychiatrist," the defendant "has never been accused of hands-on abuse," "empirical testing disproves the fear that the typical child pornography defendant will go on to molest children," and "[a]ny Guideline based on unsupported fears, rather than actual evidence, is far more likely to render an unreasonable sentence"); *United States v. Cruikshank*, 667 F. Supp. 2d 697, 703 (S.D. W.Va. 2009) ("Rarely able to catch the monsters that create the images, society reflexively nominates the consumers of this toxic material as proxies for the depraved producers and publishers."); *United States v. Phinney*, 599 F. Supp. 2d 1037, 1045 n.10 (E.D. Wis. 2009) ("[C]ourts should not assume that a defendant has or will commit additional crimes without a reliable basis."); *United States v. Grober,* 595 F. Supp. 2d 382, 404 (D.N.J. 2008) ("[T]he Court cannot make [Defendant] a surrogate for the monsters who prey on child victims through actual contact."), *aff'd* 624 F.3d 592 (3d Cir. 2010).

Another primary justification for severely punishing child pornography possessors is that they support the market for child pornography and thus encourage the abuse of more children in

order to create new images. *See* 136 Cong. Rec. S4730 (Apr. 20, 1990)(App. 12).; Tr. at 7 (1/7/2010 (prosecutor arguing that "it is the trade in the matter that makes it more valuable" and "contributes to more children being abused"). Aside from the evidence that disproves this belief in general, *see* Part IV.A.2, *infra*, Mr. Bistline did not pay for or trade any images. Moreover, there is no communication or contact between Lime Wire users: Just as Lime Wire did not notify Mr. Bistline when it shared images from his computer, Lime Wire did not notify the person(s) from whose computer(s) it obtained images it sent to Mr. Bistline. As the FBI agent testified, when law enforcement downloads files from Lime Wire, it is not contributing to the global demand for child pornography and not causing any new child pornography to be made because the files already exist and no financial or other incentive is given. Tr. at 31-32 (1/7/2010). Under these circumstances, where no economic or other incentive was given to anyone to create or post more or newer images, there was "no market effect" from Mr. Bistline's actions. Troy Stabenow, *A Method for Careful Study: A Proposal for Reforming the Child Pornography Guidelines*, 24 Fed. Sent'g Rep. 108, 124-25 (2011) ["Stabenow, *A Method for Careful Study*"](App. 14).

As Judge Graham noted at the original sentencing, technology has changed the nature of this offense. In the past, child pornography had to be obtained in a risky and secretive manner for substantial sums of money, whereas today, "even the worst kind of child pornography is available at the mere click of a mouse through the internet without any payment whatsoever." Tr. at 25 (11/12/09); *see also* Tr. at 46 (1/7/2010) ("[I]t does not require much planning or effort to accomplish this offense, using this kind of technology."). The Court of Appeals appears to have misunderstood the District Court to mean that it believed that knowing possession of child pornography is a crime that "happens to a defendant." 665 F.3d at 765.

To the contrary, the availability of this material through the click of a mouse means that less dangerous people commit this offense than was previously the case, even though the guideline range is much higher than it was previously.  Before widespread dissemination on the internet, only those bold enough to seek out child pornography by contacting suppliers directly or through the mail were able to obtain it.  In 1994 and 1995, the government prosecuted a total of only 90 defendants convicted of possessing, receiving, or distributing child pornography and only 24% used a computer.  *See* U.S. Sent'g. Comm'n, *Report to the Congress: Sex Crimes Against Children* 29 (1996) ["U.S. Sent'g Comm'n, *1996 Report*"], (App. 14).  In 2011, the government prosecuted 1,645 defendants convicted of possessing, receiving, or distributing child pornography, and 97.4% used a computer.  U.S. Sent'g. Comm'n, *Use of Guidelines and Specific Offense Characteristics* (2011), (App. 15); U.S. Sent'g Comm'n, *2011 Sourcebook of Federal Sentencing Statistics*, tbl.17. The Internet, by rendering child pornography immediately and anonymously accessible, has "facilitate[d]. . . a new kind of crime" that in most cases would not otherwise have been committed. *See* Andreas Frei *et al.*, *Paedophilia on the Internet—A Study of 33 Convicted Offenders in the Canton of Lucerne*, 135 Swiss Med. Weekly 488, 492 (2005), (App. 16); *see also* Jérôme Endrass *et al.,*, *The Consumption of Internet Child Pornography and Violent Sex Offending*, 9 BMC Psychiatry 43, 44 (2009), (App. 17); L. Webb *et al.*, *Characteristics of Internet Child Pornography Offenders: A Comparison with Child Molesters*, 19 Sexual Abuse 449, 450 (2007), (App. 18).  In short, the change in technology is relevant, in part, because it means that as the population of child pornography offenders has become less dangerous, punishment has greatly increased.  *See* Richard Wollert, PhD, *The Implication of Recidivism Research and Clinical Experience For Assessing and Treating Federal Child Pornography Offenders:  Written Testimony Presented to the U.S. Sentencing Commission* at 4-5 (Feb. 15, 2012), (App. 19).

While Mr. Bistline intentionally accessed and viewed child pornography, *see* 18 U.S.C. § 2252(a)(4)(B), any distribution that occurred "was the automatic result of the [Lime Wire] program." Tr. at 26 (11/12/09).  As the Federal Trade Commission has explained, "[s]ome users may not understand the configuration of the P2P file-sharing software's 'shared folder' and may inadvertently share sensitive personal files residing on their hard drives."  Staff Report, Federal Trade Commission, *Peer-to-Peer File-Sharing Technology: Consumer Protection and Computer Issues* 7 (2005), (App. 20).  "Some consumers may distribute [child pornography] files unintentionally" because "P2P file-sharing software often is configured so that any file a user downloads is automatically made available for redistribution to anyone else using the software." *Id*. at 11.  That is what happened here.  "Because of the nature of peer-to-peer file sharing programs, a simple possessory crime evolves into a distribution offense as soon as someone accesses a shared file." *United States v. Strayer*, 2010 WL 2560466, at *12 (D. Neb. June 24, 2010).

In determining an appropriate sentence, this Court must consider the sentences available by statute. *See* 18 U.S.C. § 3553(a)(3).  Congress set the statutory range of imprisonment for Mr. Bistline's offense at zero to ten years, and authorized a term of probation.  *See* 18 U.S.C. § 2252(b)(2); 18 USC § 3561(a); 18 USC § 3559(a).  The top of Mr. Bistline's guideline range of 87-108 months before a reduction for acceptance of responsibility is just 12 months shy of the statutory maximum.  As many courts have observed, the child pornography guideline, by enhancing sentences based upon factors that are inherent in the crime and thus appear in nearly every case, concentrates offenders at or near the statutory maximum and thus fails to meaningfully

distinguish more serious offenders from less serious offenders.[5]  As the Sixth Circuit has observed, sentences at or near the statutory maximum should be reserved for the "worst possible variation of the crime" committed by the most dangerous offender.  *See United States v. Aleo*, 681 F.3d 290, 302 (6th Cir. 2012); *cf. United States v. Poynter*, 495 F.3d 349, 354 (6th Cir. 2007) ("not all repeat sex offenders deserve" to be sentenced at the statutory maximum; "otherwise, Congress would not have set a statutory range of 0-60 years").

In *United States v. Bridgewater*, 479 F.3d 439 (6th Cir. 2007), cited by the Sixth Circuit in *Poynter* as the kind of case in which a child pornography possessor *would* be deserving of the statutory maximum, the Sixth Circuit affirmed a 10-year statutory-maximum sentence.  The district court had concluded that Bridgewater was "too dangerous" to be "placed on probation and sent back into the community."  *Id*. at 440.  He took "photographs of [himself] molesting young girls who were in [his] care" while running a home for abused and neglected children, successfully concealed these offenses and his criminal past from others "despite [his] continued proximity to youth in church programs," and his own son "condemned" him and "questioned his remorse and sincerity" in a letter to the court.  *Id*. at 440-42.  The Sixth Circuit has also given examples of factors that in general might justify a sentence at or approaching the statutory maximum as, for example, fleeing from authorities, failing to accept responsibility, using violence, or having prior convictions for of sex offenses with children.  *See Aleo*, 681 F.3d at 302; *Poynter*, 495 F.3d at 354.

Mr. Bistline's conduct and characteristics could not be farther from these, yet his guideline range is 12 months shy of the statutory maximum.  He has never improperly touched a child, he shared files only by virtue of the automatic operation of Lime Wire, he admitted what he had done

---

[5] *See, e.g., United States v. Durham,* 618 F.3d 921, 931 n.7 (8th Cir. 2010); *United States v. Dorvee*, 616 F.3d 174, 187 (2d Cir. 2010); *United States v. Kelly*, 2012 WL 236 7084, at *6-7; *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1105 (N.D. Iowa 2009); *Cruikshank*, 667 F. Supp. 2d at 702.

as soon as the agents appeared with a search warrant, and he has fully accepted responsibility for his offense. Dr. Tennenbaum concluded that he presents no risk of ever harming a child. His family reports that this behavior was not consistent with his character and believes that he will never engage in that kind of behavior again. Mr. Bistline is the offender for whom the *minimum* statutorily authorized punishment is reserved.

One of the goals of the SRA was to provide for proportionality in punishment among offenses of different seriousness. S. Rep. No. 98-225, at 45-46 (1983), (App. 21). The child pornography guideline fails that goal, as several courts have noted. *See, e.g.*, *United States v. Dorvee*, 616 F.3d 174, 187 (2010); *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1106 (N.D. Iowa 2009); *Cruikshank*, 667 F. Supp. 2d at 702. A defendant who used a computer to entice a 12-year-old to engage in illegal sexual activity, but was caught before actually having sex with the child, would receive an offense level of 30, *see* § 2G1.3(a)(3), (b)(3), just one level higher than Mr. Bistline's. In order to receive an offense level of 29 as Mr. Bistline did for viewing child pornography, one could, for example, attempt to commit murder resulting in serious bodily injury, *see* § 2A2.1(a)(2), (b)(1); commit voluntary manslaughter, *see* § 2A1.3; hold a person in involuntary servitude for over a year and cause permanent bodily injury, *see* § 2H4.1(a)(1), (b)(1), (b)(3); or rob a bank of $250,000, while brandishing a weapon and causing bodily injury, *see* § 2B3.1(a), (b)(1), (b)(2), (b)(7).

The Court of Appeals stated that the "district court's explanation of his sentence did not include any recognition" of the "great harm" inflicted on victims by Mr. Bistline's viewing of the images. 665 F.3d at 766. Judge Graham's very first concern at the initial sentencing was that Mr. Bistline be required to read the victim impact statements to impress upon him that the children involved suffer terribly as a result of these images being viewed. Tr. at 9-10, 31-32 (11/12/09).

This Court confirmed that Mr. Bistline read those statements.  Tr. at 4-5, 51 (1/7/2010).  Since the initial sentencing, as a condition imposed by the Court, Mr. Bistline participated in weekly treatment for one year, and in doing so, reached a better understanding of how the sexual abuse depicted in the images he viewed negatively impacts the child victims.  *See* Part I.A, *supra*.

This Court recognized that the images are "horrendous" and "repulsive," and depict "some of the most detestable actions that humans are capable of committing."   At the same time, the Court appropriately distinguished Mr. Bistline from people who produce child pornography, receive financial gain from it, pay for it, or knowingly distribute it, in terms of the seriousness of their conduct and the need for incapacitation to protect the public.  Tr. at 25-26, 28-29 (11/12/09); Tr. at 47 (1/7/2010).

   *b.*  *Just punishment*

The same prison sentence for an older offender amounts to harsher punishment than that for a young or middle-aged offender, because the sentence is a greater proportion of an older offender's remaining life and can amount to a life sentence.  *See* Hannah T.S. Long, *The "Inequality" of Incarceration*, 31 Colum. J. L. & Soc. Probs. 321, 343-44 (1998) (suggesting that prison sentences be adjusted for life expectancy due to age and illness), (App. 22).  For example, the three-year prison sentence that Brian Gall was facing in his mid-twenties that the district court reduced to probation, *see Gall*, 552 U.S. at 41-45, pales in comparison to a similar sentence for a defendant like Mr. Bistline who is 71 years old and has multiple serious health problems.  Offenders' health problems before and during incarceration "accelerate their aging processes to an average of 11.5 years older than their chronological ages after age 50."  U.S. Dep't of Justice, National Institute of Corrections, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, at 10 (2004), *available at* http://www.nicic.org/pubs/

33

2004/018735.pdf, (App. 23).   Offenders who committed their first crime after the age of 50 "have problems adjusting to prison since they are new to the environment, which will cause underlying stress and probable stress-related health problems," and they are "easy prey" for more experienced inmates.  *Id*. at 10.  For older prisoners who are unfamiliar with prison culture, "the prison sentence represents nothing short of a disaster, a catastrophe, and, in consequence, they are often in a psychological state of trauma."  Elaine Crawley & Richard Sparks, *Older Men in Prison: Survival, Coping, and Identity*, in *The Effects of Imprisonment* 343, 346-47 (Alison Liebling & Shadd Maruna eds., 2005)

A 71-year-old inmate with Mr. Bistline's health problems is likely to suffer greater punishment than the average inmate because the Bureau of Prisons often fails to provide adequate or even necessary medical treatment.  An audit by the Office of the Inspector General found that the Bureau of Prisons often does not provide "required medical services to inmates."  U.S. Dep't of Justice, Office of the Inspector General, Audit Division, *The Federal Bureau of Prisons' Efforts to Manage Health Care* 32, 34 (2008), (App. 24).[6]  As one example, an inmate was referred to the chronic care clinic upon intake, but was not seen until five months later, and although an EKG performed at that time showed abnormal results, the results were not reviewed by a doctor until two days later, the day the inmate died of a heart attack.  *Id*. at 33.  Preventive services are often not provided, chronic conditions (such as hypertension) and medication side effects are often not monitored, and unqualified persons are providing services.  *Id*. at ii-xx, 32-34, 51-52.

Mr. Bistline walks with a limp, frequently loses his balance, is deaf in one ear, has difficulty seeing out of his right eye, and has palsy in his face which affects his speech.  As this Court observed, "[t]his man would not fare well in prison."  Tr. at 50 (1/7/2010).  A sex offender who is

---

[6] Available at http://www.justice.gov/oig/reports/BOP/a0808/final.pdf.

too elderly and infirm to defend himself may face the harshest possible consequences.  One judge recently reported:  "The last defendant this Court was required to sentence to the mandatory five-year prison term for receipt of child pornography, a 72–year old retired attorney, was beaten to death within days of arriving at the federal penitentiary."  *Kelly*, 2012 WL 236 7084, at *2 n.1.

The Court of Appeals believed that the requirement that Mr. Bistline register as a sex offender and the publication of that information to the community and his friends and neighbors was not relevant in reflecting the seriousness of the offense because these are not consequences of the sentence, but of the conviction.   665 F.3d at 765.  Mr. Bistline recognizes that this Court must heed the Court of Appeals' ruling, but hereby objects to it and notes for the record that other courts have recognized that collateral consequences of conviction, including registration as a sex offender, are relevant to the "need" for the sentence imposed to reflect just punishment.[7]

## 2.    Need for Adequate Deterrence, 18 U.S.C. § 3553(a)(2)(B)

The Court of Appeals found that this Court's conclusion that deterrence would not be advanced by a higher sentence was "inexplicable."  665 F.3d at 767.  The explanation is as follows and as set forth in Part IV.A.2 and A.3, *infra*.

---

[7] *See, e.g.*, *United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (on remand from the Supreme Court for reconsideration in light of *Gall*, overruling its prior holding that it was inappropriate for the district court to consider the lasting effects of being required to register as a sex offender); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (in a case involving a conviction for possession of child pornography after *Gall*, affirming the district court's finding that the defendant "warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct," because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment," *id.* § 3553(a)(2)(A), and "adequate deterrence," *id.* § 3553(a)(2)(B)); *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (affirming below-guideline sentence based in part on court's findings that defendant suffered substantial mental and personal stress as a result of his prosecution, because the court's findings "were directly relevant to the § 3553(a) analysis, which requires sentences to reflect, among other things, "the history and characteristics of the defendant," the need to "protect the public from further crimes of the defendant," the need to "provide just punishment for the offense," and the need to "afford adequate deterrence").

The empirical evidence is unanimous that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"), (App. 25); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."), (App. 26); David Weisburd *et al*., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment), (App. 27); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame.").

The Sentencing Commission has found that "[t]here is no correlation between recidivism and guidelines' offense level. . . . While surprising at first glance, this finding should be expected. The guidelines' offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing*

*Guidelines*, at 15 (2004) ["U.S. Sent'g Comm'n, *Measuring Recidivism*"], (App. 29).  *See also* Part IV.A.3.  And according to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions."  Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011), (App. 30).

Nor does lengthy imprisonment of child pornography possessors have any deterrent or preventive effect on the production or dissemination of child pornography.  As explained further in Part IV.A.2, *infra*, this is in part because "it is a problem of widespread dissemination over computers of child pornography, and it is an international problem, it is a worldwide problem," as this Court noted.  Tr. at 28 (11/7/09).  There is no evidence "remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet."  *Beiermann*, 599 F. Supp. 2d at 1103; *id.* at 1103-04 ("[W]e cannot sentence Internet users and sharers of child pornography fast enough or long enough to make a dent in the availability of such material on the Internet," and while deterrence is a "laudable" goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of.").

### 3.    Need for Incapacitation, 18 U.S.C. § 3553(a)(2)(C).

A primary assumption underlying Congress's actions with respect to the child pornography guideline has been that possessors of child pornography are likely to sexually abuse children.[8] This belief is contrary to the empirical research in general, and is unjustified based on the evidence in this case.

Current empirical research demonstrates that "first-time child pornography possession only offenders appear to be very low risk of sexual recidivism [of any kind], in contrast to those with

---

[8] *See* note 3, *supra*, and Part IV.A.1, *infra*.

any prior or concurrent criminal convictions or those who engage in other sexual offending (e.g., attempted or actual contacts with a child, production of child pornography)," Written Statement of Michael C. Seto, Ph.D., C. Psych. before the U.S. Sent'g. Comm'n at 4 (Feb. 15, 2012), (App. 31)[9] and "online offenders who had no history of contact offenses almost never committed contact sexual offenses."  Michael C. Seto *et al.*, *Contact Sexual Offending by Men With Online Sexual Offenses*, 23 Sexual Abuse 124, 137 (2011), (App. 32); *see also* Written Statement of Richard Wollert, Ph.D. before the U.S. Sent'g. Comm'n, at 14-17, 21-22 (Feb. 15, 2012) (reporting that in his study of 72 federal child pornography offenders under supervision, including three production offenders, with varying criminal histories, two were arrested for possessing child pornography and none were arrested for a contact offense within four years);[10] Helen Wakeling *et al.*, *Comparing the Validity of the RM 2000 Scales and OGRS3 for Predicting Recidivism by Internet Sexual Offenders*, 23 Sexual Abuse: J. Res. & Treatment 146, 164 (2011) (child pornography offenders "do not, as a group, present a significant risk of escalation to contact sexual offenses."), (App. 33); Jérôme Endrass *et al.*, *The Consumption of Internet Child Pornography and Violent Sex Offending*, 9 BMC Psychiatry 43 (2009) (study that followed 231 child pornography offenders for six years after initial offenses found that only two offenders (.8%) committed a contact offense, and only nine offenders (3.9%) committed a non-contact sexual offense, and concluded that "the consumption of child pornography alone does not seem to represent a risk factor for committing hands-on sex offenses . . . at least not in those subjects without prior convictions for hands-on sex offenses"), (App. 17); Michael C. Seto & Angela W. Eke, *The Criminal Histories and Later*

---

[9] Available at
http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearings_and_Meetings/20120215-16/Testimony_15_Seto.pdf.

[10] Available at http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearings_and_Meetings/20120215-16/Testimony_15_Wollert_2.pdf.

*Offending of Child Pornography Offenders,* 17 Sexual Abuse 201, 207-08 & tbl.III (2005) (finding that 1.3% of those who had committed child pornography offending only recidivated with contact sex offenses; "our finding does contradict the assumption that all child pornography offenders are at very high risk to commit contact sexual offenses involving children.")(App. 34); L. Webb *et al.*, *Characteristics of Internet Child Pornography Offenders: A Comparison with Child Molesters*, 19 Sexual Abuse 449, 463 (2007) (finding Internet-only offenders "significantly less likely to fail in the community than child molesters," and concluding that "by far the largest subgroup of internet offenders would appear to pose a very low risk of sexual recidivism"), (App. 18).   As one district court recently put it, "the empirical literature [] generally concludes that there is little—if any—evidence of a direct correlation between viewing child pornography and the viewer's commission of 'contact' sexual offenses."  *Marshall*, 2012 WL 2510845, at *2.

Not only are child pornography offenders at low risk to re-offend in general, but Mr. Bistline had "no risk factors among the 20 factors" in the Sexual Violence Risk-20 test administered by Dr. Tennenbaum.   Sealed Exhibit at 5 (Psychological Consultation at 5 (12/9/2009)).   Dr. Tennenbaum concluded that "the likelihood of repeat offending is very low" and that there was "no data" to "suggest that Mr. Bistline poses any physical danger to children," "to repeat the offense, or engage in similar activities."  *Id.*

Indeed, Mr. Bistline's history and characteristics make him a very low risk to re-offend. According to the Commission, recidivism rates in general (defined to include technical supervised release violations) "decline relatively consistently as age increases," from 35.5% for offenders under age 21, down to 12.7% for offenders age 41 to 50, and down to 9.5% for offenders over age 50.  U.S. Sent'g Comm'n, *Measuring Recidivism* at 12 & Exh.9, (App. 29).  For sex offenders, too, recidivism declines with age, and only a very few child sex offenders recidivate after age 60.

*See* R.K. Hanson, *Recidivism and Age: Follow-up Data from 4,673 Sexual Offenders*, 17 J. Interpers. Violence 1046, 1054 (2002), (App. 35).  "The only factors found relevant to sentencing decisions that also affected the likelihood of recidivism were age and marriage.  The finding that age reduced the likelihood of committing subsequent offenses is consistent with the body of research that finds that offenders 'age out' of crime.  The finding that marriage has a significant effect on recidivism also is consistent with other research which has found that marriage is associated with lower crime rates."  Tina L. Freiburger & Brian M. Iannacchione, *An Examination of the Effect of Imprisonment on Recidivism*, 24 Crim. Just. Stud. 369, 377 (2011), (App. 36).  The cost of incarcerating prisoners age 50 and older has been estimated to be two to four times that of the general inmate population.[11]  "In addition to the economic costs of keeping older prisoners incarcerated, it is important to consider whether the infringement upon the liberty interest of an older prisoner who is no longer dangerous is justified."[12]

The Commission's research also demonstrates that employment, education, and family ties and responsibilities all predict reduced recidivism, *see* U.S. Sent'g Comm'n, *Measuring Recidivism* at 12-13 & Ex. 10, (App. 29); U.S. Sent'g Comm'n, *Recidivism and the "First Offender"* 8 (2004), as does substantial other research.[13]  And cognitive behavioral therapy

---

[11] U.S. Dep't of Justice, National Institute of Corrections, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, at 11 (2004) (*Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*), *available at* http://www.nicic.org/pubs/2004/018735.pdf, (App. 23); Oklahoma Department of Corrections, *Managing Increasing Aging Inmate Populations* (Oct. 2008), *available at* http://www.doc.state.ok.us/adminservices/ea/Aging%20White%20Paper.pdf, (App. 37).

[12] William E. Adams, *The Incarceration of Older Criminals:  Balancing Safety, Cost, and Humanitarian Concerns*, 19 Nova L. Rev. 465, 466 (1995), (App. 38).

[13] *See* Miles D. Harer, Federal Bureau of Prisons, Office of Research and Evaluation, *Recidivism Among Federal Prisoners Released in 1987*, at 5-6, 54 (1994), http://www.bop.gov/news/research_projects/published_reports/recidivism/oreprrecid87.pdf, (App. 39); Correctional Service Canada, *Does Getting Married Reduce the Likelihood of Criminality*, Forum on Corrections Research, Vol. 7, No. 2 (2005), (App. 40); Robert J. Sampson & John H. Laub, *Crime and Deviance Over Life Course:  The Salience of Adult*

substantially reduces recidivism for sex offenders.  U.S. Dep't of Justice, Center for Sex Offender Management, *Understanding Treatment for Adults and Juveniles Who Have Committed Sex Offenses* 10 (2006), (App. 64).

As the government noted in its sentencing memorandum three years ago, Mr. Bistline's long marriage, strong family support, education and gainful employment until his retirement "surely would support an inference, along with defendant's age, that he would be unlikely to re-offend."  Gov't Sent'g Mem. at 5.  The government objected, however, that Mr. Bistline had not received counseling.  Mr. Bistline has now successfully completed a year of weekly cognitive behavioral therapy.

While a small minority of defendants convicted of possessing child pornography may again view child pornography and an even smaller minority may molest children, Mr. Bistline is not one of them.  The sentence should reflect the fact that Congress's contrary assumption is unfounded in this case.  All of the evidence indicates that Mr. Bistline will never view child pornography again. Supervised release with conditions limiting and monitoring Mr. Bistline's use of a computer and authorizing the Probation Officer to require further treatment if necessary is more than sufficient to ensure that he never does.

### 4. Need for Medical Care and Correctional Treatment in the Most Effective Manner, 18 U.S.C. § 3553(a)(2)(D).

Mr. Bistline has successfully completed extensive psychological treatment for the underlying problems that led to this offense, and is currently on Prozac to treat his depression.  Mr. Bistline, at age 71 and with multiple serious health problems, requires medical treatment on an

---

*Social Bonds*, 55 Am. Soc. Rev. 609 (1990), (App. 41); Robert J. Sampson, John H. Laub & Christopher Winer, *Does Marriage Reduce Crime?  A Counterfactual Approach to Within-Individual Causal Effects*, 44 Criminology 465, 497-500 (2006), (App. 42); Shirley R. Klein *et al.*, *Inmate Family Functioning*, 46 Int'l J. Offender Therapy & Comp. Criminology 95, 99-100 (2002), (App. 43).

ongoing basis.  His physical and mental health problems are unlikely to be even adequately treated in in prison, much less in the most effective manner.  *See* Part I.A, *supra*; Sealed Exhibit at 7 (Letter of Dr. Carducci).

## II.   The Sentence Requested Will Avoid Unwarranted Disparities and Unwarranted Similarities, 18 U.S.C. § 3553(a)(6).

Whether any difference among sentences is warranted or unwarranted depends on the individual circumstances of each case and their relationship to the purposes of sentencing. "Unwarranted disparity is defined as different treatment of *individual* offenders who are similar in relevant ways, or similar treatment of *individual* offenders who differ in characteristics that are relevant to the purposes of sentencing."  U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing:  An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* 113 (2004), (App. 44).

As shown above in Part I and below in Part IV, the guideline calculation gives heavy weight to factors based on assumptions about the seriousness of the offense and general deterrence that are unfounded in general and particularly in this case.  The guideline range fails to take into account any of Mr. Bistline's characteristics demonstrating that there is no need to imprison him to protect the public and that treatment and rehabilitation will be achieved in the most effective manner in the community.   In this case, a substantial variance is necessary to avoid unwarranted uniformity between Mr. Bistline and dissimilar defendants who committed dissimilar conduct.  *See Gall*, 552 U.S. at 55 (in imposing a sentence of probation, district court appropriately "avoid[ed] unwarranted similarities").

This Court must also weigh sentencing practices in other courts against the § 3553(a) factors in this case and any unwarranted disparity created by the guideline itself.  *Kimbrough*, 552

42

U.S. at 108.  The data show that a sentence of one day in custody, a significant period of home confinement, and supervised release for ten years would not create unwarranted disparity.

In fiscal year 2011, only 32.8% of defendants sentenced under § 2G2.2 nationwide received a sentence within the guideline range, and 65.6% were below the range.  Judges imposed below-range sentences in 48.1% of cases without a government motion, in 14.6% of cases based on a government motion for a variance, and in 3% of cases based on a government motion under § 5K1.1.  *See* U.S. Sent'g Comm'n, *2011 Sourcebook of Federal Sentencing Statistics*, tbl.28.  In contrast, the average rate of below-range sentences without a government motion in all cases was only 17.4% and the government sought variances in only 4.4% of all cases.  *Id.*, tbl.N.

In fiscal year 2011, forty-seven defendants sentenced under § 2G2.2 nationwide received no imprisonment or a term of imprisonment no more than six months, and forty-four of these defendants were in Criminal History Category I like Mr. Bistline.  *See Placement of Sentences Under U.S.S.G. §2G2.2 – FY 2011* at 4, http://www.fd.org/docs/select-topics---sentencing/ placement-of-sentences-under-u-s-s-g-2g2-2---fy-2011.pdf?sfvrsn=4.    Of those forty-four defendants in Criminal History Category I, half had an offense level (unadjusted for acceptance of responsibility) of 29 (like Mr. Bistline) or less, and half had an offense level of 29 or more. *Id.* at 5.

In the Sixth Circuit in fiscal year 2011, 71.7% of defendants sentenced under § 2G2.2 in Criminal History Category I were sentenced below the guideline range, 53.8% without a government motion and 17.9% with a government motion.  Appendix 1, tbl.1.  No defendant in Criminal History Category I with the same enhancements as Mr. Bistline was sentenced within the range; 71.4% (five of seven) received a sentence below the range without a government motion, and 28.6% (two of seven) received a sentence below the range with a government motion.  *Id.*

43

tbl.2.  Of the 146 defendants in Criminal History Category I (including those subject to the 5-year mandatory minimum for receipt or distribution), seven defendants were sentenced to no imprisonment or imprisonment up to 6 months. *Id.* tbl.3.  Five of those seven defendants had an offense level less than 29, and two had an offense level greater than 29.  *Id.* tbl.4.  Of all defendants in all criminal history categories convicted of the sale, distribution, transportation, shipment, receipt, or possession of child pornography, 5.5% received a sentence of straight probation, probation including home confinement, or a split sentence.  Appendix 2, tbl.1.  Finally, 52.8% of those sentenced under § 2G2.2 in the Southern District of Ohio in fiscal year 2011 received a sentence below the guideline range without a government motion, 33.3% received a sentence below the guideline range with a government motion, and only 13.9% received a sentence within the guideline range.  *Id.* tbl.2.

The tone of the decision by the Court of Appeals in this case might lead an observer to believe that non-custodial sentences in these cases constitute an extreme miscarriage of justice, in defiance of the law and more generally, common sense.  However, many courts have imposed sentences exactly like sentences previously imposed in this case, without any Government appeal. Those cases are as follows:

*United States v. Malakoff*, No. 1:09-CR-00051 (D.D.C. 2009) (defendant was sexually abused as a child and suffers from post traumatic stress disorder); *United States v. Wright*, No. 09-CR-311 (D.D.C. 2010) (sentenced to 5 years' probation (where guideline range was 33-41 months) with the special condition that the defendant continue in mental health treatment and perform 600 hours of community service); *United States v. Moreira*, No. 10-CR-002 (D.D.C. 2010) (sentenced to 5 years' probation with victim restitution ordered totaling $11,600 where clinical evaluations indicated defendant did not present a risk of harm and defendant had family support and strong

work history); *United States v. McDonald*, No. 3:08-CR-30031 (D. Mass. 2008) (defendant underwent therapy); *United States v. Helbig*, No. 08-CR-30052 (D. Mass. 2009) (sentenced to 5 years' probation, six months of which in a halfway house and six months on home confinement, based on defendant's immaturity and lack of judgment, deep contrition and understanding of the seriousness of the offense, lack of risk of harm to children, and particularly strong family support); *United States v. Ramos*, No. 08-CR-30034 (D. Mass. 2010) (sentenced to 4 years' probation, 12 months of which in a halfway house, where defendant had no criminal history and had suffered from major depression over many years); *United States v. Teves*, 11-CR-10351 (D. Mass. 2012) (sentenced to 5 years' probation, the first six months on home confinement with electronic monitoring where defendant's treating physicians reported that he presents no danger and that incarceration would interrupt successful treatment); *United States v. Reardon*, 11-CR-10325 (D. Mass. 2012) (sentenced to 5 years' probation where the defendant was very timid and had a history of bipolar disorder and suicide attempts); *United States v. Proulx*, 11-CR-10274 (D. Mass. 2012) (sentenced to 5 years' probation, the first 6 months on home detention with electronic monitoring, where defendant had no pedophilic interest in children, a strong work history, and strong family support); *United States v. Guismondi*, No. 07-CR-00610 (E.D.N.Y. 2009) (developmentally disabled defendant who was victim of sexual abuse); *United States v. Arzberger*, No. 08-CR-894 (S.D.N.Y. 2010) (sentenced to 5 years' probation where guideline range was 41-51 months); *United States v. Carpenter*, No. 08-CR-06256 (W.D.N.Y. 2009) (defendant possessed several videocassettes containing at least 150 illegal images); *United States v. Waters*, No. 11-CR-98 (D. Vt. 2012) (young, immature defendant, making progress in treatment, vulnerable in prison, little risk of re-offending); *United States v. Graci*, No. 2:09-CR-00131 (E.D. Pa. 2009) (defendant, a former elementary school teacher, purchased access to child pornography websites on three

different occasions); *United States v. Butler*, No. 1:07-CR-00466 (M.D. Pa. 2008) (defendant was in his sixties with no prior criminal conduct); *United States v. Rubino*, No. 4:08-CR-00114 (M.D. Pa. 2009) (defendant was a mentally challenged man with prior drug convictions who possessed 25 disks containing child pornography); *United States v. Stewart*, No. 05-CR-242 (D.N.J. Sept. 30, 2005) (sentenced to 3 years' probation with 12 months home confinement where defendant was 87 years old at the time of sentencing); *United States v. Connelly*, No. 07-CR-830 (D.N.J. 2008) (sentenced to 5 years' probation and a $1000 fine where guideline range was 78-97 months); *United States v. Dulak*, No. 08-CR-490 (D.N.J. 2009) (young, intelligent defendant with documented mental health history); *United States v. Birdsall*, No. 11-CR-134 (D.N.J. 2011) (20-year-old offender who collected more than 1800 images and 74 videos using file-sharing software); *United States v. Calderon-Sabalier*, No. 06-CR-0122 (D.P.R. 2006); *United States v. Colon-Rodriguez*, No. 07-CR-00481 (D.P.R. 2008); *United States v. Machmer*, No. 04-CR-097 (E.D. Va. 2005) (defendant had significant social skill development issues); *United States v. Simpson*, No. 08-CR-0267 (E.D. Va. 2008) (65-year-old defendant with health problems); *United States v. Teagno*, No. 09-CR-0328 (E.D. Va. 2009); *United States v. Saenz*, No. M-05-CR-877 (S.D. Tex. 2011) (defendant had been abused as a child, served five years of home confinement, and never acted out; he possessed 126 images, including those of boys being raped); ***United States v. Boyden***, **No. 2:06-CR-20243 (E.D. Mich. 2007)** (defendant purchased access to three child pornography websites over a number of years and searched for illegal images); ***United States v. Cernik***, **No. 07-20215, 2008 WL 2940854 (E.D. Mich. 2008)** (defendant currently in treatment, employed, and incarceration would increase, not decrease defendant's risk to the public); ***United States v. Grosinsky***, **No. 08-CR-20090, 2008 WL 5062845 (E.D. Mich. 2008)** (sentenced to one day in prison followed by 5 years of supervised release, and 100 hours of community service where

probation recommended a variance and where the images were of the defendant and a mature-looking male only 3 months shy of 18 who solicited the defendant, the defendant was in treatment and "displays an understanding of his errant ways, and is unlikely to repeat his wrongful conduct"); *United States v. Ashcraft*, **No. 10-cr-20409 (E.D. Mich. 2010)** (sentenced to 5 years' probation where defendant was 40 years old with a long history of social awkwardness and depression and was in treatment while on pre-trial supervision); *United States v. Colby*, **No. 09-CR-20401 (E.D. Mich. 2010)** (78-year-old defendant with health issues who distributed, received, and possessed illegal images through file-sharing program); *United States v. Young*, **No. 09-CR-252 (W.D. Mich. Feb. 5, 2010)** (sentenced to one day in prison followed by 7 years of supervised release, and a fine of $7,000, where defendant was completely disabled due to multiple sclerosis and suffered severe depression); *United States v. Syzmanski*, **No. 08-CR-417 (N.D. Ohio 2011)** (sentenced to one day in prison followed by 5 years of supervised release where 54-year-old defendant had strong work record and community support, health problems, and therapist indicated that he presented no risk to children); *United States v. Lang*, **No. 09-CR-036 (M.D. Tenn. Nov. 21, 2012)** (sentenced to time served (6 days) followed by 7 years of supervised release with the condition that he teach in prison for 40 hours a week for 3 years, plus a $10,000 fine where defendant had been a professor of sociology for 35 years, had strong family and community support, had only a minimal amount of child pornography, and immediately sought therapy); *United States v. Hall*, **No. 12-CR-20119 (W.D. Tenn. Jan. 16, 2013)** (as corrected on Feb. 20, 2013) (sentenced to time served (one day) followed by 10 years of supervised release, with 5 years on home confinement, where defendant had been sexually abused as a child, suffered from serious medical problems and depression, and had a long work history); *United States v. Miller*, No. 05-CR-00974 (N.D. Ill. 2006) (defendant possessed five illegal videos and an additional 32 deleted

illegal images); *United States v. Manke*, No. 09-CR-172, 2010 U.S. Dist. LEXIS 3757 (E.D. Wis. 2010) (defendant possessed more than 1200 images, chatted with others to obtain more images, made progress in mental health treatment before sentencing); *United States v. DeHaven*, No. 08-CR-31 (N.D. Iowa 2009) (defendant had social anxiety disorder and a strong work history); *United States v. Driskell*, No. 08-CR-641 (E.D. Mo. 2009) (defendant had illegal images available for distribution through file-sharing program, but took steps to delete illegal images, had significant family obligations); *United States v. Smith*, No. 09-CR-0740 (E.D. Mo. 2010) (defendant had strong family and community support); *United States v. Campbell*, No. 09-CR-3023 (D. Neb. 2010) (sentenced to 5 years' probation with 120 days in a halfway house followed by six months of home confinement on electronic monitoring, 100 hours of community service, plus a $7,500 fine, where images were not as serious as most, defendant had successfully passed a polygraph, and forensic evaluations indicated that he presented little risk of recidivism); *United States v. Applequist*, No. 09-CR-120 (D. Alaska 2010) (sentenced to 5 years' probation plus a $12,500 fine where 76-year-old defendant was bed-ridden with Parkinson's disease and chronic obstructive pulmonary disease); *United States v. Horton*, No. 06-CR-1880 (D. Ariz. 2007) (defendant was old and had health problems, possessed more than 600 images); *United States v. Noel*, No. 09-CR-00701 (C.D. Cal. 2010) (socially and emotionally underdeveloped 24-year-old defendant had become addicted to viewing child pornography at age 14 while recuperating from major surgery, which left him physically disabled, and was now in counseling; sentenced to 5 years' probation (down from guideline range of 78-97 months), with the first six months to be served in a "jail-type facility"); *United States v. Shore*, No. 06-CR-00335 (E.D. Cal. 2007) (defendant was victim of molestation, possessed over 4,500 images, and shared images); *United States v. Morrison*, No. 08-CR-167 (E.D. Cal. July 18, 2011) (defendant was 70 years old, government agreed to sentence);

*United States v. Teays*, No. 09-CR-532 (E.D. Cal. 2012) (sentenced to 5 years' probation where defendant had been the victim of sexual abuse as a child, was socially withdrawn, and had been undergoing successful counseling); *United States v. Fulkerson*, No. 10-CR-0526 (S.D. Cal. 2010) (defendant had significant medical problems); *United States v. Gonzalez*, No. 07-CR-328 (W.D. Wash. 2009) (where guideline range was 87-108 months, defendant had never abused children, was cooperative and presented a low risk of re-offending, and the government agreed that a "substantial variance" was warranted (in part because the defendant had not been involved in producing child pornography), sentenced to one day in prison followed by 10 years of supervised release); *United States v. Hansen*, No. 08-CR-5090 (W.D. Wash. 2008) (sentenced to one day in prison followed by 30 years of supervised release to include 80 hours of community service, and a fine of $5,000 where defendant was mildly mentally retarded, had never touched a child, presented limited risk to children, and the government agreed that a "long period of supervised release, combined with electronic home monitoring, will adequately punish [the defendant] and protect the public"); *United States v. Victor*, No. 08-CR-5821 (W.D. Wash. 2010) (where guideline range was 121-151 months, sentenced to one day in prison followed by 10 years of supervised release with the first 6 months on home confinement with electronic monitoring plus 100 hours of community service, where defendant had been in active military duty, was successfully undergoing treatment, was cooperating, presented little risk of harm to children, and the government recommended a downward variance to a guideline range of  27-33 months); *United States v. Flores*, No. 09-CR-60100 (D. Or. 2010) (defendant a 23-year military veteran, lost $1.9 million in retirement benefits as a result of conviction, scrubbed computer to eliminate evidence); *United States v. Pustis*, No. 10-CR-60038 (D. Or. 2010) (sentenced to five years' probation (where guideline range was 87-108 months) and $20,000 fine, where defendant was over 50 years old,

had engaged in extensive therapy since his arrest, passed a polygraph, and presented little risk of committing further crimes); *United States v. Van Dusen*, No. 08-CR-60136 (D. Or. 2010) (sentenced to one day in prison plus up to one year in a residential reentry center and 10 years of supervised release where defendant was mentally and physically frail and defendant presented expert on the Bureau of Prisons stating that the Bureau was not able to address his medical problems very well and that the defendant would be susceptible to extortion and assault); *United States v. Rausch*, 570 F. Supp. 2d 1295 (D. Colo. 2008) (defendant had multiple health problems); *United States v. Meillier*, 650 F. Supp. 2d 887 (D. Minn. 2009) (defendant was mentally disabled and had been the victim of sexual abuse); *United States v. Huffman*, No. 09-CR-20073 (D. Kan. 2010) (defendant was young and attending treatment); *United States v. Rhoads*, No. 12-CR-40078 (D. Kan. 2013) (sentenced to 5 years' probation (guideline range of 97-121 months) where defendant was 18-19 years old at the time of the offense, was a victim of childhood abuse, and was successfully undergoing outpatient sex offender treatment); *United States v. Jones*, No. 04-CR-1840 (D.N.M. 2004) (defendant had Asperger's syndrome and family obligations); *United States v. Hill*, No. 08-CR-00208 (W.D. Okla. 2009) (defendant had been sexually abused, obtained and shared images through file-sharing); *United States v. Angel*, No. 09-CR-00401 (M.D. Fla. 2011) (defendant was 75-year-old with medical needs); *United States v. Tucker*, No. 11-CR-00252 (M.D. Fla. 2012) (sentenced to time served (one day) followed by 15 years of supervised release, with 18 months in home detention with electronic monitoring); *United States v. Bender*, 12-CR-128 (M.D. Fla. 2013) (sentenced to time served (one day) followed by 10 years of supervised release with two years on home confinement where defendant was young, suffered from depression, was vulnerable to abuse in prison, presented a low risk of harm to others, and was doing well in treatment). (Sixth Circuit Cases listed in bold print).

### III.    The Sentence Requested Would Meet the Purposes of Sentencing Under the Circumstances in this Case and Satisfy the Sixth Circuit.

This Court is required to consider "the kinds of sentences available" by statute.  18 U.S.C. § 3553(a)(3).  Congress has provided for a range of sentences, from a term of probation of one to five years to 10 years' imprisonment, and if a term of imprisonment is imposed, has authorized a term of supervised release of at least five years and at most life.  *See* 18 U.S.C. §§ 2252(a)(4)(B), (b)(2), 3583(k).  "Congress thus not only envisioned, but accepted, the possibility that some defendants found guilty of that subsection of the statute would receive no jail time at all."  *United States v. Husein*, 478 F.3d 318, 332 (6th Cir. 2007) (upholding sentence of one day in prison followed by three years' supervised release where statutory range for drug trafficking was 0-20 years).

The Sixth Circuit recently indicated that a sentence of one day in custody, a significant period of home confinement, and ten years' supervised release with conditions would be a sufficient sentence in this case.   In *United States v. Robinson*, 669 F.3d 767 (6th Cir. 2012), the defendant possessed 7,100 images, including images of torture and bondage, and the guideline range was 78-97 months.   The judge varied downward based on Robinson's individualized circumstances, which included his older age (43) and a "debilitating back condition," and imposed a sentence of one day in prison and five years' supervised release, without any period of home confinement.  *Id.* at 772, 775.  Although the Sixth Circuit reversed the sentence as substantively unreasonable, its analysis indicates that if the court had imposed a period of home confinement of 12 or 18 months, the sentence would have been sufficient.   First, it said that the sentence would not deter others because it was "devoid of any significant period of incarceration, home confinement, or substantial fine."  Second, in discussing the need to avoid unwarranted disparities, it distinguished the sentence imposed in Robinson's case from two other one-day sentences it had

previously affirmed, *see United States v. Stall*, 581 F.3d 276 (6th Cir.2009), and *United States v. Prisel*, 316 F. App'x 377 (6th Cir.2008), on the ground that those sentences included a significant fine or period of home detention.  *Id*. at 779.

In *Stall*, the defendant had only 18 images at the time of his arrest, but he had downloaded, viewed, then deleted an unknown number of images over a period of at least five years.  He received the enhancement for images depicting sadistic or masochistic conduct, and faced a guideline range of 57-71 months.  581 F.3d at 276.  In light of the evidence and arguments made at sentencing, the Sixth Circuit upheld as reasonable the sentence of one day in prison, 12 months' home confinement, 10 years' supervised release, and a $5,000 fine, emphasizing that the defendant was in treatment while monitored on supervised release.  *Id*. at 277-78, 283.[14]  In distinguishing *Stall*, the court in *Robinson* described Stall's sentence as "more severe than Robinson's" because it included a "significant period" of home confinement, and emphasized that the district court in *Stall* "conduct[ed] an extensive analysis of how a [five-year] term of supervised release would restrict [the defendant's] freedom and protect the public and explain[ed] why the district court believed this sentence will deter similar offenders and why this case warranted a variance." *Robinson*, 669 F.3d at 779 (alterations in original, internal quotation marks omitted).

In *Prisel*, the defendant possessed 1,189 images and had paid for videotapes.  Under a previous version of the guideline (before the PROTECT Act increases), the applicable guideline range was 27-33 months.  316 F. App'x at 379.  Citing a psychological evaluation indicating the defendant presented no danger to children, the defendant's mental and emotional condition, and

---

[14] The Court of Appeals said that *Stall* was decided under plain error review, *Bistline*, 665 F.3d at 768, but this is not correct.  Although the government's *new* appellate arguments were rejected under plain error review, the Sixth Circuit reviewed the district court's substantive justifications for abuse of discretion, as the government concedes, and found them adequate.  Gov't Supp. Sent'g Mem. at 38 n.26.

family responsibilities, the district court imposed a sentence of one day in prison, three years' supervised release, 18 months home confinement, and a $6,000 fine.  *Id.* at 380.  In affirming the sentence, the Sixth Circuit emphasized the fact that the sentence included 18 months of home detention during the period of supervised release.  *Id.* at 385-86.  In distinguishing *Prisel*, the court in *Robinson* said that Prisel's sentence was "more severe than Robinson's" because it included a "significant period" of home confinement.  *Robinson*, 660 F.3d at 779.[15]

In addition, although there was no policy disagreement in *Robinson*, the Court of Appeals acknowledged that there are grounds for a policy disagreement with the child pornography guideline.  It said that an enhancement that applies in "almost every case"—such as the computer enhancement—is contrary to the purpose of enhancements, which "are meant to increase a sentence for conduct more aggravated than the typical type of offense," and that as a result, § 2G2.2 is "an anomaly." *Id.* at 778.  Regarding the number-of-images enhancement, it said that "in the computer age, [it] ha[s] some doubt that the number of pictures alone captures the gravity of the crime of possession of child pornography."   It recognized that "quantifiable measurements" — like the amount of drugs in a drug case, the amount of loss in a fraud case, and the number of images in a child pornography case — may overstate the seriousness of the offense.  *Robinson*, 669 F.3d at 778 & n.3.  In particular, it suggested that the number-of-images enhancement overstates the gravity of the offense for those who share files but do not necessarily know the number of images to be received, and results in unwarranted disparities because it applies to those who view, trade, and save a large number of files while ignoring those who view, trade, and delete

---

[15] The court in *Robinson* said that *Prisel* was decided under plain error review, *Robinson*, 669 F.3d at 779, but this is not correct. While the court in *Prisel* rejected some of the government's *new* appellate arguments under plain error review, it ultimately reviewed the sentence imposed for abuse of discretion:  "[T]aking into account the totality of the circumstances, . . . we conclude that the district court did not abuse its discretion in departing downward 27 months from the advisory Guidelines range." *Prisel*, 316 F. App'x at 388.

the same number. *Robinson*, 669 F.3d at 778-79. It said the enhancement more appropriately applies to a defendant who "acquired a large number of images" "over a long period of time" and who "paid money" for images. *Id.*

These cases make clear that the requested sentence should satisfy the Sixth Circuit. Here, Mr. Bistline did not pay for, trade, or affirmatively share any images. Though Stall had fewer images on his computer, he viewed many more then deleted them for at least five years. Mr. Bistline viewed child pornography for no more than two years. PSR ¶ 18. Mr. Bistline did not receive the enhancement for sadistic or masochistic images, and like Prisel, presents no danger to children. Unlike Robinson, who was 43 years old and suffered only from back pain, Mr. Bistline is 71 years old and suffers from multiple serious medical problems. He had a heart attack and has had two strokes. He has high blood pressure, wears a pacemaker, cannot see well out of one eye, and is deaf in one ear. He walks with a limp, loses his balance frequently, and takes multiple medications daily. In addition, unlike Robinson, Mr. Bistline is the primary caretaker of his wife, who is 68 years old, suffers from numerous serious health problems, and cannot live alone.

As the Solicitor General noted, the Court of Appeals "did not require the district court to impose a particular sentence on remand."[16] Thus, if adequately justified as the Court of Appeals requires, a sentence of one day in prison, a significant period of home detention, and ten years of supervised release with special conditions should be upheld by the Sixth Circuit.

## IV. The Guideline Rests on Congressional Assumptions That Are Contrary to Empirical Evidence and Commission Action Unsupported By Empirical Evidence, and Recommends a Sentence That Is Greater than Necessary to Serve the Purposes of Sentencing or Any Other Sound Policy Goal.

---

[16] Brief for the United States in Opposition, *Bistline v. United States*, No. 11-1431, 2012 WL 3756871, at *9-10 (Aug. 29, 2012).

Since the guideline for possession of child pornography was first promulgated, the offense level applicable to Mr. Bistline's offense (before acceptance of responsibility) has risen by 17 levels, from 12 to 29, and the range has risen from 6-12 months to 67-78 months, an increase of more than 600%.

**Effect on Mr. Bistline's Guideline Range Over Time**

| Past Practice | Not a crime | |
|---|---|---|
| 1991 – Original Guideline § 2G2.4 | 10 | Base Offense Level |
| | 2 | Prepubescent minor |
| | -2 | Acceptance of responsibility |
| | **10** | **6-12 months** |
| | | |
| 1991 Amendments § 2G2.4 | 13 | Base Offense Level |
| | 2 | Prepubescent minor |
| | 2 | 10 or more items |
| | -2 | Acceptance of responsibility |
| | **15** | **18-24 months** |
| | | |
| 1996 Amendments § 2G2.4 | 15 | Base Offense Level |
| | 2 | Prepubescent minor |
| | 2 | 10 or more items |
| | 2 | Possession as a result of computer use |
| | -3 | Acceptance of responsibility |
| | **18** | **27-33 months** |
| | | |
| 2003 Amendments § 2G2.4 | 15 | Base Offense Level |
| | 2 | Prepubescent minor |
| | 2 | 10 or more items |
| | 2 | Possession as a result of computer use |
| | 5 | More than 600 images |
| | -3 | Acceptance of responsibility |
| | **23** | **46-57 months** |
| | | |
| 2004 Amendments § 2G2.2 | 18 | Base Offense Level |
| | 2 | Prepubescent minor |
| | 2 | Distribution |
| | 2 | Use of computer for the possession of the material |
| | 5 | More than 600 images |
| | -3 | Acceptance of responsibility |
| | **26** | **63-78 months** |

Most of this massive increase was mandated by Congress. Under the Court of Appeals' decision, with respect to enhancements mandated by Congress, this Court must refute Congress's reasons, whether "empirical" or "value judgments," "in terms that are persuasive on policy grounds." 665 F.3d at 763, 764. With respect to enhancements adopted by the Commission without a congressional mandate *and* without empirical grounds, the guideline is vulnerable precisely on that ground. *Id*. at 764.

In *Kimbrough*, the Supreme Court addressed the crack guidelines, which were not directly mandated by Congress but which the Commission based on congressional policy, and refuted Congress's reasons for its policy. 552 U.S. at 94-99. Likewise, Congress, in dictating much of the content of § 2G2.2, relied on "assumptions . . . that more recent research and data no longer support." 552 U.S. at 97. In other respects, the Commission adopted enhancements without a congressional mandate and without empirical grounds. Analogous to the Commission's later "regret" over having based the crack guideline on the mandatory minimum statute, 665 F.3d at 763, the Commission has expressed objections to some of Congress's directives, and is currently preparing a report that is expected to recommend ameliorating changes to the child pornography guideline. *See* U.S. Sent'g Comm'n, *The History of the Child Pornography Guidelines* at 1 n.4, 8 (2009) ["U.S. Sent'g Comm'n, *History*"], (App. 45).

Meanwhile, the Court of Appeals' account of Congress's reasons is incomplete and in part inapposite. It cited two sources for the "grounds" of congressional action in raising offense levels under § 2G2.2: (1) a directive to the Commission set forth in Pub. L. No. 108-21, § 513(c) (2003), and (2) an observation by the Commission that "Congress has demonstrated its continued interest in deterring and punishing child pornography offenses." 665 F.3d at 764.

56

The directive cited by the Court of Appeals is not relevant to the guideline range in this case.  It stated that the "Commission shall review and, as appropriate, amend the Federal Sentencing Guidelines and policy statements to ensure that the guidelines are adequate to deter and punish conduct that involves a violation of" 18 U.S.C. § 2252A(a)(3)(B), which criminalized pandering, "or" 18 U.S.C. § 2252A(a)(6), which criminalized distribution of child pornography to a minor for purposes of inducing the minor to participate in illegal activity.  Pub. L. No. 108-21, § 513(c) (2003).  Mr. Bistline was not convicted of either offense, and the directive had no effect on his guideline range.

The Commission's general observation that Congress was interested in deterring and punishing child pornography offenses will be addressed below in connection with its reasons for directives that affected the guideline range in this case.  The Court of Appeals views deterrence as an empirical ground, and retribution as a value judgment.  665 F.3d at 764 (stating that it is "clear that the grounds of its actions were not only empirical, but retributive—that they included not only deterrence, but punishment").

In order to assist this Court in refuting Congress's reasons, the history of the child pornography guideline as it affected Mr. Bistline's guideline range is set forth in Appendix 3.

### A.      Congressional Components, Reasons Given, and Contrary Evidence

As set forth in Appendix 3, Congress directed the Commission to take four actions relevant to Mr. Bistline's guideline calculation:  (1) increase the base offense level from 10 to 13 in 1991; (2) increase the base offense level from 13 to 15 in 1995; (3) expand the definition of "distribution" to include "non-pecuniary interest"; and (4) add the 2-level enhancement for use of a computer. Congress itself added the number-of-images table, which included the 5-level enhancement for 600 or more images.

Congress did not make formal findings in support of any of its directives to the Commission, but its reasons can be gleaned from the legislative history. This history suggests that Congress acted on three primary beliefs: (1) child pornography possessors are pedophiles who use pornography to sexually abuse children; (2) increasing penalties for possessors will dry up the market and thereby prevent the sexual abuse of children by removing the market incentive for those who abuse children for the purpose of producing new images; and (3) severe penalties will deter others from possessing child pornography. Each belief is based on assumptions that current empirical evidence refutes.

### 1.    The Belief That Child Pornography Possessors Are Pedophiles Who Use Pornography to Molest Children

When it directed the Commission in 1991 to increase the base offense level from 10 to 13, Congress acted on the belief that those who possess child pornography are actually predatory child molesters who use pornography to desensitize, lure, entice, or coerce children to be sexually abused. *See, e.g.*, 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms), (App. 66), (stating that "child pornography plays a central role in child molestations by pedophiles" and is "directly connected to child molestation," citing a congressional commission report stating that pedophiles use child pornography to "lower a child's inhibitions in order to sexually abuse the child"); *id.* at H6736, H6738 (Sept. 24, 1991) (Representative Wolf) ("[T]hose who receive child pornography through the mails are often also involved in the actual sexual abuse of children – or at the very least meet the psychological profile of those likely to engage in molesting children."), (App. 4). When Congress directed the Commission in 1995 to increase the base offense level from 13 to 15, its discussion focused on "predatory pedophiles [who] sell, purchase and swap" child pornography to "satisfy prurient desire." 141 Cong. Rec. S5509 (Apr. 6, 1995) (Senator Grassley), (App. 5). When it directed the Commission to define "distribution" to include distribution for "a

58

nonpecuniary interest," Congress focused on stalkers and abductors who use child pornography to "lower the inhibitions of potential targets." 144 Cong. Rec. S12262 (Oct. 9, 1998) (Senator Hatch), (App. 6).  And while there was never any direct discussion in Congress of the number-of-images enhancement, Congress referred to child pornography as a "tool used by pedophiles to break down the inhibitions of children" and "act out their perverse sexual fantasies" in support of the Feeney Amendment, which added the number-of-images enhancement.  *See* 149 Cong. Rec. S5126 (Apr. 10, 2003) (Senator Hatch), (App. 7). Under this view, punishing child pornography possessors serves as a proxy for punishing child sexual abusers.

However, as explained in Part I.B.1.a, *supra*, this belief is not supported by current research.  In brief, "the evidence to date strongly and rather consistently shows that child pornography consumption itself does not represent a risk factor for contact sexual crimes." Melissa Hamilton, *The Child Pornography Crusade and Its Net-Widening Effect*, 33 Cardozo L. Rev. 1679, 1723-24 (2012) ["Hamilton, *Child Pornography Crusade*"], (App. 9).  Instead, "multiple studies show that child pornography offenders are at a much lower risk for contact sexual offending than previously known contact offenders."  *Id.* at 1723.  Moreover, studies show that a finding of pedophilia "is not synonymous with either contact sexual abuse or child pornography." *Id.* at 1715.  The "Butner study," cited by Senator Hatch in support of the Feeney Amendment, has since been thoroughly discredited and rejected as a basis for punishment.  *See* note 4, *supra*.

Mr. Bistline has not been convicted of sexually abusing a child, has not in fact sexually abused a child, and is at no risk of harming a child.  This distinguishes Mr. Bistline from the offenders Congress had in mind.

Nor is there any evidence that the number of images possessed bears on the likelihood that an offender is a child molester.  Instead, the number of images chosen by Congress is arbitrary,

and so low that "the majority of defendants receive the highest possible enhancement." *Kelly*, 2012 WL 2367084, at *6. With the Internet and programs like Lime Wire, "it takes only marginally more effort to collect 10,000 images than it does to collect ten." Stabenow, *A Method for Careful Study*, at 124, (App. 13). The Sixth Circuit has recognized that the enhancement may overstate or understate the seriousness of the offense, and more appropriately applies to a defendant who "acquired a large number of images" "over a long period of time" and who "paid money" for images. *See Robinson*, 669 F.3d at 778 & n.3.

Thus, not only is the number-of-images enhancement "not linked to any empirical data pertaining to sentencing and the purposes of punishment," *see United States v. Schinbeckler*, 2011 WL 4537907, at *6 (N.D. Ind. Sept. 29, 2011), under the Sixth Circuit's view, it is particularly unsuited for those who, like Mr. Bistline, acquired more than 600 images during a relatively short period of time, never paid for or traded images, and did not affirmatively save or share images.

### 2. The Belief That Severe Punishment for Possession Will Dry Up the Market and Prevent the Abuse of Children

In initially criminalizing the possession of child pornography, Congress acted on the view that those "who possess and view" child pornography represent the "market" for the production of child pornography, and that punishing child pornography possessors will dry up the market and thereby reduce demand for the abuse of children in order to produce child pornography. 136 Cong. Rec. S4730 (Apr. 20, 1990) (Senator Thurmond). It relied on this same view when it directed the Commission to increase the base offense level in 1991. *See* 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) ("[W]e must increase the sentencing levels for child porn if we want to stop child molestations and put a dent in the child porn trade.").[17]  And when it directed the

---

[17] Echoing this view, the government here argued that "it is the trade in the matter that makes it more valuable" and "contributes to more children being abused." *See also* Tr. at 7 (1/7/2010). And the Court of Appeals indirectly relied on this view when it found "inexplicable" this Court's assessment that a higher

Commission to add the 2-level enhancement for use of a computer, Congress was concerned with deterring the online distribution and trade of child pornography. 141 Cong. Rec. S5509 (Apr. 6, 1995) (Senator Hatch) (purpose was to "increase[e] penalties for the use of computers in connection with the distribution of child pornography," in part to "ensure that [the information super] highway is not littered with the debris of child pornography"), (App. 5); *see also id.* (Senator Grassley) (purpose was to "discourage child pornographers from using computers to trade in child pornography").

But Congress was mistaken. As Judge Graham observed at the original sentencing, general deterrence has little to do with this case because "it is a problem of widespread dissemination over computers of child pornography, and it is an international problem, it is a worldwide problem." Tr. at 28 (11/7/09). In fact, many countries do not have laws aimed at child pornography, and of those that do, many do not criminalize the possession of child pornography. John Carr, Commonwealth Internet Governance Forum, *A Joint Report on Online Child Protection Combatting Child Pornography on the Internet* 19 (2010), (App. 46). As a result, there is a large, international legal market for child pornography that exists whether Mr. Bistline is incarcerated for one day or five years. This market is not organized, but is mostly comprised of amateur collectors who can freely and easily obtain images, increasingly via peer-to-peer networks, *see* United Nations Office on Drugs and Crime, *The Globalization of Crime: A Transnational Organized Crime Threat Assessment* 13 (2010), (App. 47), and thus does not operate by the ordinary rules of supply and demand. In this context, severe punishment of a marginal consumer can have little impact on the proliferation of child pornography on the Internet.

---

sentence for Mr. Bistline will not advance the goal of general deterrence. 665 F.3d at 767 (citing *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010), which in turn relied on the Seventh Circuit's view that "[t]he logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so the more will be produced")).

Moreover, while Congress was concerned that computers would make it easy for dangerous offenders to disseminate and trade images, it did not tailor the computer enhancement to meet that concern.  Instead, it required the Commission increase penalties for those who are not dangerous and who did not use the computer in the ways Congress imagined.  The Commission has recognized that the enhancement sweeps too broadly and indicated that the use of a computer might appropriately be considered an aggravating factor only when it was used to widely disseminate pornography or to make it accessible to children.  *See* U.S. Sent'g Comm'n, *1996 Report*, at 28-30 & n.23; *see also Dorvee*, 616 F.3d at 95 (recognizing the Commission's criticism); *Phinney*, 599 F. Supp. 2d at 1042 ("[S]ome computer users are more harmful than others, yet the enhancement provided no distinction.").  Here, Mr. Bistline did not use his computer to trade or affirmatively disseminate images, or to make images accessible to children.  He is not the offender Congress had in mind.

Most important, there is no empirical evidence to support the assumption that children are abused for the sole purpose of creating child pornography for dissemination.  *Id.* at 214 ("[I]n most cases, the images are generated as a result of the abuse, rather than the abuse being perpetrated for the purpose of selling images."); *see also* Janis Wolak *et al.*, *Arrests for Child Pornography Production: Data at Two Time Points from a National Sample of U.S. Law Enforcement Agencies*, 16 Child Maltreatment 184, 192-93 (2011) (The data "suggest that online distribution often was not a motivation for [child pornography] production."), (App. 48).  Even Congress has since recognized that "the production of child pornography is a byproduct of, and not the primary reason for, the sexual abuse of children."  Pub. L. No. 108-21, § 501 (2003).

Accordingly, several courts have found that there is no evidence "remotely supporting the notion that harsher punishment would reduce the flow of child pornography on the Internet."

62

*Beiermann*, 599 F. Supp. 2d at 1103; *id.* at 1103-04 (noting that while deterrence is a "laudable" goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of."); *United States v. Stern*, 590 F. Supp. 2d 945, 952 n.5 (N.D. Ohio 2008) ("The Court is … forced to note the somewhat limited impact of domestic prosecution for a fundamentally international crime. . . . [N]o court should be deluded into believing that limiting domestic consumption alone can eradicate the international market for child pornography."); *Kelly*, 2012 WL 236 7084, at *5 ("The Court is aware of absolutely no evidence suggesting that increased penalties for the consumers of child pornography have decreased the swell of child pornography produced or posted to the internet, or deterred 'hands-on' abuses against children.  To the contrary, while prosecutions of child pornography have skyrocketed, prosecutions of actual sexual abuse of children have remained constant.").  They recognize that possessing even large numbers of images does not affect the market.  *Id.* at *7 ("[T]he tragic realities are such that downloading 500 widely-available images has virtually no effect on the market.  Sadly, the worldwide market for child pornography is so vast that the relative impact of several hundred additional images is minuscule, yet results in a significant increase in the guideline range.") (internal quotation and citation omitted);  *United States v. Raby*, 2009 WL 5173964, at **6-7 (S.D. W. Va. Dec. 30, 2009) ("The worldwide market for child pornography is so vast that the relative market impact of [] having even 592 additional images is minuscule.").

### 3. The Belief That Punishing Possessors of Child Pornography Will Deter the Commission of Child Pornography Offenses

Congress has also apparently relied on the view that severe penalties will deter others from possessing child pornography.  In support of criminalizing the possession of child pornography, Senator Thurmond said that "tough penalties . . . will be a deterrent to those who would sexually

exploit children." 136 Cong. Rec. S9029 (June 28, 1990), (App. 49).  The Court of Appeals here, referring to Congress's actions over the years with regard to child pornography offenses, said it is "clear" that Congress was interested in "deterrence" whenever it acted to increase the guideline range.  *Bistline*, 665 F.3d at 764.  But to the extent that Congress believed that increasing penalties will deter others from possessing child pornography, it was mistaken.  As shown in Part I.B.2, *supra*, empirical research is unanimous that more severe sentences do not decrease the likelihood that others will commit crimes.

To the extent that Congress meant to deter child pornography possessors themselves from committing further crimes, all of the empirical research is in agreement that imprisonment does not reduce recidivism.  *See, e.g.*, Tina L. Freiburger & Brian M. Iannacchione, *An Examination of the Effect of Imprisonment on Recidivism*, 24 Crim. Just. Stud. 369, 377 (2011) ("The results indicate that incarceration did not affect either offenders' likelihood of recidivating or the severity of recidivism."), (App. 36); Howard E. Barbaree *et al.*, Canadian *Psychological Association Submission to the Senate Standing Senate Committee on Legal and Constitutional Affairs* 6 (Jan. 2012) ("Psychology researchers have identified effective methods, or 'what works', to reduce crime – the overwhelming consensus of the literature is that treatment works, incarceration does not."), (App. 50).[18]   As Judge Roger Warren, President Emeritus of the National Center for State Courts, stated in 2007:  "The research evidence is unequivocal that incarceration does not reduce offender recidivism."  Roger Warren, National Center for State Courts, *Evidence-Based Practice to Reduce Recidivism: Implications for State Judiciaries* 11 (2007), (App. 51).[19]   Instead,

---

[18] *Available at* http://www.cpa.ca/docs/file/Government%20Relations/SenateCommitteeSubmission_January302012.pdf.

[19] *Available at* http://nicic.gov/library/files/023358.pdf.

"[i]ncarceration actually results in slightly increased rates of offender recidivism." *Id.*[20]  In other words, "across the offender population, imprisonment does not have special powers in persuading the wayward to go straight.  To the extent that prisons are used because of the belief that they reduce reoffending more than other penalty options, then this policy is unjustified."  Francis T. Cullen *et al., Prisons Do Not Reduce Recidivism:  The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011) ("[H]aving pulled together the best available evidence, we have been persuaded that *prisons do not reduce recidivism more than noncustodial sanctions.*"), (App. 30).  As for why this is so, the Commission and scholars have identified numerous "criminogenic" effects of incarceration, including that prison serves as a school for criminals; severs ties to family and community; diminishes employment options upon release; and reduces rather than increases the inmate's willingness or ability to conform to social norms.[21]

In sum, each of Congress's actions rested on unfounded assumptions.  As the Commission has noted, congressional directives "creat[e] anomalies in the guidelines structure" and "new

---

[20]  *See also* Mark W. Lipsey and Francis T. Cullen, *The Effectiveness of Correctional Rehabilitation:  A Review of Systematic Reviews*, 3 Ann. Rev. L. Soc. Sci. 297, 302 (2007), (App. 52), ("[R]esearch does not show that the aversive experience of receiving correctional sanctions greatly inhibits subsequent criminal behavior.  Moreover, a significant portion of the evidence points in the opposite direction – such sanctions may increase the likelihood of recidivism.  The theory of specific deterrence inherent in the politically popular and intuitively appealing view that harsher treatment of offenders dissuades them from further criminal behavior is thus not consistent with the preponderance of available evidence.").  A recent Missouri study shows "that recidivism rates actually are lower when offenders are sentenced to probation, regardless of whether the offenders have prior felony convictions or prior prison incarcerations."  Missouri Sentencing Advisory Commission, *Probation Works for Nonviolent Offenders*, 1 Smart Sentencing 1 (June 2009), http://www.courts.mo.gov/file.jsp?id=45429, (App. 53).  On a three-year follow up from the start of probation or release from prison, first or second-time offenders on probation were incarcerated at a significantly lower rate (36%) than those who had been sent to prison (55%).  *Id.*

[21]  *See generally* Martin H. Pritikin, *Is Prison Increasing Crime*, 2008 Wis. L. Rev. 1049, 1054-72 (cataloging eighteen criminogenic effects of incarceration), (App. 54); Lynne M. Vieraitis, Tomaslav V. Kovandzic, & Thomas B. Marvel, *The Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002*, 6 Criminology & Pub. Pol'y 589, 614-16 (2007), (App. 55); *see also* U.S. Sent'g Comm'n, Staff Discussion Paper, *Sentencing Options under the Guidelines* 19 (1996) (recognizing imprisonment has criminogenic effects, including contact with more serious offenders, disruption of legal employment, and weakening of family ties), (App. 56).

sentencing disparities," and "are potentially in tension with the fundamental Sentencing Reform Act objectives of delegating to an independent, expert body in the judicial branch of the government the finer details of formulating sentencing policy, and revising that policy in light of actual court sentencing experience over time." U.S. Sent'g Comm'n, *Mandatory Minimum Penalties in the Federal Criminal Justice System* 122-23 (1991), (App. 57). Yet, as shown next, the relevant amendments promulgated by the Commission by its own choice were also without empirical support.

**B.    The Commission's Choices**

As set forth in Appendix 3, when Congress directed the Commission to define "distribution" to include distribution for a "nonpecuniary interest," Congress did not direct the Commission to add the 2-level enhancement for distribution that applies in Mr. Bistline's case. Nor did Congress direct the Commission to consolidate § 2G2.4 with § 2G2.2 in 2004, which resulted in the application of the distribution enhancement in simple possession cases regardless of *mens rea* and regardless of the purpose of the distribution. The Commission also chose to increase the base offense level from 15 to 18, and to count each video as 75 images. Each action was done without empirical support.

*Distribution not for pecuniary gain, thing of value, or to a minor, and without mens rea.* The Commission provided no empirical basis for adding the 2-level enhancement for distribution that is not for pecuniary gain or "thing of value," or to a minor. USSG App. C, amend. 592 (Nov. 1, 2000); USSG § 2G2.2(b)(3)(F). Instead, it referred to "congressional concerns" that "pedophiles" distribute pornography over the Internet "to desensitize children to sexual activity, to convince children that sexual activity involving children is normal, and to entice children to engage in sexual activity." It did not give any reason for increasing sentences for those sentenced

under § 2G2.2 who did not engage in that conduct, and thus were not the object of Congress's concern.

Moreover, when the Commission consolidated § 2G2.4 with § 2G2.2, the result was that the enhancement now applies in simple possession cases whenever there was *any* distribution of any kind, and regardless of *mens rea*, a result the Commission did not explain or even acknowledge. The extremely wide net thus cast by the Commission ensnares those, like Mr. Bistline, whose offense conduct involved only the most passive form of distribution, occurring not as an effort to distribute images or to distribute them to children, but as a by-product of the operation of the Lime Wire program. The enhancement goes far beyond congressional concerns, is not based on empirical data, does not further any sentencing purpose, and is unsound.

*Increase to base offense level from 15 to 18.* In 2004, the Commission increased the base offense level from 15 to 18 "because of the increase in the statutory maximum term of imprisonment from 5 to 10 years" as part of the PROTECT Act, "and to maintain proportionality with [the new five-year mandatory minimum for] receipt and trafficking offenses," the guidelines for which were calibrated to "reach or exceed" the mandatory minimum in nearly every case. USSG, App. C, amend. 664 (Nov. 1, 2004); *see also* U.S. Sent'g Comm'n, *History* at 44-46. In other words, the Commission simply "looked to the mandatory minimum sentences set in the [PROTECT] Act, and did not take account of 'empirical data and national experience.'" *Kimbrough*, 552 U.S. at 109; *see also Bistline*, 665 F.3d at 763-64 (Commission "simply lifted the ratio off the rack of" the mandatory minimum statute, "not tak[ing] account of empirical data and national experience," and was "vulnerable on precisely that ground").

The Commission has since acknowledged that the mandatory minimum to which Mr. Bistline's sentence is linked "may be excessively severe." U.S. Sent'g Comm'n, *Report to the*

*Congress:  Mandatory Minimum Penalties in the Federal Criminal Justice System* 365 (2011).  It noted that 71% of judges surveyed "state that the mandatory minimum penalty for receipt of child pornography is too high," *id.*, and that prosecutorial charging practices suggest that prosecutors also believe that the mandatory minimum penalty is too high.  *Id.*  Thus, the current base offense level is not only devoid of empirical basis, but contrary to national experience.

*Counting each video as 75 images.*  In 2004, the Commission decided to count "[e]ach photograph, picture, computer, or computer-generated image, or any similar visual depiction [as] one image."  USSG, App. C, amend. 664 (Nov. 1, 2004); USSG § 2G2.2 cmt. (n.4(B)(ii)).  It further instructed that each "video, video-clip, movie, or similar recording shall be considered to have 75 images."  *Id.*  As a result, as in Mr. Bistline's case, possessing 56 digital videos increased the number of "images" from 361 (subject to a 4-level enhancement) to 4,505, subject to a 5-level enhancement.

The Commission did not provide any reason for this change.  It later explained that the Department of Justice had proposed subjecting each video to a 2- or 3-level enhancement, that it had accepted that position, and it counted each video as 75 images so that a single video would receive a 2-level enhancement under Congress's number-of-images table.  *See* U.S. Sent'g Comm'n, *History* at 43-44 (explaining that it selected 75 images because it is "squarely in the middle of the 2-level increase range").  In other words, the Commission's choice to use 75 images for each video was not based on empirical evidence, but was based on the Department of Justice's request and Congress's number of images table, which itself was adopted without explanation or justification.  The Commission provided no evidence that persons who possess videos as opposed to still images are more culpable or present a greater risk of harm.  Moreover, as the Sixth Circuit suggested in *Robinson*, this enhancement is particularly unsound as applied to a defendant who,

like Mr. Bistline, acquired freely available videos over a relatively short period of time and did not affirmatively save or distribute them.  *See* 669 F.3d at 778.

### C.    Enhancements That Apply In Nearly Every Case

The enhancements for material involving prepubescent minors, use of a computer, and number of images apply in nearly every case sentenced under § 2G2.2.  In fiscal year 2011, 95.3% of defendants received the 2-level enhancement for material involving prepubescent minors; 97.4% received the 2-level enhancement for use of a computer"; and 96% received at least a 2-level enhancement based on the number of images, with most (70.9%) receiving the 5-level enhancement for 600 images or more.  U.S. Sent'g Comm'n, *Use of Guidelines and Specific Offense Characteristics* (2011), (App. 15).[22]

These circumstances thus describe conduct that is "essentially inherent to the crime itself," not aggravating factors describing a more serious offense or higher risk of harm.  *Kelly*, 2012 WL 2367084, at *6.  As the Sixth Circuit has recognized, enhancements that apply in "almost every case" are contrary to the purpose of enhancements, which "are meant to increase a sentence for conduct more aggravated than the typical type of offense." *Robinson*, 669 F.3d at 778 (discussing the enhancement for "use of a computer").  Such enhancements render § 2G2.2 an "anomaly." *Id*.

### D.    A More Appropriate Sentence

Based on the above analysis, this Court has ample grounds to decline to follow § 2G2.2 "in terms that are persuasive on policy grounds."  *Bistline*, 665 F.3d 763, 764.  The ability to disagree on policy grounds "necessarily permits adoption of a replacement [range]." *Spears*, 555 U.S. at 265; *see also Phinney*, 599 F. Supp. 2d at 1043 (declining to follow the 2008 version of §

---

[22] Although Mr. Bistline did not receive the four-level enhancement for images depicting sadistic or masochistic conduct or violence, 79.4% of defendants receive it.  U.S. Sent'g Comm'n, *Use of Guidelines and Specific Offense Characteristics* (2011).

2G2.2, and noting that "[b]ased on the Commission's initial approach, which was based on study, defendant's guideline range in this case would have been 6-12 months.").

The only guideline based, at least in part, on the Commission's "characteristic institutional role," and thus arguably sound, is the original guideline promulgated by the Commission in 1991. That guideline reflected the Commission's analysis of empirical data and national experience suggesting that judges believed that § 2G2.2 was already too severe in non-distribution cases, as evidenced by a 38% rate of downward departure.  *See* 137 Cong. Rec. H6737 (Sept. 21, 1991). The Commission expressed concern that raising penalties even higher "may aggravate this below-guideline rate and heighten sentencing disparity."  *Id.*

Today, below guideline sentences are imposed in 65.6% of cases sentenced under § 2G2.2, which includes hundreds of downward variances under § 3553(a) sponsored by the government. *See* U.S. Sent'g Comm'n, *2011 Sourcebook of Federal Sentencing Statistics*, tbl.28.  While most judges do not follow § 2G2.2, others do, resulting in sentencing disparity.

Under the original guideline, Mr. Bistline's offense level would have been 12.  With two levels off for acceptance of responsibility, *see* USSG § 3E1.1 (1991), his total offense level would have been 10.  In Criminal History Category I, his guideline range would have been 6 to 12 months in Zone B.  *See* USSG, App. C, amend. 372 (Nov. 1, 1991).  And the guidelines would permit a sentence of five years' probation with six months of home confinement.  USSG § 5C1.1(c)(3). Here, in order to take account of the extensive and compelling evidence that any term of imprisonment would be harsher than necessary in light of Mr. Bistline's age, health, family circumstances, low risk of recidivism, and successful efforts in therapy, Mr. Bistline asks this Court to impose a sentence of one day in custody, a significant period of home confinement, and

ten years' supervised release with special conditions—a greater loss of liberty than even the original guideline would require.

In declining to follow § 2G2.2 on policy grounds, this Court will be in good company. Seventy percent of district court judges believe that the guideline range for possession of child pornography is too severe.  *See* U.S. Sent'g Comm'n, *Results of Survey of United States District Judges*, tbl.8 (2010), (App. 58).[23]   And 83% believe that sentences other than straight imprisonment should be made more available under the guidelines for child pornography cases, whether probation (19%), probation with community or home confinement (23%), or a split sentence of incarceration with community or home confinement (41%).  *Id.* tbl. 11.  As more fully set forth in Part II, *supra*, judges sentence below the guideline range recommended by § 2G2.2, sometimes far below, in the large majority of cases.  Congress directed the Commission to take this data into account in reviewing and revising the guidelines, *see* 28 U.S.C. § 994(o), and it is in the process of attempting to do so.  *See* U.S. Sent'g Comm'n, *History* at 1 nn.4, 8.

## V.      The Policy Statements to Which the Court of Appeals Refers are Not "Pertinent," and May Not Be Used to Deny a Variance.

As demonstrated in Part I, Mr. Bistline's advanced age, poor health, and need to care for his wife are highly relevant to the purposes of sentencing under § 3553(a).  The Court of Appeals acknowledged that this Court "was entitled to consider these circumstances," but held that the sentence imposed was not adequately justified because this Court did not consider the Commission's departure policy statements regarding age (USSG § 5H1.1), physical condition (USSG § 5H1.4), and family circumstances (USSG § 5H1.6), which, according to the Court of Appeals, "are all discouraged factors under the guidelines."   *Id.* at 767.  The court cited *United*

---

[23] Available at http://www.ussc.gov/Research/Research_Projects/Surveys/20100608_Judge_Survey.pdf.

*States v. Christman*, 607 F.3d 1110 (6th Cir. 2010), which said that "section § 3553(a)(5) requires that the district court consider applicable policy statements issued by the Sentencing Commission," *id.* at 1119.

Judge Graham did consider the government's various arguments based on policy statements but rejected them. The government initially argued that under § 5H1.6, a downward "departure" for family circumstances was permitted only in "exceptional circumstances," which it claimed were not present here, and did not attempt to claim that the policy statement controls variances. *See* Gov't Sent'g Mem. at 6 (Nov. 4, 2009). It later acknowledged that the restrictions on departures initiated by the PROTECT Act "went away with *Booker*," Tr. at 9 (Jan. 7, 2010), and argued that they had "no effect on the guideline debate" in this case, Gov't Supp. Sent'g Mem. at 24-25. Yet, it also argued that this Court improperly relied on age, education, employment and family responsibilities because §§ 5H1.1, 5H1.2, and 5H1.6 rendered those factors "impermissible grounds for departure" and "not ordinarily relevant in granting a variance." Tr. at 55 (1/7/2010). On appeal, the government claimed that these policy statements "contradict" this Court's consideration of Mr. Bistline's history and characteristics as grounds for a variance under § 3553(a). Judge Graham obviously considered but rejected the government's welter of shifting arguments.

This Court should reject the advice of the policy statement in ruling on a variance in this case for several reasons. First, policy statements regarding "departures" are not "pertinent" to variances. Second, the Court may not, under Supreme Court and statutory law, deny a variance based on policy statements that prohibit or discourage consideration of factors that are highly relevant under § 3553(a)(1) and (2) and that must be considered under § 3661. Third, the policy statements offer no useful advice and therefore should be disregarded.

### A.    The Policy Statements Are Not "Pertinent."

As the Supreme Court said in *Rita*, a defendant's argument for a lower sentence may "take *either* of two forms."  551 U.S. at 344 (emphasis added).  The defendant may "argue *within the Guidelines' framework*, for a departure." *Id*. (emphasis in original).  Or, the defendant may "argue that, independent of the Guidelines, application of the factors set forth in 18 U.S.C. § 3553(a) warrants a lower sentence."  *Id*. (citing *United States v. Booker*, 543 U.S. 220, 259-60 (2005)).  The Supreme Court has also made plain that policy statements pertaining to "departures" do not control variances. *See Irizarry v. United States*, 553 U.S. 708, 714-15 (2008) ("[T]here is no longer a limit comparable to [a departure] on the variances from Guidelines ranges that a district court may find justified under the sentencing factors set forth in 18 U.S.C. § 3553(a).").

While a district court must consider "pertinent" policy statements, 18 U.S.C. § 3553(a)(5), policy statements are "pertinent" only to the first kind of argument the Supreme Court identified in *Rita*:  "departures."  Mr. Bistline seeks a variance, not a "departure."  Not only do these policy statements not apply to variances by their terms, but as further explained in Section C, these policy statements are, by necessity under Supreme Court law, not "pertinent" to variances.

### B.    What the Policy Statements Say

Before explaining further why the policy statements referred to by the Court of Appeals cannot be used to deny a variance in this case, it is important to clarify what those policy statements actually say.  What they say reveals why they cannot be used to deny a variance.  Moreover, neither the government nor the Court of Appeals appears to be aware of what they say.

In cases in which the defendant was convicted of an offense "*other than* child crimes and sexual offenses," USSG § 5K2.0(a) (emphasis added), family circumstances are "not ordinarily relevant in determining whether a departure may be warranted."  USSG § 5H1.6.  This means that

the court "may depart" only if the "the court finds, pursuant to 18 U.S.C. § 3553(b)(1), that there exists an aggravating or mitigating circumstance . . . of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different from that described." USSG § 5K2.0(a)(1). It also means that the family circumstances in question "may be relevant . . . in determining whether a departure is warranted . . . only if . . . present to an exceptional degree." USSG § 5K2.0(a)(4). In addition, the application notes to USSG § 5H1.6 contain specific requirements, including that the defendant's care or financial support be "irreplaceable." *Id.*, cmt. (n.1(B)(iv)).

In cases in which the defendant was convicted of an offense "*other than* child crimes and sexual offenses," USSG § 5K2.0(a) (emphasis added), a "departure" based on age or physical condition must likewise comply with excised 18 U.S.C. § 3553(b)(1), *see* USSG § 5K2.0(a)(1), but, as amended in 2010, these factors now "may be relevant in determining whether a departure is warranted," but only "if . . . individually or in combination with other offender characteristics, [they] are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." *See* USSG § 5H1.1, USSG § 5H1.4.

Although the Court of Appeals appeared to believe that the policy statements described above would apply in this case, 665 F.3d at 767, they would not apply in this case even if Mr. Bistline had requested a "departure" because he has been convicted of possessing child pornography.

The policy statements regarding "downward departures in child crimes and sexual offenses," USSG § 5K2.0(b), are different. As part of the PROTECT Act, Congress enacted § 3553(b)(2) to state that, for child and sex crimes, a sentencing court "shall" impose a sentence

74

within the guideline range unless the court finds "there exists a mitigating circumstance of a kind or to a degree, that [] has been affirmatively and specifically identified as a permissible ground of downward departure" in the Commission's policy statements.  *See* 18 U.S.C. § 3553(b)(2); Pub. L. No. 108-21 § 401(a) (2003).  It amended §5K2.0 to prohibit "downward departure" on a ground that "has not been affirmatively and specifically identified as a permissible ground of downward departure" in Chapter 5, Part K.  USSG  § 5K2.0(b).  It amended § 5H1.6 to state that family circumstances are "not relevant not relevant in determining whether a sentence should be below the applicable guideline range."  USSG § 5H1.6.  It added a policy statement to state the "age may be a reason to depart downward only if and to the extent permitted by §5H1.1," and that "extraordinary physical condition may be a reason to depart downward only if and to the extent permitted by §5H1.4."  USSG § 5K2.22.  *See* Pub. L. No. 108-21 § 401(b).

In sum, if Mr. Bistline had requested a "departure" in this case, a departure based on family circumstances would be prohibited.  *See* USSG § 5H1.6.  His age and physical impairment "may be a reason to depart downward only if and to the extent permitted by" USSG § 5H1.1 and USSG § 5H1.4.  *See* USSG § 5K2.22.  That is, they "may be relevant in determining whether a departure is warranted" only "if . . . individually or in combination with other offender characteristics, [they] are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines."  *See* USSG § 5H1.1, USSG § 5H1.4.  His physical impairment would also have to be "extraordinary."  USSG § 5K2.22(2).

### C.    The Policy Statements May Not Be Used to Deny a Variance.

The Supreme Court excised 18 U.S.C. § 3553(b)(1) because, by virtue of the standard contained therein (and still cited and quoted in the Commission's policy statements) and its incorporation of the Commission's policy statements by reference ("court shall consider only the sentencing guidelines, policy statements, and official commentary" in determining whether a

"circumstances was adequately taken into consideration"), it made the guidelines mandatory.  *See United States v. Booker*, 543 U.S. 220, 234-35 (2005) (finding the guidelines were mandatory, and thus unconstitutional, because "departures are not available in every case, and in fact are unavailable in most"); *id*. at 245, 259 (excising § 3553(b)(1).  For the same reason, all of the courts of appeals, including the Sixth Circuit, have held that § 3553(b)(2) must be excised as well.  *United States v. Shepherd*, 453 F.3d 702, 704 (6th Cir. 2006).  Thus, a variance may not be denied on the basis of policy statements that prohibit or discourage a departure.

In *Gall*, the Supreme Court upheld a probationary sentence based on factors the Commission's policy statements prohibited, *i.e.*, voluntary withdrawal from a conspiracy and discontinuing the use of drugs, or deemed "not ordinarily relevant," *i.e.*, age, education, and employment.  552 U.S. at 51-60.  In approving the judge's reliance on these factors, the Supreme Court disregarded the Commission's policy statements and imposed no requirement that district courts even consider them.  In doing so, the majority rejected Justice Alito's argument in dissent that the policy statements should be given "significant weight."  *Id.* at 61-68 (Alito, J., dissenting).  The Court also rejected the Eighth Circuit's "extraordinary circumstances" test for a variance.  *Id.* at 46.  Thus, a variance may not be denied based on a policy statement that prohibits consideration of family circumstances, or based on policy statements that permit consideration of age and physical impairments only if "present to an unusual degree and distinguish the case from the typical cases covered by the guidelines," USSG §§ 5H1.1, 5H1.4, a standard that is indistinguishable from the "extraordinary circumstances" test rejected in *Gall*.

In *Pepper v. United States*, 131 S. Ct. 1229 (2011), the Supreme Court rejected the Eighth Circuit's bar on considering post-sentencing rehabilitation.  *Id.* at 1241-42.  It held that post-sentencing rehabilitation is "highly relevant to several of the § 3553(a) factors," including the

history and characteristics of the defendant, the need for deterrence, incapacitation, and rehabilitation, and "may also critically inform the sentencing judge's overarching duty under § 3553(a) to 'impose a sentence sufficient, but not greater than necessary'" to serve the purposes of sentencing.  *Id.* at 1242.  In Pepper's case, there was "no question" that Pepper's post-sentencing rehabilitation—which included successful drug treatment, education, employment, and a renewed relationship with his father—was relevant to his history and characteristics, shed light on his likelihood of committing further crimes, suggested a diminished need for further correctional treatment, and "[bore] directly on the District Court's overarching duty to 'impose a sentence sufficient, but not greater than necessary' to serve the purposes of sentencing."  *Id.* at 1242-43.  Moreover, the Court emphasized, 18 U.S.C. § 3661 provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court may receive and consider for the purpose of imposing an appropriate sentence."  The Court therefore held that the Eighth Circuit's rule barring the consideration of these circumstances contravened §§ 3553(a) and 3661.  *Id.* at 1241-43.  In this part of its opinion, the Supreme Court did not mention §5K2.19, a policy statement prohibiting consideration of post-sentencing rehabilitation.

In a different part of the opinion, the Court responded to an argument by *amicus* appointed by the Court to defend the Eighth Circuit's judgment that the outcome should be governed by § 5K2.19.  *Id.* at 1247.  It found that the policy statement rests on "wholly unconvincing policy rationales not reflected in the sentencing statutes Congress enacted."  *Id.* at 1247.  The Court rejected, consistent with its decision in *Gall*, amicus's suggested rule that would "elevate[]" §3553(a)(5) over factors that are relevant under other subsections of § 3553(a), and directed the district court to give "appropriate weight" to those relevant factors.  *Id.* at 1249-50.

In sum, in considering a variance, the only question is whether the characteristics of the defendant are relevant to the purposes of sentencing under § 3553(a)(2) and its overarching duty to impose a sentence that is sufficient but not greater than necessary to satisfy those purposes.  The question is not, and cannot be, whether a policy statement prohibits or discourages the factor.  If raised in opposition to a variance, policy statements that prohibit or discourage consideration of factors that are relevant under § 3553(a) may not be used to deny a variance.

### D.        The Policy Statements Offer No Useful Advice.

In *Pepper*, the Supreme Court examined a policy statement for which the Commission had provided an explanation.  It found that explanation "wholly unconvincing" and "not reflected in the sentencing statutes Congress enacted."  *Id.* at 1247.   The Commission has never given any reason for discouraging the consideration of advanced age, health problems, or family circumstances, (App. 59).[24]  *See* USSG 5H1.1, 5H1.4, 5H1.6.  In the absence of any rationale, and in light of the evidence that these factors are highly relevant to the purposes of sentencing, and the fact that no limitation may be placed on the information this Court may consider in choosing an appropriate sentence, the Commission's policy statements are without basis, contrary to law, and should not be followed.

Although the Court of Appeals did not require this Court to "refute" Congress's reasons for deeming family circumstances "not relevant" in child pornography cases and for limiting variances based on age and physical condition to the narrow terms of the Commission's policy statements, there are ample grounds to do so.  The only reason given in the official legislative history was a wish to reduce the incidence of departures.  H.R. Rep. No. 108-66, at 58-59 (2003) (Conf. Rep.), (App. 60).  That reason is invalid under *Booker*, and is the very reason the Supreme

---

[24] *See* Amy Baron-Evans & Kate Stith, Booker *Rules*, 160 U. Pa. L. Rev. 1631, 1657-58  (2012).

Court excised § 3553(b).  *See Booker*, 543 U.S. at 234-35 (finding that the guidelines were mandatory, and thus unconstitutional, because "departures are not available in every case, and in fact are unavailable in most"); *cf. Pepper*, 130 S. Ct. at 1244-46 (invalidating § 3742(g)(2) because it requires district courts "to treat the Guidelines as mandatory in an entire set of cases" on remand). The sponsor of the bill, Congressman Feeney, opined that sex offenders have an "enormously high recidivism rate" and that there would be "a lot less child abuse, and perhaps less kidnapping if we adopt this amendment." 149 Cong. Rec. H2424 (Mar. 27, 2003) (statement of Rep. Feeney), (App. 7).  Mr. Feeney was wrong on both counts.  *See* Parts I.B.3 & IV.A, *supra*.

If the Court of Appeals was suggesting that this Court may not consider Mr. Bistline's age, health, and family circumstances in granting a variance, that position would not only violate Supreme Court law, but it is clearly not the law across the nation.  In fiscal year 2011, judges cited age as a reason to sentence below the guideline 995 times; 72.8% of these below-range sentences were based on § 3553(a) alone and not on a "departure" in whole or in part.  Judges cited family circumstances 2,000 times; 73.5% were based on § 3553(a) alone.  Judges cited physical condition 815 times; 63.5% were based on § 3553(a) alone.  *See* U.S. Sent'g Comm'n, *2011 Sourcebook of Federal Sentencing Statistics*, tbls. 25, 25A, 25B.  In response to a Commission survey in 2010, 67% of district court judges said that age is "ordinarily relevant," 64% said that physical condition is "ordinarily relevant," and 62% said that family circumstances are "ordinarily relevant."  U.S. Sent'g Comm'n, *Results of Survey of United States District Judges January 2010 through March 2010*, tbl. 13 (2010).[25]  Asked why they do not rely on departures, 76% of judges said that the "*Guidelines Manual* does not contain a departure provision that adequately reflects the reason for

---

[25] Available at
http://www.ussc.gov/Research/Research_Projects/Surveys/20100608_Judge_Survey.pdf.

the sentence outside the guideline range," and 65% said the policy statements are "too restrictive." *Id*., tbl.14.   Obviously, it is not the law that these policy statements control variances.

If this Court declines to take into account this evidence because it reads the Court of Appeals' decision as requiring adherence to the policy statements, Mr. Bistline urges the Court to make that basis clear on the record.

If, instead, the Court of Appeals would only require this Court to "consider" the "departure" policy statements to which it referred in response to the government's argument that these policy statements control variances, it should, in doing so, reject their advice as unsound and in conflict with the governing sentencing statutes and Supreme Court law.

## III.    CONCLUSION

For the reasons stated, Mr. Bistline respectfully requests that this Court grant his request for a variance, and impose the requested sentence of one day in custody, a period of home detention with electronic monitoring that is significant in this Court's judgment (with credit for all of the time already served), and ten years of supervised release with the conditions that he register as a sex offender with the state of Ohio (as he has done); any further treatment deemed necessary by the Probation Officer in addition to the one year weekly treatment program Mr. Bistline has already completed; no access to the internet except for educational or employment purposes and as approved by the Probation Officer, and permission for the Probation Officer to install monitoring software in any computer he owns or to which he has access; and no association with any unrelated minor out of the presence of another responsible adult.  Such a sentence furthers the principles and purposes of sentencing as set forth in 18 U.S.C. § 3553(a).

Moreover, if this Court interprets the decisions from the Court of Appeals to compel the imposition of any particular sentence, Defendant respectfully requests that this Court set forth such

a conclusion in a written decision.  Likewise, if this Court feels that the decisions by the Court of Appeals have impinged upon this Court's ability to weigh any of the § 3553(a) factors, either individually, or collectively, Defendant requests that this Court set forth such a conclusion in a written decision. Furthermore, should this Court conclude that the Court of Appeals decisions require this Court to provide a higher level of deference to the congressionally mandated guideline applicable to this case, Defendant respectfully requests that this Court set forth such a conclusion in a written decision.  Finally, to the extent that this Court concludes that the decisions by the Court of Appeals compel this Court to consider or follow any policy statements set forth in the United States Sentencing Guidelines, Defendant respectfully requests this Court set forth such a conclusion in a written decision.

Respectfully submitted,

/s/ Jonathan T. Tyack
Jonathan T. Tyack      (0066329)
Tyack, Blackmore, Liston & Nigh Co., L.P.A.
536 South High Street
Columbus, Ohio 43215
(614) 221-1341 Telephone
(614) 228-0253 Facsimile
jttyack@tblattorneys.com
*Attorney for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 30th day of May, 2014, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Jonathan T. Tyack
Jonathan T. Tyack      (0066329)
Tyack, Blackmore, Liston & Nigh Co., L.P.A.
*Attorney for Defendant*